David T. Pritikin (Pro Hac Vice)
dpritikin@sidley.com
SIDLEY AUSTIN LLP
1 South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

M. Patricia Thayer (SBN 90818)
pthayer@sidley.com
Philip W. Woo (SBN 196459)
pwoo@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

I. Neel Chatterjee (SBN 173985)
nchatterjee@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 614-7400
Facsimile: (650) 614-7401

William H. Wright (SBN 161580)
wwright@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone: (213) 629-2020
Facsimile: (213) 612-2499

Attorneys for Plaintiff
SYNOPSYS, INC., a Delaware Corporation

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SYNOPSYS, INC., a Delaware Corporation, | Case No. 3:12-cv-06467-MMC |
| Plaintiff, | |
| vs. | **PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** |
| MENTOR GRAPHICS CORPORATION, an Oregon Corporation, | |
| Defendant. | **Date: October 28, 2013**<br>**Time: 9:00 a.m.**<br>**Place: Courtroom No. 7, 19th Floor**<br>**Judge: Hon. Maxine M. Chesney** |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     LEGAL STANDARDS ........................................................................................2

III.    TECHNICAL BACKGROUND OF THE ASSERTED PATENTS ...................................3

IV.     CLAIM TERMS ................................................................................................5

      A.      "assignment condition" ...........................................................................5

      B.      "predetermined assignment conditions" ....................................................6

      C.      "data function" and "load function" ........................................................8

      D.      "GOTO statement" ................................................................................12

      E.      "hardware independent user description of a logic circuit" and "operational characteristics of said logic network" ..................................................14

      F.      "level sensitive latch" ...........................................................................19

      G.      "inferring" .........................................................................................19

      H.      "resetable memory" ..............................................................................21

V.      CONCLUSION.................................................................................................23

1

# TABLE OF AUTHORITIES

2
**Page(s)**

3
CASES

4
*Abbott Labs. v. Sandoz, Inc.*,
5
    566 F.3d 1282 (Fed. Cir. 2009)...............................................................................................8

6
*Abbott Labs v. Syntron Bioresearch, Inc.*,
    334 F.3d 1343 (Fed. Cir 2003)...............................................................................................8

7
*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
8
    618 F.3d 1354 (Fed. Cir. 2010)......................................................................................13, 15

9
*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*
    289 F.3d 801 (Fed. Cir. 2002).........................................................................................13, 15
10

11
*Dealertrack, Inc. v. Huber*,
    674 F.3d 1315 (Fed. Cir. 2012).........................................................................................2, 11

12
*Electro Medical Systems v. Cooper Life Sciences*,
13
    34 F.3d 1048 (Fed. Cir. 1994)..................................................................................................2

14
*Epistar Corp. v. ITC*,
    566 F.3d 1321 (Fed. Cir. 2009)..........................................................................................7, 8
15

16
*Hill-Rom Co. v. Kinetic Concepts, Inc.*,
    209 F.3d 1337 (Fed. Cir. 2000)................................................................................................2

17
*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
18
    256 F.3d 1323 (Fed. Cir. 2001)................................................................................................2

19
*Jansen v. Rexall Sundown, Inc.*,
    342 F.3d 1329 (Fed. Cir. 2003).........................................................................................13, 15
20

21
*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995)......................................................................................... passim

22
*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
23
    521 F.3d 1351 (Fed. Cir. 2008)................................................................................................6

24
*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...............................................................2, 3, 5, 18
25

26
*SkinMedica, Inc. v. Histogen, Inc.*,
    2013 U.S. App. LEXIS 17627, 62-63 (Fed. Cir. Aug. 23, 2013) .........................................3, 5

27
*SRI Int'l v. Matsushita Elec. Corp. of America*,
28
    775 F.2d 1107 (Fed. Cir. 1985)................................................................................................3

*Symantec Corp. v. Computer Assocs. Int'l, Inc.*
    522 F.3d 1279 (Fed. Cir. 2008)...............................................................................13, 15

*Unique Concepts, Inc. v. Brown*,
    939 F.2d 1558 (Fed. Cir. 1991).........................................................................................2

*Vitronics Corp. v. Conceptronics, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)..............................................................................2, 3, 5, 18

*Voda v. Cordis Corp.*,
    536 F.3d 1311 (Fed. Cir. 2008)........................................................................................8

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF – CASE NO. 3:12-CV-06467-MMC

1       Plaintiff Synopsys, Inc. ("Synopsys") submits this opening brief regarding the construction

2  of terms appearing in U.S. Patent Nos. 5,530,841 ("'841 patent"), 5,680,318 ("'318 patent"),

3  5,748,488 ("'488 patent"), and 6,836,420 ("'420 patent")  (collectively, the "Asserted Patents").[1]

4  **I.    INTRODUCTION**

5       The Asserted Patents relate generally to the process of creating modern complex integrated

6  circuits (ICs) or "chips," and in particular to "logic synthesis," which is the process of using a

7  computer tool to convert (or "synthesize") a human designer's descriptions of the operations of the

8  IC into the electronic circuit components  (or the "logic circuits" or "logic networks") of the IC that

9  perform those operation.  ICs are the foundation for all modern electronics, from mobile phones to

10 computers to televisions.  Synopsys was established in 1986 for the express purpose of developing

11 and marketing ground-breaking logic synthesis technology.  Synopsys pioneered the commercial

12 application of logic synthesis that has since been adopted by every major semiconductor design

13 company in the world.  *See* Woo Decl. Ex. K; Woo Decl. Ex. L.  Without this technology, the

14 complex IC designs of today would not be possible.

15      In dispute are the meanings of eight claim terms in the Asserted Patents.[2]  The parties have

16 taken sharply divergent approaches to the construction of the disputed terms.  Synopsys's proposed

17 claim constructions adhere to the Federal Circuit's directives that the intrinsic record—the claims,

18 specification, and prosecution history—provides the best evidence for understanding the invention

19 the inventors conceived and patented.  In contrast, Defendant Mentor Graphics Corporation

20 ("Mentor") proposes constructions which deviate from the unambiguous intrinsic record, import

21 limitations from the specification of the Asserted Patents, or are inconsistent with the ordinary

---

[1] Copies of the Asserted Patents are provided as Exhibits A-D to the Declaration of Philip W. Woo ("Woo Decl."), filed herewith.

[2] The day before this brief was due (Sept. 18, 2013), Mentor served supplemental interrogatory responses alleging for the first time that the asserted "machine readable medium" claims of the '420 patent require "processing ***both*** behavioral and RTL level descriptions." According to Mentor, the claim language that supports this alleged non-infringement position is the limitation: "inferring the existence of a resettable memory from a behavioral **or** RTL level description of a semiconductor circuit."  '420 patent, claim 11 (emphasis added).  To the extent Mentor is permitted to pursue this alleged non-infringement defense and it rests on issues of claim construction, Mentor should have raised it as part of the claim construction process and timely notified Synopsys of its contentions.  Synopsys reserves all rights with respect to this untimely disclosed claim construction position.

1   meanings of the disputed terms.  Further, even though Mentor's own expert, Dr. Majid

2   Sarrafzadeh, acknowledges that the meanings of most of the disputed terms are "clear" in light of

3   the intrinsic record, he offers arguments in favor of Mentor's constructions that contradict that

4   record.  *See e.g.,* Woo Decl. Ex. I at ¶¶ 79, 91, 106, 109, 129, 134, 140.

## II.   <u>LEGAL STANDARDS</u>

6        "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

7   which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

8   (Fed. Cir. 2005) (*en banc*) (citation omitted).  In construing disputed claims, a court's primary

9   source is the intrinsic evidence of the patent.  *See Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d

10  1576, 1582-83 (Fed. Cir. 1996).  Intrinsic evidence includes "the claims, the specification, and the

11  prosecution history," *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991), as

12  well as the abstract, *see Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 (Fed. Cir.

13  2000).  Preferably, patent claims are construed based solely on the intrinsic evidence.  *See*

14  *Vitronics*, 90 F.3d at 1583.

15       Claim construction "begin[s] and remain[s] centered on the language of the claims

16  themselves, for it is that language that the patentee chose to use."  *Interactive Gift Express, Inc. v.*

17  *CompuServe, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).  In general, claim language is "'given

18  [its] ordinary and customary meaning.'"  *Phillips*, 415 F.3d at 1312 (*quoting Vitronics*, 90 F.3d at

19  1582).  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would

20  have to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1313.

21       The claims must also "be read in view of the specification, of which they are a part."  *Id.* at

22  1314.  The patent specification "may act as a sort of dictionary, which explains the invention and

23  may define terms used in the claims."  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986

24  (Fed. Cir. 1995*).  Although a court considers the specification in determining the meaning of a

25  disputed claim, it generally is improper to limit the scope of the claim to the examples set forth in

26  the specification.  *See, e.g.*, *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012) ("As

27  a general rule, it is improper to read limitations from a preferred embodiment described in the

28  specification.");* Markman,* 52 F.3d at 980; *Electro Medical Systems v. Cooper Life Sciences*, 34

2

1   F.3d 1048, 1054 (Fed. Cir. 1994).  The claims of the patent, not the specification, "measure the

2   invention."  *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1122 (Fed. Cir. 1985).

3           Finally, the district court reviews the prosecution history, which is "often of critical

4   significance in determining the meaning of the claims."  *Vitronics*, 90 F.3d at 1582.  And, the court

5   may, but often need not, consider extrinsic evidence, which "consists of all evidence external to the

6   patent and prosecution history, including expert and inventor testimony, dictionaries, and learned

7   treatises."  *Phillips*, 415 F.3d at 1317 (internal quotation and citation omitted).  However, extrinsic

8   evidence such as expert testimony is given no weight if it is based on "conclusory, unsupported

9   assertions," or "clearly at odds with the claim construction mandated by the [intrinsic evidence]."

10  *Id.* at 1318; *Vitronics*, 90 F.3d at 1584; *see also SkinMedica, Inc. v. Histogen, Inc.*, 2013 U.S. App.

11  LEXIS 17627, 62-63 (Fed. Cir. Aug. 23, 2013) (district court properly gave expert's opinion no

12  weight because it was "conclusory and incomplete" and "lack[ed] any substantive explanation tied

13  to the intrinsic record").

14  **III.   TECHNICAL BACKGROUND OF THE ASSERTED PATENTS**

15          The Asserted Patents are directed to logic synthesis, a fundamental step in creating the

16  modern, complex ICs that are today at the heart of virtually every electronic product, from mobile

17  phones to computers and televisions.  Contained within an IC are various logic circuits and logic

18  networks, each of which performs particular operations or "behaviors" for processing information.

19  Each logic circuit or network is implemented with tens, hundreds, even potentially thousands, of

20  transistors, resistors, capacitors, or other "hardware" on the IC.[3]  Logic synthesis is the process of

21  using a computer program called a "synthesis tool" to convert a computer file that may include a

22  human designer's high-level description (commonly referred to as a "user description") of the

23  desired behavior or operation of a logic circuit/ network into a "netlist."  The netlist specifies the

24  hardware components which implement the logic circuits and logic networks in the IC.  Synthesis

25  tools—such as those sold by Synopsys—automate aspects of the IC design process, thus

26  ─────────────────

27  [3] As such, each logic circuit is a "hardware element" that is made up of specific hardware (e.g.,
    transistors, resistors, capacitors), although the specific hardware and their connections can vary for
28  different implementations of the logic circuit.

1    permitting vastly more complex IC designs.

2         The '841, '318, and '488 patents (collectively, the "Gregory patents")—which share the

3    same specification[4]—disclose techniques that enable the synthesis of complex logic circuits (*e.g.*,

4    high impedance drivers, level sensitive latches, and edge sensitive flip-flops) from human designer

5    descriptions without requiring the designer to specify the hardware for implementing those

6    circuits—*i.e.*, the user description is "hardware independent." Prior to the inventions of the

7    Gregory patents, only simple logic circuits could be synthesized without requiring the designer to

8    specify the hardware; for more complex logic circuits, the human designers were required to have

9    detailed knowledge about the use and operation of these circuits and specify them expressly in the

10   user description. With the techniques disclosed in the Gregory patents, the computer file input to a

11   synthesis tool may contain user descriptions that are hardware independent as well as ones that are

12   not hardware independent. In one technique of the Gregory patents, a synthesis tool converts a

13   hardware independent user description of the desired operation of a logic circuit/ network into the

14   hardware for the logic circuit. To accomplish this, the synthesis tool uses "hardware description

15   functions" (such as synchronous and asynchronous load and data functions) in combination with

16   "assignment conditions" (each of which may be associated with a variable (*e.g.*, "Q")), to generate

17   the corresponding logic circuit/network.

18        The '420 patent is directed to a process in which a synthesis tool is able to infer and

19   incorporate a resetable memory[5] into the design of an IC as part of the synthesis process. Thus,

20   the '420 patent discloses and claims synthesis of even more complex parts of the IC design than the

21   inventions of the Gregory patents, specifically resetable memory and particular optimized

22   implementations of such memory. These inventions allow an engineer to describe the operations

23   of a desired IC without needing to know the particular implementations available for resetable

24   memory.

25        In short, the inventions of the Asserted Patents both simplify automated logic circuit design

---

26   [4]Because the specifications for the Gregory patents are essentially the same, for brevity, Synopsys
27   cites primarily to the disclosure of '488 patent in this Opening Brief.
     [5]The '420 patent spells "resetable" with one "t." For consistency, Synopsys uses this spelling in
28   this Opening Brief.

and make automated IC design available to human designers with limited knowledge of complex circuit components. *See* Woo Decl. Ex. H at ¶ 13.

## IV.    CLAIM TERMS

### A.    "assignment condition"

| Synopsys's Proposed Construction | Mentor's Proposed Construction |
| --- | --- |
| "the condition under which the hardware description function (*e.g.*, 'AL' or 'AD') is true for a particular variable (*e.g.*, 'Q') in the user description" | "a condition used by a hardware generator to select a hardware element, by determining the logic OR of all of the conditions under which a hardware description function is true for a particular variable" |

The parties agree that the term "assignment condition" did not have a plain and ordinary meaning at the time of invention of the Gregory patents. Woo Decl. Ex. H at ¶ 23; Woo Decl. Ex. I at ¶ 108. Instead, the specification of the Gregory patents <u>expressly</u> defines the term "assignment condition" as "the condition under which the hardware description function is true for a particular variable." '488 patent, Col. 16:5-7. Thus, the specification "act[s] as a sort of dictionary," which explains the invention and defines the term "assignment condition" as used in the claims. *See Markman*, 53 F.3d 967 at 979. Further, during prosecution of the Gregory patents, the patentee stated that the term "'assignment condition' has been defined in the specification." Woo. Decl. Ex. E at 10. Synopsys's proposed construction for "assignment condition" is the one expressly provided in the specification, as confirmed by the prosecution history.

In contrast, Mentor ignores the express definition of "assignment condition" given in the specification and instead proposes a construction that is both unsupported and improperly limits the scope of this term. Further, as discussed herein, Mentor appears to be relying on extrinsic evidence, *i.e.*, the unsupported declaration of Dr. Sarrafzadeh, that is at odds with the claim construction mandated by the intrinsic evidence. *See* Woo Decl. Ex. I at ¶¶ 110, 112-115. Federal Circuit case law is clear that such unsupported expert testimony should be ignored by the Court. *Phillips*, 415 F.3d at 1318; *Vitronics*, 90 F.3d at 1584; see also *SkinMedica*, 2013 U.S. App. LEXIS 17627 at 62-63.

First, nothing in the intrinsic evidence supports requiring an assignment condition to be

5

"used by a hardware generator to select a hardware element" as provided in Mentor's construction. The broadest claims in which the term "assignment condition" appears do not even mention a "hardware generator." The patent discloses that an assignment condition is used to <u>create</u> or <u>generate</u> a hardware element, but nowhere does the intrinsic evidence state or even suggest that hardware elements are "selected" by the assignment condition as required by Mentor's construction. '488 patent, Col. 6:66-7:38; *see also* Woo Decl. Ex. H at ¶ 27. The portion of the specification cited by Dr. Sarrafzadeh in his declaration to support Mentor's "select" language includes the terms "create" and "generate" but not the term "select." Woo Decl. Ex. I at ¶ 110. In fact, Dr. Sarrafzadeh explicitly admits that "assignment conditions [are] used in the <u>generation</u> of hardware elements," *id.* at ¶ 111-12, and Mentor nowhere explains why the language of the patent specification should be ignored.

Second, Mentor's construction adds a requirement of "determining the logic OR of all of the conditions." The claim term itself—i.e., "assignment <u>condition</u> [singular]"—as well as the specification of the Gregory patents is clear that there is <u>only one</u> condition under which the hardware description function is true for a particular variable, not multiple "<u>conditions</u>" as in Mentor's construction. '488 patent, Col. 16:5-7; Col. 17:65-19: 44; *see also* Woo Decl. Ex. H at ¶ 27.

**B.     "predetermined assignment conditions"**

| Synopsys's Proposed Construction | Mentor's Proposed Construction |
|---|---|
| *See* Synopsys's construction for "assignment condition."<br><br>Otherwise, the term "predetermined" has its plain and ordinary meaning, which is "determined before hand." | "an assignment condition that is set in the user description" |

Synopsys believes that no construction is necessary for the term "predetermined assignment conditions" beyond the construction for the term "assignment condition" discussed above. The plain and ordinary meaning of the word "predetermined" adequately expresses what is covered by the claim. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351,

6

1361 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.").

To the extent the Court decides to construe it, the term "predetermined" was well understood to mean "determined beforehand" by one of ordinary skill in the art as of the priority date of the '318 patent. Woo Decl. Ex. H at ¶ 82. General purpose dictionaries define "predetermine" in the same way. *See id* at ¶ 83 (citing *Merriam-Webster's Collegiate Dictionary* (9th Ed. 1998) at 926 (defining "predetermine" as "to determine beforehand.")). Even Mentor's expert confirms this meaning: "One of ordinary skill in the art would have concluded that a 'predetermined' assignment condition is an assignment condition that is <u>determined before some event.</u>" Woo Decl. Ex. I at ¶ 118 (*emphasis added*).

Mentor's construction is inconsistent with the plain and ordinary meaning of the term "predetermined."[6] Mentor's proposed construction improperly limits the scope of the claim by adding limitations for both *what* is making the determination (*i.e.*, the user) as well as *when* the determination is made (*i.e.*, prior to processing of the computer file by the synthesis tool). It must therefore "overcome a heavy presumption that claim terms carry their full ordinary and customary meaning, unless it can show the patentee expressly relinquished claim scope." *Epistar Corp. v. ITC*, 566 F.3d 1321, 1334 (Fed. Cir. 2009). Mentor cannot meet that burden here, and its construction should be rejected.

One of ordinary skill in the art as of the priority date of the '318 patent would be well aware that given the plan and ordinary meaning of "predetermined," an assignment condition (as defined by Synopsys) could be determined at <u>any</u> point beforehand by not only the user, but also by the synthesis software. For example, the '318 patent discloses that assignment conditions may be determined by the synthesis software in an Assignment Condition Generator before being used in a Hardware Generator to create a specific logic circuit. '318 patent, Claims 1-50; Col. 15:35-61.

---

[6] Mentor apparently agrees with Synopsys that the term "assignment condition" does not need to be construed differently when it appears as part of the larger term "predetermined assignment condition," since Mentor's proposed construction for the latter uses the term "assignment condition." *See also* Woo Decl. Ex. I ¶ 118. As such, the dispute between the parties is with respect to the meaning of "predetermined."

1   Nothing in the term "predetermined assignment conditions" as it is used in the claims of the

2   '318 patent requires that the assignment conditions be "set by the user in the user description."

3   Similarly, nothing in the specification assigns the term "predetermined" any special meaning,

4   much less the one advanced by Mentor.  Woo Decl. Ex. H at ¶ 82.  Mentor relies on a single

5   statement in the specification, which states that in <u>one</u> embodiment, "a user may specify either a

6   predetermined condition that must be satisfied, or a clock edge condition."  Woo Decl. Ex. I at ¶

7   120 (citing '841 patent, Col. 15:24-28).[7]  This statement does not contain the type of explicit

8   definitional language that would justify restricting the term to that one embodiment.  *See Abbott*

9   *Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1354-55 (Fed. Cir 2003).

10   Under Federal Circuit law, in order to constitute a disclaimer, there must be "expressions of

11   manifest exclusion or restriction, representing a clear disavowal of claim scope."  *Epistar*, 566

12   F.3d at 1334.  "Indeed, the specification may reveal an intentional disclaimer, or disavowal, of

13   claim scope by the inventor.  However, any such disclaimer must be clear."  *Voda v. Cordis Corp.*,

14   536 F.3d 1311, 1320 (Fed. Cir. 2008) (citations omitted).  Even if a patent specification describes

15   only a single embodiment, claim language should not be limited to that embodiment "unless the

16   patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of

17   manifest exclusion or restriction.'"  *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir.

18   2009) (citations omitted).

19   In this case, the language from the '318 patent upon which Mentor relies does not constitute

20   a clear disavowal of the ordinary claim scope.  The specification merely states that in performing

21   one of the preferred embodiments, "<u>a user may</u> specify either a predetermined condition that must

22   be satisfied, or a clock edge condition."  '318 patent, Col. 15:22-24 (emphasis added).

23   **C.      "data function" and "load function"**

| **"asynchronous data function AD( )" or "asynchronous data function" or "synchronous data function SD( )" or "synchronous data function"** | |
|---|---|
| **Synopsys's Proposed Construction** | **Mentor's Proposed Construction** |
| | |

[7] Mentor's expert admits that "this is the only statement in the '841, '488, and '318 Patents that relates to the timing of a predetermined assignment condition…"  Woo Decl. Ex. I at ¶ 120.

| "a hardware description function for data specifying the condition or conditions under which the variable is [asynchronously/ synchronously] assigned a value" | "a hardware description function specifying the condition or conditions under which the variable is [asynchronously/ synchronously] assigned a logic one value" |
|---|---|
| The terms "asynchronous" and "synchronous" have their plain and ordinary meanings. | The terms "asynchronous" and "synchronous" have their plain and ordinary meanings in the context of the '841, '488, and '318 patents and asserted claims. |
| The plain and ordinary meaning of "synchronous" is "triggered by a timing signal." | The plain and ordinary meaning of "synchronous" in the context of the '841, '488, and '318 patents and asserted claims is "occurring on a clock edge." |
| The plain and ordinary meaning of "asynchronous" is "not synchronous." | The plain and ordinary meaning of "asynchronous" in the context of the '841, '488, and '318 patents and asserted claims is "not controlled by a clock edge." |

| "asynchronous load function AL( )" or "asynchronous load function" or "synchronous load function SL( )" or "synchronous load function" | |
|---|---|
| **Synopsys's Proposed Construction** | **Mentor's Proposed Construction** |
| "a hardware description function for load specifying the condition or conditions under which the variable is [asynchronously/ synchronously] assigned a value" | "a hardware description function specifying the condition or conditions under which the variable is [asynchronously/ synchronously] assigned a value" |
| The terms "asynchronous" and "synchronous" have their plain and ordinary meanings. | The terms "asynchronous" and "synchronous" have their plain and ordinary meanings in the context of the '841, '488, and '318 patents and asserted claims. |
| The plain and ordinary meaning of "synchronous" is "triggered by a timing signal." | The plain and ordinary meaning of "synchronous" in the context of the '841, '488, and '318 patents and asserted claims is "occurring on a clock edge." |
| The plain and ordinary meaning of "asynchronous" is "not synchronous." | The plain and ordinary meaning of "asynchronous" in the context of the '841, '488, and '318 patents and asserted claims is "not controlled by a clock edge." |

The parties agree that the terms "asynchronous data function AD( )," "asynchronous data function," "synchronous data function SD( )" and "synchronous data function" (collectively, the "data function" terms) should be construed consistently, and that the terms "asynchronous load function AL( )," "asynchronous load function," "synchronous load function SL( )" and

9

"synchronous load function" (collectively, the "load function" terms) should likewise be construed consistently.  The parties also agree that the "data function" and "load function" terms did not have a plain and ordinary meaning at the time of invention of the Gregory patents.  Woo Decl. Ex. H at ¶¶ 29 and 41; Woo Decl. Ex. I at ¶ 89.

Both Synopsys and Mentor propose that the "data function" and "load function" terms should be construed to mean "a hardware description function" specifying the condition or conditions under which the variable is assigned some value.  The specification discloses a number of different hardware description functions—including "asynchronous load function, an asynchronous data function, an asynchronous high impedance function, a synchronous load function, a synchronous data function, a synchronous high impedance function, and a 'don't care' function"—each of which specifies the condition under which a variable is assigned some value. *See* '488 patent, Col. 4:13-41.

Synopsys's proposed construction distinguishes the "data function" and "load function" terms from each other, and from the remaining hardware description functions disclosed in the specification, by including the concepts of "data" and "load" which are part of the terms themselves (*i.e.*, asynchronous <u>data</u> function AD ( )," "asynchronous <u>data</u> function," "synchronous <u>data</u> function SD( )," "synchronous <u>data</u> function," asynchronous <u>load</u> function AL ( )," "asynchronous <u>load</u> function," "synchronous <u>load</u> function SL( )," and "synchronous <u>load</u> function" (emphasis added)).

In contrast, Mentor's proposed constructions for the "data function" and "load function" terms fail to meaningfully distinguish these hardware description functions from each other, much less the other hardware description functions disclosed in the Gregory patents.  As such, Mentor's proposed constructions are flawed.

Also, Mentor's proposed construction for the "data function" terms improperly requires that the variable is assigned "a logic one value."  Again, Mentor is seeking to add a limitation that is not required by the claims and is potentially misleading.  None of the claims require that a "data function" be limited to the case where the variable is assigned a logic value one.  Instead, Mentor's construction improperly imports a limitation from embodiments disclosed in the specification of

10

1    the Gregory patents in which the variable is assigned a logic one value. *See e.g., Markman*, 52

2    F.3d at 980; *Dealertrack*, 674 F.3d at 1327 ("As a general rule, it is improper to read limitations

3    from a preferred embodiment described in the specification").  But at least one other embodiment

4    provides that for a data function "SD," a variable ("v") is assigned a "logic zero value" rather than

5    "a logic one value":

6        Notice that in contrast to the definition of assignment condition SL(v), assignment
         condition <u>SD</u>(v) is not limited to just the logic OR function of activation
7        conditions…. When variable v is assigned a constant <u>logic zero value</u> on a clock
         edge, the condition used in evaluation of the logic OR function is a logic zero.
8

9    '488 patent, Col. 20:9-17 (emphases added).

10            Further, Mentor's own expert witness, Dr. Sarrafzadeh, admits that data functions "specify

11   the conditions under which a variable will take a <u>logic 0 or logic 1 value</u>."  Woo Decl. Ex. I at

12   ¶ 96.  Mentor's construction seeks to limit data functions arbitrarily to one value when the

13   specification is clear—and Mentor's own expert witness admits—that a variable may be assigned

14   one of two values. *See also*, Woo Decl. Ex. H at ¶ 32.

15                          **a.        "synchronous" and "asynchronous"**

16            The terms "asynchronous" and "synchronous" appear in each of the "data function" and

17   "load function" terms.  Both Synopsys and Mentor agree that the terms "asynchronous" and

18   "synchronous" were well understood by one of ordinary skill in the art as of the priority date of the

19   '841, '318 and '488 patents.  *See* Woo Decl. Ex. H at ¶¶ 35-36; Woo Decl. Ex. I at ¶ 100.

20            Synopsys proposes that the plain and ordinary meaning of "synchronous" is "triggered by a

21   timing signal" and that the plain and ordinary meaning of "asynchronous" is "not synchronous."

22   One of ordinary skill in the art as of the priority date of the '841, '318 and '488 patents would

23   understand that timing signals may include clock signals, strobe signals from a timer or a counter,

24   and other signals that are synchronous.  Woo Decl. Ex. H at ¶ 38.  Synopsys's proposed

25   construction for "synchronous" does not improperly limit the meaning to only one type of timing

26   signal.

27   Mentor, on the other hand, has offered an overly narrow construction for "synchronous" that seeks

28   to limit the term to only clock signals (edges), thereby excluding other timing signals that would

---

11

have been considered "synchronous" by one of ordinary skill in the art as of the priority date of the '841, '318 and '488 patents. *See* Woo Decl. Ex. H at ¶¶ 38-39. Because Mentor's construction for "synchronous" is too narrow, its construction for "asynchronous" improperly includes timing signals that would be considered "synchronous" by one of ordinary skill in the art as of the priority date of the '841, '318 and '488 patents. *See id.*

Further, nothing in the intrinsic record requires imposition of the "clock edge" limitations that Mentor has added. While Mentor cites passages from the '841 patent which disclose embodiments where synchronous assignments <u>can</u> occur on a clock edge, and asynchronous assignments are not controlled by a clock edge, the specification does not limit assignments to those embodiments. *See* Woo Decl. Ex. H at ¶ 38. In fact, while Mentor's expert disagrees with Synopsys's constructions, he admits that there may be "timing signals" other than clock signals. *See* Woo Decl. Ex. I at ¶ 107.

Mentor's construction for synchronous excludes these synchronous timing signals and thus is arbitrarily narrow. On the other hand, Mentor's construction for "asynchronous" is too broad since, as Mentor's expert witness admits, it fails to exclude timing signals that are not clock signals. *See* Woo Decl. Ex. I at ¶ 107

### D.    "GOTO statement"

| Synopsys's Proposed Construction | Mentor's Proposed Construction |
|---|---|
| The preamble of claim 1 is not a limitation on claim scope. While Synopsys has provided a preliminary construction for language appearing in the claim preamble, such construction should not be considered as an assertion or admission that any preamble language is limiting. | The preamble of claim 1 containing "GOTO statement" is a limitation on the claim scope because it recites essential structure or steps, it is necessary to give life, meaning, and vitality to the claim, it provides an antecedent basis to terms used in the body of the claim, and/or it recites additional subject matter underscored as important by the specification. |
| To the extent the preamble is deemed a substantive limitation, the term "GOTO statement" means "a flow control statement that goes to another part of the user description." | The plain and ordinary meaning of "GOTO statement" is its meaning in programming languages that include that command. |

The term "GOTO statement" is part of the preamble of claim 1 of the '841 patent, and the

1    parties dispute whether it acts as limitation on the claim.  It does not.  "Generally…the preamble

2    does not limit the claims."  *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir.

3    2010).

4           The term "GOTO statement" is part of a statement that describes the purpose, context, and

5    intended use of the claim.  In fact, the preamble provides nothing essential to the invention that is

6    not expressly provided for in the body of the claim.  *See Symantec Corp. v. Computer Assocs. Int'l,*

7    *Inc.*, 522 F.3d 1279, 1288-89 (Fed. Cir. 2008) (if the preamble is "reasonably susceptible to being

8    construed to be merely duplicative of the limitations in the body of the claim," the preamble is not

9    a limitation).  The body of claim 1 specifies the steps of the claimed method, and the preamble

10   simply states the purpose of the invention.  Accordingly, the preamble does not need to be

11   construed.  *See Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-09 (Fed. Cir.

12   2002); *see also Am. Med. Sys.,* 618 F.3d at 1358.  Additionally, the preamble was not amended

13   during prosecution, further confirming that it is not a limitation.  *See Jansen v. Rexall Sundown,*

14   *Inc.*, 342 F.3d 1329, 1333-34 (Fed. Cir. 2003).

15          To the extent the Court decides that the preamble is a substantive limitation (which it

16   should not), the term "GOTO statement" should be defined as "a flow control statement that goes

17   to another part of the user description."  The specification teaches that, as used in the '841 patent, a

18   GOTO statement is defined by its general operation—i.e., it is a statement that "goes to" another

19   part of the user description.  *See e.g.*, '841 Patent, Col. 39:54-40:10 (Table 46).  The specification

20   includes examples of four <u>different</u> statements that are all GOTO statements (*i.e.*, "SWITCH,"

21   "RETURN," "BREAK," and "GOTO").  '841 patent, Col. 11:20-39.  The specification discloses

22   that these examples are from the C programming language, and are meant to be "illustrative only

23   of the principles of this invention and are not intended to limit the invention to the particular names

24   and embodiments described herein."  *Id.*

25          Further, the specification refers to "IF" and "GOTO" statements and discloses that "other

26   flow control statements may be expressed in terms of <u>only</u> these two flow control statements."  *Id.*

27   Therefore, "SWITCH," "RETURN," and "BREAK" are just three examples of "GOTO"

28   statements.  The specification thus makes clear that the term "GOTO statement" is not limited to a

13

statement that literally states "GOTO."  Finally, the specification discloses that the user description is written in a hardware description language (HDL), '841 Patent, Col. 9:60-10:28, and the two leading HDLs as of the priority date of the '841 patent (Verilog and the VHSIC Hardware Description Language (VHDL)) did not have a statement that literally states "GOTO."  *See* Woo Decl. Ex. H at ¶ 55.  Therefore, one of ordinary skill in the art as of the priority date of the '841 patent would have understood that "GOTO statement" as used in the '841 patent would not be meant to require a statement that literally states "GOTO" but rather a statement that "goes to" another part of the user description.  *See id.*

Mentor contends that the term should be given its "plain and ordinary meaning" which is "its meaning in programming languages that include that command" apparently in an effort to argue that it is limited to a very specific flow control statement with the syntax "GOTO."  *See* Woo Decl. Ex. I at ¶ 129.  This approach is flawed and results in a construction at odds with the express teaching of the specification, which makes clear that the "GOTO statement" may be <u>any</u> statement that directs the program to "go to" another part of a user description, including "SWITCH," "RETURN," "BREAK," and "GOTO."  Nothing in the specification supports Mentor's attempt to limit the "GOTO statement" language to a specific statement with the syntax "GOTO."  Mentor offers no reason for "GOTO statement" to be construed to exclude various statements that "go to" another part of the user description, even if those statements do not expressly recite "GOTO."

**E.     "hardware independent user description of a logic circuit" and "operational characteristics of said logic network"**

| "hardware independent user description of a logic circuit" | |
|---|---|
| **Synopsys's Proposed Construction** | **Mentor's Proposed Construction** |
| The preambles of claim 1 of the '841 patent and claims 1, 2, 8 and 9 of the '488 patent are not a limitation on claim scope.  While Synopsys has provided a preliminary construction for language appearing in the claim preambles, such construction should not be considered as an assertion or admission that any preamble language is limiting. | The preambles of claim 1 of the '841 Patent and claims 1, 2, 8, and 9 of the '488 Patent are a limitation on claim scope because they recite essential structure or steps, they are necessary to give life, meaning, and vitality to the claim, they provide an antecedent basis to terms used in the body of the claim, and/or they recite additional subject matter underscored as important by the specification. |

| To the extent any preamble is deemed a substantive limitation, the term "hardware independent user description of a logic circuit" has its plain and ordinary meaning, which is "a user description of the desired operation of a logic circuit, independent of the specific hardware for implementing the logic circuit." | The term "hardware independent user description of a logic circuit" means "a user description of the desired operation of a logic circuit containing only signal levels in a logic network and the conditions under which those signal levels are generated, without describing the structures for implementing the logic circuit" |

| "operational characteristics of said logic network" | |
| --- | --- |
| Synopsys's Proposed Construction | Mentor's Proposed Construction |
| This term has its plain and ordinary meaning, which is "a user description of the desired operation of the logic network, independent of the specific hardware for implementing the logic network." | "a user description of the desired operation of a logic circuit containing only signal levels in a logic network and the conditions under which those signal levels are generated, without describing the structures for implementing the logic circuit" |

As an initial matter, the term "hardware independent user description" is found in the preambles of claim 1 of the '841 patent and claims 1, 2, 8 and 9 of the '488. Synopsys contends that the preambles of these claims are not limiting. "Generally…the preamble does not limit the claims." *Am. Med. Sys.*, 618 F.3d 1354, 1358. In each preamble, the term "hardware independent user description" is part of a statement that describes the purpose, context and intended use of the claim. It is the body of each of claim 1 of the '841 and claims 1, 2, 8 and 9 of the '488 patents that describes the complete inventions. In fact, the preambles provide nothing essential to the inventions that are not expressly provided for in the body of each claim. *See Symantec Corp.*, 522 F.3d at 1288-89 (noting that if the preamble is "reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim," the preamble is not a limitation.). Here, the preambles simply state the purposes of the inventions and provide nothing essential to the inventions and, accordingly, the preambles do not need to be construed. *See Catalina Mktg. Int'l*, 289 F.3d at 808-09 (Fed. Cir. 2002); *see also Am. Med. Sys.,* 618 F.3d at 135. Additionally, these preambles were not amended during prosecution, further confirming that they are not a limitation. *See Jansen*, 342 F.3d at 1333-34.

To the extent that the preambles are deemed a substantive limitation, Synopsys believes that no construction is necessary for the term "hardware independent user description of a logic

1    circuit," as the plain and ordinary meaning of the term adequately expresses what is covered.

2            However, to the extent the Court decides to construe this term, one of ordinary skill in the

3    art would have understood the term "hardware independent user description of a logic circuit" to

4    mean "a user description of the desired operation of a logic circuit, independent of the specific

5    hardware for implementing the logic circuit."  *See* Woo Decl. Ex. H at ¶¶ 57, 59.  Indeed, Mentor's

6    expert confirmed this understanding at his deposition:

7                12        Q. Can you -- what does "hardware independent
                13    user" description mean to you?
8                14        A. Meaning independent of hardware that is a
                15    user description -- or a user description that is
9                16    independent of hardware.

10   Woo Decl. Ex. J at 94:12-16.

11           As is readily apparent, Synopsys's construction for "hardware independent user description

12   of a logic circuit" is consistent with the claim language itself.  Synopsys's construction also is

13   supported by the specification of the Gregory patents.  For example, the specification discloses:

14   "This invention relates … in particular to a method and system for synthesizing a logic circuit from

15   a user description with conditional assignments of values to logic variables and <u>no hardware

16   specific descriptions</u>."  '488 patent, Col. 1:28-33 (emphasis added).  The specification also

17   discloses:  "The user description is a sequence of statements that <u>specify how the desired digital

18   hardware operates…</u>.  <u>Specification of any specific logic element</u>, such as a flip-flop, or any

19   connections between logic elements to generate the desired signals <u>is not required in the user

20   description</u>."  '488 patent, Col. 2:44-52  (emphasis added).  Likewise, the specification discloses:

21   "According to the principles of this invention, a method is provided for <u>synthesizing a logic circuit

22   from a user description that includes only operational characteristics of the logic circuit</u>, e.g.,

23   signals and the circumstances under which those signals are generated."  '488 patent, Col. 7:8-12

24   (emphasis added).

25           Further, the specification gives several examples of different hardware independent user

26   descriptions of logic circuits, including the example shown in Table 8.  '488 patent, Col. 21:58-65.

27   Table 8 is reproduced below:

28

TABLE 8

| An Example of User Description 110 |
|---|
| If ( COND ) |
| Q = D |
| else |
| endif |

In the example above, Table 8 shows a hardware independent user description of a particular operation (*i.e.*, if a particular condition (COND) occurs, then the variable Q is assigned the value of D). This logic operation can be performed by a particular logic circuit (here, a level sensitive "D" latch) which is implemented by certain hardware, but the user description does not specify that hardware. The patent discloses that the synthesis tool processes the hardware independent user description in Table 8 to generate the level sensitive "D" latch shown in Figure 8B (reproduced below). Woo Decl. Ex. H at ¶¶ 63-64.



FIG. 8B

The file history of the application from which the '841 and '488 patent claim priority is also unambiguous about what the patentee meant by "hardware independent." In the June 23, 1993 Response to Office Action, the patentee noted that "Applicants' invention is an automatic logic synthesis unit that has the novel characteristic of generating the logic network starting with a hardware independent description of, for example, flip-flops, multiplexers, level sensitive latches or don't care conditions." Woo Decl. Ex. E at 6. It is therefore abundantly clear from the claims, specification and file histories what the patentee meant by "hardware independent"—that is, user descriptions of the desired operation of logic circuits (*e.g.*, flip-flops and level sensitive latches) that do not include the specification of the hardware for implementing the logic circuits and logic

17

networks that are generated by the synthesis tool from the user description.

In contrast, Mentor's construction seeks to add limitations into the claim – i.e., "containing only signal levels in a logic network and the conditions under which those signal levels are generated." The specification discloses that "signals and the circumstances under which those signals are generated" are simply <u>one example</u> of operational characteristics of the logic circuit that might be part of a hardware independent description of a circuit. *See* '488 patent, Col. 7:8-12.

Mentor's proposed construction is also flawed because it creates ambiguity where there is none. Mentor's construction uses the word "structures" (i.e., "without describing the <u>structures</u> for implementing the logic circuit") rather than "hardware," as found in the disputed term "<u>hardware</u> independent user description of a logic circuit" itself and Synopsys's proposed construction (i.e., "independent of the specific <u>hardware</u> for implementing the logic circuit"). The difference between "hardware" and "structures" is significant. "Structures" is an undefined and potentially limitless term, whereas what is meant by the term "hardware" is readily apparent from the intrinsic evidence, as discussed above. Because of the lack of intrinsic evidence for its construction, Mentor appears to be relying exclusively on extrinsic evidence, *i.e.*, the unsupported declaration of Dr. Sarrafzadeh. *See* Woo Decl. Ex. I at ¶¶ 84-85. In doing so, Mentor ignores the Federal Circuit's admonition that evidence such as testimony from experts should not be used to "vary[ ] or contradict[ ] the terms of the claims." *Markman*, 52 F.3d at 981; *see also Phillips*, 415 F.3d at 1318; *Vitronics*, 90 F.3d at 1584.

Synopsys believes that no construction is necessary for the term "operational characteristics of said logic network," as the plain and ordinary meaning of the term adequately express what is covered. Nonetheless, to the extent that any construction is necessary, one of ordinary skill in the art would have understood that this term has a meaning similar (but not identical) to that for "hardware independent user description of a logic circuit" – i.e., "a user description of the desired operation of the logic network, independent of the specific hardware for implementing the logic network." The reason for the difference between Synopsys's proposed constructions for these two terms is that one relates to a "logic network" while the other relates to a "logic circuit." For all of the same reasons as discussed above the term for "hardware independent user description of a logic

circuit," Synopsys's proposed construction for "operational characteristics of said logic network" is supported by the claims, specification, and prosecution history of the Gregory patents.

In contrast, Mentor's proposed construction for "operational characteristics of said logic network" is identical to its proposed construction for "hardware independent user description of a logic circuit," and is thus flawed for all of the same reasons. Moreover, Mentor's construction fails to account for the distinction between "logic network" in the former and "logic circuit" in the latter.

### F.    "level sensitive latch"

| Synopsys's Proposed Construction | Mentor's Proposed Construction |
| --- | --- |
| "flow through latch" | "a storage element that either outputs a constant value or allows its output to change, depending on the level of a control signal received by the storage element " |

Synopsys's proposed construction for the term "level sensitive latch" corrects an error by the Patent Office, which failed to enter an amendment by the applicant to change "level sensitive latch" in claim 1 of the '841 patent to "flow through latch." *See* Woo Decl. Ex. F at 1 (patentee specifically asked the Patent Office to "delete 'level sensitive' and substitute --flow through --.").

One of ordinary skill in the art as of the priority date of the Gregory patents would recognize that the patentee intended (and specifically requested) for the term "level sensitive latch" in claim 1 of the '841 patent to have the same meaning as "flow through latch." '841 patent, Claim 1; Woo Decl. Ex. H at ¶ 21.

Mentor's construction adds confusion and ambiguity where none currently exists. Mentor proposes a construction that introduces new, undefined terms including "storage element" and "control signal." These terms are completely absent from the claims and specification of the '841 patent. Further, Mentor's construction completely ignores the very evident Patent Office error.

### G.    "inferring"

| Synopsys's Proposed Construction | Mentor's Proposed Construction |
| --- | --- |
| This term has its plain and ordinary meaning, which is "deducing [e.g., the existence of a | "recognizing that a portion of a circuit design corresponds to a specific hardware structure |

| resetable memory from a behavioral or RTL level description of a semiconductor circuit]." | or class of structures" |
|---|---|

Mentor's and Synopsys's experts agree that "inferring" is used in its plain and ordinary sense in the claims of the '420 patent. *See* Woo Decl. Ex. I at ¶¶140-41; Woo Decl. Ex. H at ¶¶94-96. The parties' dispute centers on whether, to the extent a construction is required at all, the plain and ordinary meaning of "inferring" is "deducing" or "recognizing."[8]

The '420 patent teaches that a resetable memory can be "inferred from a behavioral level or RTL[9] level description of a [] design." '420 patent, Col. 5:33-37. "A behavioral level or RTL level description is a circuit description that is tailored to be understood by a computer that describes the circuit in terms of its methodology (e.g., the various processes performed by the circuit and the relationship(s) between them) as opposed to describing the circuit only in terms of its hardware components and the interconnections between them (e.g., gates, registers, signal lines, etc.)." '420 patent, Col. 5:37-44. The claimed "inferring" requires a synthesis tool to infer that certain hardware is needed to perform certain functions, here resetable memory. This inference is based on the methodology described in the behavioral or RTL level description, which could be expressed differently from design to design, and does not include a specific identification of the hardware components or interconnections. The parties do not dispute that this concept of a synthesis tool "inferring" hardware from behavioral or RTL was well understood by one of ordinary skill in the art as of the priority date of the '420 patent. Woo Decl. Ex. I at ¶¶140-41; Woo Decl. Ex. H at ¶¶94-96 and 101. As such, no construction of this term is required.

To the extent any construction of "inferring" is necessary, "deducing . . ." (as proposed by

_____

[8] Mentor's expert also criticizes Synopsys's description of the plain and ordinary meaning of "inferring" because it "does not explain what is being 'deduced' or inferred." Woo Decl. Ex. I at ¶143. But, "inferring" need not do the work of the rest of the claim, nor should it be construed to make other claim language redundant. Claims 1 and 11 of the '420 patent set forth exactly what is being inferred and from where:

. . . inferring the existence of a resetable memory from a behavioral or RTL level description of a semiconductor circuit . . . .

'420 patent, claim 1 and 11.

[9] RTL is an abbreviation for "register transfer level." Figure 2C of the '420 patent provides an example of an RTL description of a resetable memory. '420 patent, Col. 2:27-29.

Synopsys) most accurately captures the meaning in the context of '420 patent.  Mentor's expert admits that "deduce" is "generally synonymous with 'infer.'"  Woo Decl. Ex. I at ¶143.  And, general purpose dictionaries identify it as an appropriate synonym as well.  See Woo Decl. Ex. H at ¶97 (citing Merriam-Webster's Collegiate Dictionary (10th Ed. 1998) at 597).  Thus, any construction or clarification of the plain and ordinary meaning of the term "inferring" should include that it means "deducing [e.g., the existence of a resetable memory from a behavioral or RTL level description of a semiconductor circuit]."

In contrast, Mentor asks this Court to replace "inferring" with a word that has a different meaning—i.e., "recognizing."  "Recognize" means "to perceive to be something or someone previously known."  Woo Decl. Ex. G at 3.  "Inferring" in the '420 patent does not entail perceiving a previously known description of a resetable memory.  Rather, the '420 patent teaches that the synthesis tool infers the use of a resetable memory by "identifying from the operational flow of the circuit description that a reset condition is being individually applied to one or more variables."  '420 patent, Col. 5:53-59.  This examination of the operational flow of the circuit requires more than merely perceiving something previously known.  The synthesis tool must deduce from the functional description of the circuit that certain hardware is needed.

### H.    "resetable memory"

| Synopsys's Proposed Construction | Mentor's Proposed Construction |
|---|---|
| "a memory unit with a plurality of storage cells, each cell associated with a unique address that provides access to that storage cell, where the memory unit can be reset to a particular value." | "a unit comprising one or more storage cells that can set the read value of each storage cell in the unit to '0' in a single step" |

Mentor's expert admits that "there was no plain and ordinary meaning for the phrase 'resetable memory' in the field of behavioral or logic synthesis" at the time of invention.  Woo Decl. Ex. I at ¶144.  The intrinsic evidence of the '420 patent provides that:

- "[a] memory unit [] may be viewed as having a plurality of storage cells (or simply, "cells")" ('420 patent, Col. 1:14-16) (emphasis added);

- "[a]ssociated with each cell is a unique address that provides access to the location of a particular storage cell" ('420 patent, Col. 1:16-18) (emphasis added);

- "[a] reset function effectively 'clears' the memory unit's cell word values to some <u>reset' value</u> (e.g., a n wide value of '0')" ('420 patent, Col. 1:59-61) (emphasis added); and

- "different reset values may be used for various groupings of cells (or individual cells themselves)" ('420 patent, Col. 4:64-66).

Synopsys's proposed construction incorporates each of these elements from the specification.

Mentor's proposed construction for "resetable memory" ignores the intrinsic evidence in order to broaden the claim term to cover prior art having a single register. Mentor does this by stripping out several of the elements that define a "resetable memory" in the '420 patent.

First, Mentor ignores the '420 patent's teaching that a "memory" includes a <u>plurality</u> of storage cells: "[a] memory unit [] may be viewed as having a plurality of storage cells (or simply, "cells")." '420 patent, Col. 1:14-16. Every memory unit discussed in the specification and shown in the figures includes a <u>plurality</u> of storage cells, which is further emphasized, for example, by the fact that each memory requires an address line to access any particular one of its plurality of cells. *See* '420 patent, Col. 2:60-5:5, Col. 6:52-8:34, Figs. 1, 2A, 2B, 5. Furthermore, the specification distinguishes between a single register and the claimed resetable memory. For example, when discussing one embodiment of resetable memory, the specification explains that "a resetable register 511 is used as a storage cell for the memory unit with reset." '420 patent, Col. 6:60-61, Fig. 5. The distinction between a single-bit register and the claimed memory unit are clear. When the inventors wanted to refer to a single-bit register, they knew how to do so.

Second, Mentor ignores that a memory in the context of the '420 patent, as distinct from an ordinary register, must be <u>addressable</u>. The specification states unambiguously that "[a]ssociated with each cell [of a memory unit] is a unique address that provides access to the location of a particular storage cell." '420 patent, Col. 1:16-18. As noted above, every memory unit discussed in the specification and shown in the figures is explicitly <u>addressable</u>. *See* '420 patent, Col. 2:60-5:5, Col. 6:52-8:34, Figs. 1 (input "ADDR"), 2A (same), 2B (same), 5 (same); 6 (same). Mentor's expert claims -- in the abstract -- that "[m]any memory units are not addressable," but provides only the examples of "ordinary flip-flops and latches" (Mentor's favored prior art register) without

support.  Woo Decl. Ex. I at ¶158.  But, as the '420 patent specification illustrates, a memory and a register (flip-flop or latch) are distinct structures for purposes of the claimed invention.  *See* '420 patent, Col. 6:60-63 (discussed above).

Finally, Mentor's construction ignores embodiments of the '420 patent and argues that a resetable memory must be reset "in a single step."  This portion of its construction again appears to spring from an intent to describe Mentor's favored prior art, a register.  The specification teaches and claims embodiments where the number of available clock cycles for resetting the "resetable memory" are inferred, and the particular implementation of the "resetable memory" is optimized based on that determination.  *See* Woo Decl. Ex. H at ¶106; '420 patent, Col. 8:44-9, claims 7-9, 17-19.  To the extent Mentor's proposed construction is meant to imply that the reset must occur in a single clock cycle, it is directly at odds with the specification.  Mentor's expert does not even attempt to justify the inclusion of this limitation or explain what in the patent it is based on.  *See* Woo Decl. Ex. I at ¶¶144-159.

## V.  CONCLUSION

For the foregoing reasons, Synopsys requests that the Court adopt its proposed constructions.

Dated: September 19, 2013                    Respectfully submitted,

                                             By:  */s/ Philip W. Woo*
                                                     Philip W. Woo

                                             David T. Pritikin (*Pro Hac Vice*)
                                             dpritikin@sidley.com
                                             SIDLEY AUSTIN LLP
                                             1 South Dearborn Street
                                             Chicago, IL  60603
                                             Telephone:  (312) 853-7000
                                             Facsimile:   (312) 853-7036

                                             M. Patricia Thayer (SBN 90818)
                                             pthayer@sidley.com
                                             Philip W. Woo (SBN 196459)
                                             pwoo@sidley.com
                                             SIDLEY AUSTIN LLP
                                             555 California Street, Suite 2000
                                             San Francisco, CA  94104
                                             Telephone:  (415) 772-1200
                                             Facsimile:   (415) 772-7400

                                             I. Neel Chatterjee (SBN 173985)
                                             nchatterjee@orrick.com
                                             ORRICK, HERRINGTON & SUTCLIFFE LLP
                                             1000 Marsh Road
                                             Menlo Park, CA  94025
                                             Telephone:  (650) 614-7400
                                             Facsimile:    (650) 614-7401

                                             William H. Wright (SBN 161580)
                                             wwright@orrick.com
                                             ORRICK, HERRINGTON & SUTCLIFFE LLP
                                             777 South Figueroa Street, Suite 3200
                                             Los Angeles, CA  90017
                                             Telephone:   (213) 629-2020
                                             Facsimile:    (213) 612-2499


                                             Attorneys for Plaintiff
                                             SYNOPSYS, Inc., a Delaware Corporation

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF – CASE NO. 3:12-CV-06467-MMC