Pages 1 - 240

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

```
SYNOPSYS, INC., a Delaware      )
corporation,                    )
                                )
            Plaintiff,          )
                                )
  VS.                           )    NO. C 12-06467 MMC
                                )
MENTOR GRAPHICS CORPORATION,    )
an Oregon corporation,          )
                                )
            Defendant.          )
_____ )
```

San Francisco, California
Monday, October 28, 2013

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

SIDLEY AUSTIN LLP
555 California Street
San Francisco, California  94104
BY:  **M. PATRICIA THAYER, ATTORNEY AT LAW**
**PHILIP W. WOO, ATTORNEY AT LAW**
**ASEEM S. GUPTA, ATTORNEY AT LAW**
**SUE WANG, ATTORNEY AT LAW**
**CYNTHIA CHEN, ATTORNEY AT LAW**

ORRICK, HERRINGTON & SUTCLIFFE
1000 Marsh Road
Menlo Park, California  94025
BY:  **VICKIE FEEMAN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

3                                O'MELVENY & MYERS LLP
                                Two Embarcadero Center - 28th Floor
                                San Francisco, California  94111
4                      **BY:   MARK E. MILLER, ATTORNEY AT LAW**

5                                KLARQUIST SPARKMAN LLP
                                One World Trade Center
6                                121 SW Salmon Street - Suite 1600
                                Portland, Oregon  97204
7                      **BY:   JEFFREY S. LOVE, ATTORNEY AT LAW**
                            **JOHN D. VANDENBERG, ATTORNEY AT LAW**
8                            **ANDREW M. MASON, ATTORNEY AT LAW**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2     Monday, October 28, 2013

3                                                      **PAGE**

4     Tutorial                                           15
      Claims Construction                                62

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  <u>**Monday - October 28, 2013**</u>                            <u>**9:00 a.m.**</u>

2                    <u>**P R O C E E D I N G S**</u>

3                       ---oOo---

4        **THE CLERK:**  Calling Civil Case Number 12-6467,

5  Synopsys versus Mentor Graphics.

6        Will counsel please step forward and state your

7  appearances for the record?

8        **MS. THAYER:**  Yes.  Good morning.  Patricia Thayer from

9  Sidley Austin --

10        **THE COURT:**  Thank you.

11        **MS. THAYER:**  -- for the plaintiff Synopsys.  I have a

12  number of people that I guess I'll introduce once we get on

13  with the tutorial and *Markman* hearing as well.

14        **THE COURT:**  Very good.  All right.  Good morning.

15        **MR. MILLER:**  Good morning, Your Honor.  Mark Miller of

16  O'Melveny & Meyers for the defendant Mentor Graphics.

17        I would like to make some introductions to the people who

18  will be speaking today.  At counsel table is John Vandenberg of

19  the Klarquist Sparkman firm, and Jeff Love also of Klarquist

20  Sparkman firm; and Mr. Vandenberg will be addressing the

21  Gregory patents, Mr. Love will be addressing the '420 patent.

22        **THE COURT:**  Very good.

23        **MR. MILLER:**  And then in the gallery is Thomas Evans,

24  In-house Patent Counsel at Mentor Graphics; and next to him is

25  Dr. Majid Sarrafzadeh who will be presenting the technology

 1  tutorial for Mentor Graphics.

 2      Also at counsel table is Andy Mason also of the Klarquist

 3  Sparkman firm.

 4          **THE COURT:**  All right.  Thank you.

 5      Does that change your mind about introducing people?

 6          **MS. THAYER:**  Yes, it does, Your Honor, if we're doing

 7  it in that order.  Thank you so much.

 8      I will be sharing the podium today with Mr. Phil Woo, my

 9  partner at Sidley Austin.  Also present is cocounsel Vickie

10  Feeman from the Orrick, Herrington firm.

11      And we also have present David Pursley -- you can come on

12  up to counsel table if you like -- Associate General Counsel at

13  Synopsys.

14          **THE COURT:**  All right.  Your name again?  I'm sorry.

15          **MR. PURSLEY:**  Hi.  Dave Pursley.  Good morning,

16  Your Honor.

17          **THE COURT:**  Thank you.  Good morning.

18          **MS. THAYER:**  And we also have from Sidley Austin the

19  wonderful group that have been assisting me.  We've got too

20  many to be at counsel table but Aseem Gupta, Sue Wang, and

21  Cynthia Chen.

22      And we also have with us one of the inventors today who

23  will help me keep on the straight and narrow, Mr. Brent

24  Gregory.

25          **THE COURT:**  Good morning.

1          **MS. THAYER:**  Thank you.

2          **THE COURT:**  All right.  Thank you.

3      Yes, it wasn't necessary actually that you all introduce

4  everybody right away, but that's fine.  Because given the

5  number of people and whoever is going to be speaking, the court

6  reporter not being familiar with all of you, I think that if

7  someone is going to be making a presentation, I'd say other

8  than Ms. Thayer or Mr. Miller, then be sure to identify

9  yourselves so that the reporter will know that.  Even

10 Ms. Thayer and Mr. Miller might do that just once.

11     Okay.  Now, I understand you've already overcome, either

12 with these patents or otherwise, the technological problem this

13 morning.  All of the evidence carts apparently were in use

14 elsewhere; and whatever you did, you managed to hook up

15 whatever you plan to show, which is good because one of the

16 reasons I went to law school many years ago is because I didn't

17 want to take science courses, and here we are now involved in

18 this particular field of high technology.

19     Just to reassure you, I have some idea, I think, about how

20 this works but I could be totally wrong, and I'm relying on you

21 all to really educate me this morning as to the particular

22 field and these particular seven inventions that are before the

23 Court.

24     How did you plan to handle the tutorial?  I assume this is

25 an agreed-upon procedure.

1    **MS. THAYER:**  Yes, Your Honor.  Earlier when we met

2  with you before the summer, it was set forth that we would have

3  45 minutes each for the tutorial and then an hour for the

4  arguments with respect to claim construction.

5    I believe we have agreed that I will present Synopsys'

6  tutorial, and then Mentor will present its tutorial; and then

7  we will go into, I assume you'll want some sort of break, but

8  then we will go into the arguments.

9    And I discussed it with Mr. Vandenberg, and we thought it

10  might be useful to you if we would, instead of having one side

11  present argument on all of the terms that are in dispute, we

12  have -- well, we've clumped it into sort of three groups that

13  we thought sort of logically would work together, so that I

14  would present or Mr. Woo would present and then Mr. Vandenberg

15  or -- I'm sorry?

16    **MR. LOVE:**  Mr. Love, yes.

17    **MS. THAYER:**  -- Mr. Love will present so that you have

18  in proximity the arguments for each segment, and we would just

19  explain as we start which terms that we're going to be

20  addressing, if that works for you.

21    **THE COURT:**  Yes, it does.  I think that makes sense.

22  As far as grouping them, then, each of you discuss the patents

23  in different order -- or the terms, rather, in a different

24  order in your briefs than you had in your joint statement where

25  you discuss them in a particular order.

1   As long as you tell me in advance which ones, you know, as
2   you get to them, that you're going to put together, I should be
3   able to figure out my notes on the particular terms and kind of
4   coordinate with your presentation because I may have questions
5   about, you know, various things.

6   **MS. THAYER:**  Well, of course.  And if at any point you
7   would like for us to go back to anything that has been
8   addressed, we can certainly try and do that.

9   There was one term, I believe, John, that we agreed that
10  we would submit on the papers.

11  **MR. VANDENBERG:**  Right.  The "level-sensitive latch."
12  Obviously if Your Honor has questions on that --

13  **THE COURT:**  Well, I do have questions.  I don't know
14  that I want you to submit it because the whole issue is not
15  over construction.  It's over the legal effect of submitting an
16  amendment and not having anybody pay attention to it or, in
17  fact, consciously deciding against it.  I can't tell which, and
18  I don't know.  I mean, you can't just get up and say it means
19  something that's different.

20  And I want to point out that term is used in another
21  patent without anybody complaining about it meaning something
22  different than what, I guess, you might agree "level-sensitive
23  latch" means or you don't agree, because I don't really have a
24  full-blown dispute on "level-sensitive latch."  I've got one
25  side saying, "This is what 'level-sensitive latch' means"; the

1   other side saying, "No, it means 'flow control,'" or whatever

2   the word was that they flow through or whatever the term was

3   that they intended to use or thought they did, in any event.

4       So I want to take that up with you because I may need some

5   kind of briefing on what is the significance of having asked

6   for the amendment and is this, you know, *Marbury v. Madison*, a

7   ministerial act that somebody overlooked; or is it a

8   significant determination by the PTO in not issuing the patent

9   with what apparently was a requested amendment.

10      **MS. THAYER:**  We'll certainly be prepared to address

11  that and also to submit a brief because, Your Honor, it is a

12  ministerial act and we would welcome the chance to brief that

13  additionally for you.  Mr. Woo will address that when it's his

14  turn.

15      **THE COURT:**  Okay.  The other thing then is, let me

16  just ask you or Mr. Woo, whoever's going to address this

17  particular point, assuming arguendo you're correct about the

18  ministerial nature of the change, all right, do you disagree,

19  then, with what the ordinary definition of "level-sensitive

20  latch" would be?

21      **MS. THAYER:**  We do disagree, and I'll let Mr. Woo --

22  depending on what "ordinary" is, I'll let him address that.

23      **THE COURT:**  Well, do -- I can't remember now.  There

24  were a lot of terms here.  Did you -- my recollection was you

25  really didn't take them on as to their definition of

1    "level-sensitive latch" in the abstract, just in the context of

2    the particular patent you were arguing about.

3         **MS. THAYER:**  Well, every term must be taken in context

4    of the patent and the claim in which it appears; and, so, if

5    you don't mind, I will turn it over to Mr. Woo.

6         **THE COURT:**  Well, that's okay.  We'll wait until we

7    get to it.

8         **MS. THAYER:**  All right.

9         **THE COURT:**  Because apparently we're going to get to

10   it at the end because you weren't going to get to it at all, so

11   we'll get to it at the end.

12                          (Laughter)

13        **MS. THAYER:**  That's a very, very good guess,

14   Your Honor.

15        **THE COURT:**  Okay.  So assuming we've got time, then,

16   we'll deal with it.

17      I gather what you're going to say is that in this patent

18   it means "flow-through," but I guess we wouldn't have to worry

19   about it.  If you're right that it's ministerial, then you just

20   have "flow-through."

21        **MS. THAYER:**  Right.

22        **THE COURT:**  And then the question for them is whether

23   they disagree about what "flow-through" means, and they didn't

24   disagree anywhere else about it.

25        **MS. THAYER:**  That is correct.

1              **THE COURT:**  Okay.  Yeah, I had that flipped backwards.

2    Sorry.

3              **MR. VANDENBERG:**  Well, just briefly, we agree that it

4    appears to have been a Patent Office mistake.  It was

5    ministerial.  The Patent Office didn't sit down and say, "No,

6    we're not going to allow this."  So we certainly agree with

7    that.

8         Our main concern was that "flow-through latch" would not

9    be helpful to the jury and, therefore, what would be helpful to

10   the jury would be to explain what a "level-sensitive latch" is.

11   We proposed a construction on that; and, obviously, and Mr. Woo

12   and I can discuss that, but that was the -- that was, I think,

13   the essence of the dispute.  We didn't disagree that it was a

14   mistake.

15             **THE COURT:**  Okay.  When you, then, are providing a

16   construction for, quote/unquote, "level-sensitive," was it your

17   intent to actually have that mean what a "flow-through latch"

18   is?

19             **MR. VANDENBERG:**  We pointed out that in the technology

20   there is a difference between those two terms; however, in this

21   patent it's clear they intended "flow-through latch" -- the

22   "level-sensitive latch" to mean "flow-through latch" and,

23   therefore, we are construing -- I think we could say we're

24   construing the meaning of both of those.

25        We're agreeing that those are used to mean the same thing,

1    and then we're proposing what they mean.  So the question

2    really is:  Should the jury be told what a "level-sensitive

3    latch" or "flow-through latch" means.

4            THE COURT:  Well, they're not synonyms apparently, so

5    you couldn't use it for the same thing.  You have to pick one

6    or the other to define, I think, either "flow-through" or

7    "level-sensitive."  I understood you were promoting

8    "level-sensitive."

9            MR. VANDENBERG:  Well, I would suggest that both

10   parties were saying that in this patent the patent applicants

11   intended them to mean the same thing because that's why they

12   asked for one to be substituted for the other in order for the

13   patent to consistently refer to "level-sensitive" to

14   "flow-through latch."

15           THE COURT:  Are you arguing that they meant, then, a

16   "level-sensitive flow-through latch"?

17           MR. VANDENBERG:  We would be saying our understanding

18   of what they intended was that "level-sensitive latch" they

19   intended to mean a standard level-sensitive latch that they had

20   been referring to at places as a "flow-through latch."

21           THE COURT:  Well, then they say they're relying on it

22   being a "flow-through latch" and you want all the

23   "flow-throughs" to be "level-sensitive," which is not the same

24   argument that at least is immediately before me as I understood

25   it.

1    It is true that in the specifications every time they're

2  talking about something not being a constant, they start

3  talking about "level-sensitive latches" because something's got

4  to change because something else is changing, but I don't know

5  that that necessarily is required.

6    If you're saying you have to have a level-sensitive latch

7  in this instance, a flow-through latch that's level sensitive,

8  I gather, if that is the dispute, then that's not what seems to

9  be written here, at least I didn't understand it as such.  So I

10  would have to get back and talk to you about it maybe at the

11  end so we don't wear ourselves out talking about it now.

12    **MR. VANDENBERG:**  At least one of the tutorials

13  addresses sort of the background technology here, so it may be

14  helpful to readdress this again at the end of the day.

15    **THE COURT:**  Maybe, yeah.  Okay.  I mean, there was a

16  lot of switching around anyway.  There were the original claim

17  construction disputes.  Then the defendant started changing

18  some of their proposed constructions to deal with what they

19  understood to be some of the complaints but not enough to

20  actually get rid of the dispute.  So there we are, then, with a

21  kind of progression of constructions.

22    Now it turns out whatever your fight was about

23  "level-sensitive" is not what I understood it to be, so let's

24  get on with the tutorials and see how the show goes.

25    Okay.

1      **MS. THAYER:**  Thank you, Your Honor.

2          And what I just heard was a new argument, and Mr. Woo will

3   try and address it.  Fortunately it comes last and he'll have

4   some time to try and address this new argument.

5          **THE COURT:**  Yeah, he has lots of time to think about

6   it.

7                        (Laughter)

8      **MS. THAYER:**  And I don't think you're going to

9   convince anybody in this courtroom that you didn't like science

10  in school.

11         **THE COURT:**  No, no, really I didn't.  Okay.  But that

12  was long before all of this, that's the point.

13       Okay.  So are you ready to proceed?

14         **MS. THAYER:**  I'm almost ready to proceed.  The

15  wrong -- I need a toggle here so that our slides come up.

16         **THE COURT:**  Oh, okay.

17         **MS. THAYER:**  And I need a glass of water.

18         **THE COURT:**  That's fine, too.

19         **MS. THAYER:**  My whole family has been sick, and my

20  voice this morning doesn't sound like it's going to last.

21         **THE COURT:**  That's okay.  I have one ear that feels

22  plugged up, and I feel like I'm talking underwater.  So if

23  anything sounds weird, just tell me.  You won't be impolite.

24         **MS. THAYER:**  Sounds good.

25  ///

 1          THE COURT:  Okay.

 2                        **TUTORIAL**

 3          MS. THAYER:  So I'm going to try and do three things

 4  here for you this morning:  Give you a little bit of background

 5  on integrated circuits, and my goal here is to help with the

 6  vocabulary.  We are not going to get too in the weeds in this

 7  tutorial about the particular patents because that's for the

 8  argument; but also there are many issues about the patents that

 9  will be discussed at later stages in the proceedings,

10  infringement or otherwise, where more detail is perhaps needed

11  here.  I'm trying to equip you with some concepts and

12  vocabulary and relationships that then will make the argument a

13  little bit easier.

14          THE COURT:  Okay.

15          MS. THAYER:  Next I'll talk a little bit about IC,

16  integrated circuit, design process as it existed many years ago

17  and as it has evolved.

18          And then, finally, just a very brief overview about the

19  four patents-in-suit.

20          THE COURT:  Okay.

21          MS. THAYER:  So here we see integrated circuits.

22  You've heard them referred to as chips or semiconductors.  They

23  are, of course, ubiquitous and they are essential to modern

24  electronic devices.

25          Here we've just shown a blow-up of a Smartphone.  So we've

1   got a printed circuit board with a lot of chips on them.  You

2   can see all those little black square looking things are chips,

3   and they could be for memory, for graphics, for the camera

4   because, of course, our Smartphones do everything and you need

5   a chip for all of those different functions.

6        And just to show you a little bit more about a chip, in

7   the package it looks pretty simple; but once you peel off that

8   protective packaging and then look at the semiconductor, the

9   silicon material that the chip is made from -- we're going to

10  blow it up again -- you can see that each one of these chips

11  contains millions and even billions, depending on the chip, of

12  these microscopic elements, components, called hardware

13  components.  And those hardware components, actually you might

14  recognize from your physics class, are the embodiment of the

15  building blocks of electronics:  Transistors, resistors,

16  capacitors, diodes.

17       So the hardware components are etched into that chip, and

18  there are millions of them; and they are not simply sitting --

19  this blowup makes it look like there's just one component and

20  it sits there and then there's another one.  They are

21  interconnected and that's what's critical.

22       Now, engineers represent these hardware components with

23  symbols or schematics.  Just like we've got here a photo of

24  Mr. Gregory back there, he can be represented in schematic

25  form.  So can these hardware components.

1        And you'll see these particular schematics -- and

2    unfortunately my pointer isn't working -- but these schematics

3    here for the hardware components, you can actually see those in

4    some of the figures of the patent, so we thought it's useful

5    just to associate in your mind when you see something like

6    that, it is a schematic for a hardware component.

7            THE COURT:  Do you have, by the way, any paper copies

8    of any of these screens?

9            MS. THAYER:  Yes.  My wonderful partner, Mr. Woo,

10   actually has one for you and for your clerk.  I apologize for

11   not passing it out previously.

12           THE COURT:  Oh, that's okay.  I just realized I

13   wouldn't mind having just the schematics there -- oh, yes,

14   that's fine.  She'll bring it over.  Thank you, Mr. Woo -- for

15   later because that's helpful in just looking at these.

16           MS. THAYER:  Absolutely.  That was the intent.

17           THE COURT:  Okay.  Good.  I may not, you know, need it

18   right now but for later.

19           MS. THAYER:  So, again, just to summarize, you start

20   with an integrated circuit or a chip; and if you break that

21   down into more fine distinctions or organization, chips are

22   made up of logic circuits and memory circuits.  And we're going

23   to talk a lot about logic and memory circuits in just a minute.

24       And then those logic and memory circuits themselves are

25   made up of the hardware components.  And, so, whether you're

1   talking logic or memory, you need to drill down.  If you want

2   to know what they're made up of, you want to talk about

3   hardware components.  And, so, that's what this slide tells you

4   as well.

5        Chips are made of these two types of circuits.  The

6   circuits are made up of hardware components.  And what's the

7   difference?  Well, a logic circuit processes information and

8   then performs a function, or sometimes you'll see it referred

9   to in these patents as a behavior of a circuit.  But memory

10  circuits store information, and that's the main difference

11  between the two types of circuits.

12       So here we show just this concept of how do you form a

13  logic circuit from hardware components.  Well, you need to know

14  how many of a particular type you need, and then how they are

15  interconnected.  As you can see here, they don't just sit side

16  by side.  They're connected one to another.

17       And what this is, in terms of what circuit do all those

18  components form, it's an adder circuit.  So this adder circuit

19  will take the inputs A and B and add them to get sum S.  So

20  this is a pretty simple type of circuit.  Not all that many

21  components.  It's a simple circuit.

22       But, of course, there are a number of different types of

23  circuits that are used in integrated circuits or chips.  We

24  have the adder at the top.  We've got a subtracter.  That's

25  probably pretty obvious what that does.

1    The patents, the Gregory patents in particular, because

2  they're about logic circuits and synthesis of logic circuits,

3  you will see in them both the words and these schematics for

4  what's called a "level-sensitive latch circuit" and the

5  "edge-sensitive flip-flop circuit," and we're going to get into

6  more detail.  I'm not going to explain exactly what they do

7  right now because we've got a lot to cover in the tutorial, but

8  because also we're going to get into that when we're talking

9  about claim construction.

10    But we have written down here, as best we can in plain

11 English, what the function of each of these circuits is, and

12 they're important because the Gregory patents taught how to

13 synthesize complex circuits like the ones on the bottom.

14    So logic circuits.  Memory circuits make up chips.  I just

15 talked about some of the logic circuits.

16    Memory circuits are also formed from hardware components,

17 and here we see multiple storage cells in rows and lines so

18 that you can figure out which cell is at which address in the

19 memory.  And they're made up, again, of hardware components.

20    And you see this memory circuit on the right made up of

21 the hardware components in these cells make up the memory

22 circuit.

23    And this is actually a figure from the '420 patent that's

24 not a Gregory patent.  So we've got three of them with the same

25 specification.  We haven't been using the numbers.  We just

 1    call them the Gregory patents.

 2         **THE COURT:**  That's fine.

 3         **MS. THAYER:**  When we get to the *Markman* argument,

 4    we'll tease them apart a bit.

 5         **THE COURT:**  Yeah.  One of you, just to split things up

 6    again, one of you used one of the Gregories as your prime

 7    source of reference and the other used a different one.  So I

 8    just kind of flipped a coin on that one.

 9         **MS. THAYER:**  I apologize for that.

10         **THE COURT:**  That's okay.

11         **MS. THAYER:**  We could have been a little bit more --

12    we could have been a little bit more coordinated.

13         **THE COURT:**  That's all right.  The specifications were

14    the same so it didn't really matter.

15         **MS. THAYER:**  Yeah, you're right.  When you go back and

16    look at the line, it may be shifted up one or the other, so I

17    apologize for that.

18         **THE COURT:**  Exactly.  A little bit.

19         **MS. THAYER:**  I believe all of our quotations in this

20    presentation are going to be from just one patent, unless we're

21    talking about different claim language.

22         **THE COURT:**  Okay.

23         **MS. THAYER:**  I show you this graphic just because it's

24    going to appear later in the discussion about the '420 patent.

25    Another way to depict the storage cells is simply as

1   interconnected cells without depicting all of the hardware

2   elements in each one of them.

3       Now, the patents sometimes refer to logic networks and

4   sometimes to logic circuits; and, again, just the vocabulary is

5   that a logic network is one or more logic circuits.

6           **THE COURT:**  Oh, okay.

7           **MS. THAYER:**  All right.  So here we have shown a logic

8   network made of a lot of circuits, and this I am told is a

9   counter.  This one down here (indicating).  It is not one

10  that's in the patent so we're not going to dwell on it.  This

11  is, again, just to give you some notion of the relationship

12  between terms.

13          **THE COURT:**  Okay.

14          **MS. THAYER:**  So let me move on to the design process,

15  because that's really at the heart of the patents in the field

16  that we're talking about here.

17      You start back in 1958 with literally the first integrated

18  circuit.  I believe it's from Texas Instruments.  There may be

19  some dispute over that.  It doesn't matter for our purposes

20  because that was a long time ago.  So integrated circuits began

21  to be made on chips where the hardware elements and their

22  connections are all on a single chip.

23      Moore came along and predicted and announced Moore's Law,

24  that there would be an exponential increase in the number of

25  circuits that we would actually be able to put on a chip just

1  from the standpoint of our ability to manufacture ever smaller

2  lines and configurations and, of course, he was right.

3      So by the early 1970s, integrated circuits were more

4  complicated than this very simple thing we saw in 1958 but they

5  were still simple enough that they were -- as you can see in

6  this figure, engineers would hand draw them.  So you'd see this

7  engineer here with this huge piece of paper actually drawing

8  out the elements and the circuits how they should be connected

9  in order to manufacture the chip.

10      But at some point you hit a wall, that without automation,

11  you're not going to be able to design the chips that we

12  actually could make.  It's just too complicated to do it all by

13  hand, and that is what leads to the field of electronic design

14  automation in the mid-1980s.

15          THE COURT:  Which campus is that in the third picture?

16          MS. THAYER:  Yes, that is Berkeley indeed.

17          THE COURT:  Very good.

18          MS. THAYER:  So what is EDA, electronic design

19  automation?  I'm sorry, there are just lots and lots of

20  acronyms.  Ms. Wang actually has created a glossary that we

21  would be happy to provide, also to our court reporter, of just

22  all of these acronyms and what they stand for.  If that would

23  be useful, we'd be glad to get that to the court reporter.

24      But EDA is --

25          THE COURT:  How about to the Court as well?

 1          MS. THAYER:  Oh, to the Court as well, yes, for sure.

 2    For sure.

 3          THE COURT:  All right.  Thank you.

 4          MS. THAYER:  We'll submit it to opposing counsel first

 5    so that we make sure there's nothing in dispute.

 6          THE COURT:  Oh, okay.

 7          MS. THAYER:  There's nothing disputed in it, but it's

 8    just a helpful tick-down as to what does what mean.

 9          THE COURT:  Okay.

10          MS. THAYER:  Okay.  So electronic design automation is

11    a very broad field and it describes the use of computers to,

12    and most importantly for this case, to create designs for

13    integrated circuits.  And this is what, this process of

14    synthesis, is at the heart of the Gregory patents.

15          The computers are also used now to simulate computer

16    design using software.  So once you have a design, to simulate

17    it in software and see if it is working as you expect it to

18    work.

19          And, also, computers are used for this similar process of

20    emulation.  And we'll see a few slides from now emulation is,

21    again, mocking up the chip design to test it and verify it; but

22    emulation uses both hardware and software, and I'll explain a

23    little bit more about that in a minute.

24          And as I said, EDA is a very broad field, so we put down

25    here there are a lot of other operations that are just not

1  relevant to these patents that are part of EDA, but we're just

2  going to glide over those for simplicity.

3       Now, Synopsys founded in 1986.  We see here the original

4  building.  And Mr. Gregory is in that back row.  He was the

5  ninth employee at Synopsys.  It was founded by really the

6  pioneers in synthesis, and today it is the biggest provider of

7  EDA in the whole world.

8       And here we have an article from 1989 just before

9  conception of the inventions in the Gregory patents with the

10  *New York Times* confirming that Synopsys pioneered logic

11  synthesis -- again, that's really the heart of our discussion

12  today -- that has been adopted by every major semiconductor

13  design company in the world.

14       And then at the bottom:  Without this technology, the

15  complex designs of today, these are designs of integrated

16  circuits, would not be possible.

17       And this just shows you the types of companies that use

18  the EDA products, including synthesis, from Synopsys.  And you

19  will recognize, for example, Intel.  So Intel everybody knows

20  makes chips.  What everybody doesn't know, or certainly I

21  didn't know before this case, is that Intel uses the products

22  actually of both companies in electronic design automation, and

23  it needs synthesis products in order to do what it does in

24  building chips.

25       So back to the specifics of design.  This is a very

1   simplified diagram of what's going on now when a design

2   engineer -- this is not you or me understand.  This is somebody

3   at Intel who wants to design a new chip, and in the patents

4   this is referred to as the user.  So it's the user of the

5   computer system.

6       The design engineer has to input some variables and

7   commands, and we'll go over that in just a second, into the

8   computer system that includes the synthesizer software and that

9   will synthesize the design of the circuit.  And then that

10  circuit that has been designed will be emulated, tested, in the

11  emulator.

12      So we thought we'd try and -- because the first time I

13  listened to all this, I was a little -- just a little foggy.  I

14  did like science in college, but I didn't study any of this.

15      THE COURT:  That's all right.  You mentioned my

16  physics class.  I took physics from Edward Teller.  I didn't

17  understand one word that was being said.

18      MS. THAYER:  But you probably were pretty impressed by

19  him nonetheless.

20      THE COURT:  Yes, he was very impressive.

21      MS. THAYER:  So imagine you sit down to a computer,

22  and here we've got the user of this system is a motorist who

23  wants to get to Disneyland and inputs into the computer the

24  ultimate location.  Does that person prefer to drive highways

25  or scenic routes?  Does that person need to get there as fast

1    as possible or as slow as possible?  So all sorts of inputs

2    could be given to this computer system.

3        And the output, then, is all the driving directions,

4    either the fastest or the slowest, highway, not, and how long

5    it will take, and it does that automatically.

6        With synthesis, you have got the -- I'm sorry, that says

7    "Synthesizer."  That should say -- it's the user.

8        The user says, "I need a chip, a design for a chip that

9    does Y, X, Z."  And the synthesizer is going to produce the

10   directions for building that chip; namely, the circuits and

11   their connections that are going to be necessary in order to

12   create the chip that the designer wants to build.

13       So it's, unfortunately, not as easy as that analogy.

14   Synthesis is a lot more complicated, so now I'm going to drill

15   down a little bit more and it gets a little bit more hard to

16   follow.

17       So we've got the user.  The user has to write in code for

18   the computer to use.  This is not just ordinary English

19   language that you can input.  The engineers at Intel have to

20   learn a specific language to do this.  So the engineer writes

21   code and in what's called hardware description language.  And

22   HDL is another important acronym.  So HDL is a type of

23   programming language that was developed specifically for

24   electronic design automation.

25       And as of 1990, which is the priority date for the Gregory

1    patents, there were two prevalent HDLs in existence, and you're

2    going to hear a lot about those today, Verilog and VHDL.

3         There were, of course, other computer programming

4    languages in existence in 1990, like C, you see that in one of

5    the patents, Fortran was in existence, but these were not

6    languages used in EDA.

7         So the user needs to select a desired chip objective.  Am

8    I building a memory chip?  Am I building a video chip?  And

9    lots of other inputs need to be decided by the engineer to

10   describe the sort of functions or behaviors that the chip needs

11   to perform.

12        And the user can specify in this input either the specific

13   circuits that are desired or the functions to be performed.

14   So, for example, we've got here an example of our user

15   inputting the code on the left.  And I want to make sure I

16   don't make a mistake here.

17        So this is saying, "Need an adder circuit," and we just

18   saw that is a logic circuit, and the user is specifying an

19   adder circuit.

20        But here the user is inputting in an HDL sum A plus B.

21   That doesn't say, "I need an adder circuit."  It says, "I need

22   to sum these two variables."  So it is specifying a function

23   but not the circuit that's going to perform that function.

24        Now, you might say, "Well, heck, you already showed me

25   that an adder circuit sums the two up," and that's true.

1    Simple, very simple circuits could have pretty simple ways of

2    communicating their behavior; but, as you get more complicated,

3    you require the user to know a lot more about the logic

4    circuits than she actually needs to do given now the Gregory

5    inventions.

6         HDL code hardware description languages could include user

7    descriptions of both circuits and functions.  In other words,

8    you weren't required to do only one or the other.  You could

9    use a combination.  So here we could show in the user

10   description Module 1 is specifying circuits and in Module 2

11   and 4 the user is specifying functions.  And these, of course,

12   would not be the function of the same circuit that the user has

13   specified.  It's going on because these are long, complicated

14   programs.

15        Similarly, as I mentioned before, you don't just have

16   logic circuits, you have memory circuits in chips and the user

17   can specify either the memory circuit that is needed or the

18   behavior that is needed.  And the synthesizer will then take

19   that input and come out with a synthesized design that tells

20   exactly what are the circuits that are needed and how do they

21   need to be interconnected to perform as the designer has

22   intended.

23        Then the last step I mentioned is you take the synthesized

24   design that the synthesizer has created, and the next step is

25   either to simulate or emulate that design.

1     So you've come up with a design, and you see this term

2  "simulator" and "emulator," these are similar.  As I mentioned

3  before, in simulation it is purely in software; whereas, in

4  emulation the mock-up of the integrated circuit design that the

5  synthesizer has created is built into both software and

6  hardware.

7     And I've got a little picture here that tries to make that

8  clearer.  We've got an emulator box that's an actual product,

9  and inside you will see that that box contains chips.  And

10 underneath this printed circuit board it's got a lot of other

11 connections, so this is very simplified.  But it's got chips,

12 and those chips are not the integrated circuit or chip that the

13 designer had sat down to create.  Rather, these are

14 programmable chips.  They can be sort of anything you want them

15 to be.

16    And, so, you can program them.  Once you have, from the

17 synthesizer, once you have your synthesized design, you can

18 program that design into these programmable chips and see,

19 again:  With my experimental inputs, am I getting the expected

20 outputs?

21    So you can do that purely in software, and that's called

22 simulation; or you can do it in an emulator, which is partly

23 using software and partly using these programmable chips.

24 FPGAs I think is the acronym you'll see in that regard.

25    So that concludes my very brief overview of the design

**TUTORIAL**

1  process.  And, again, we just took a snapshot of the front end

2  of that process.  There's a lot more that goes on after this

3  before you actually have a manufactured chip, but this is the

4  part that I think is most relevant to the discussion in the

5  *Markman*.

6      And then, finally, the patents at issue, I mentioned we've

7  got three with the same specification and we have referred to

8  them as the Gregory patents.

9      Mr. Gregory, I mentioned employee nine and an inventor on

10  all three of these and more that are related; and that's

11  relevant, Your Honor, before I get to this next slide.  The

12  specification of the Gregory patents is more than 60 columns

13  long.  I don't know if you have tried to read all 60.

14          **THE COURT:**  I stopped at a certain point.

15          **MS. THAYER:**  Yes, I'm not surprised at all.

16      It is 60 columns long.  It has more than 25 figures.  It

17  is a collection of a number of new features.  It's not just one

18  invention in all those 60 columns.

19      It has spawned a number of patents.  Three are at issue in

20  this case.  There are others with the same specification,

21  different claims.  And there are, within the patents-in-suit,

22  many claims; and it is important, once we get to the argument

23  phase, to recall that not every claim is going to embody every

24  single novel feature that is expressed throughout the

25  specification.

1          So the Gregory patent, then, this is the '488, explains

2     about the background; that before these inventions, many

3     complex circuit elements, again that's logic circuits and

4     memory circuits, the designer was required first to specify the

5     specific circuit element that was needed, like a

6     ledge-sensitive latch, for example.

7          So here we show that the user sitting down to design a

8     chip is going to have to say, "Well, here's the function.  Is

9     there a function that I'm thinking about I need to perform?

10    Okay.  Here's schematically what it needs to do.  Okay.  Then I

11    better get a flip-flop."

12         This is, again, before the patents-in-suit.  So that would

13    be part of the HDL, the language input into the synthesizer,

14    and you get the synthesized design.

15         So the Gregory patents-in-suit were not -- came at a time

16    when there was already synthesis occurring.  As we saw in the

17    *New York Times* article, there had already been a big leap

18    forward based on the work at Synopsys and elsewhere; but at

19    this point, complex circuits you had to -- the user had to know

20    what that circuit was, what it would do, and specify it for the

21    synthesizer.

22         After the Gregory patents, all the user needs to do is

23    come up with the behavior or functional or operational language

24    and as the patentee chooses; thus, the system and method of

25    this invention allow a user with minimal knowledge of specific

```
 1   logic elements -- that's another way of saying specific logic
 2   circuits -- so with minimal knowledge of the logic circuits,
 3   that user can generate a logic network that may be subsequently
 4   mapped and optimized using any automated logic design system.
 5           THE COURT:  Can you give me an example of what the
 6   user might essentially, then, tell the system?
 7           MS. THAYER:  The user might what?
 8           THE COURT:  Tell the system.  In other words, "This is
 9   what I want," or tell whoever this machine is or whatever.
10           MS. THAYER:  We have it right here.  The user bubble
11   there is an example.  Again, it's not plain English.  You can't
12   just talk to the computer the way in my navigation.
13           THE COURT:  Yeah.  What does that boil down to in
14   regular language would you say, or can you not translate it?
15   Is it not translatable?
16           MS. THAYER:  Well, that would be -- I actually can't
17   tell you.  I would need to know more about the context.
18           THE COURT:  Okay.
19           MS. THAYER:  As we see, here's another user
20   description.  That user description, the computer will infer
21   from that that you need a level-sensitive latch.
22           THE COURT:  Yeah.  It says from whatever you say, not
23   you but the user says, it's going to figure out what kind of
24   hardware you need, or however you want to describe the latches
25   and other --
```

```
 1            MS. THAYER:  Right.  I'm being told by my much smarter

 2     partner here --

 3            THE COURT:  -- hardware.

 4            MS. THAYER:  -- the commands you see for the user

 5     there, we've just written it here in the same way.  So the

 6     answer to your question is the synthesizer, if it is programmed

 7     correctly, will infer the level-sensitive latch.

 8            THE COURT:  Yes, but the user is saying, "I want this,

 9     whatever it is, to do something"; right?

10            MS. THAYER:  Yes.  And the very specifics about what

11     these circuits do, that part of this discussion I have left to

12     Mr. Woo --

13            THE COURT:  Okay.  I'll ask him.

14            MS. THAYER:  -- because he is going to explain it to

15     you a lot better than I am about the difference between a

16     level-sensitive latch and a high-impedance driver and an

17     edge-sensitive flip-flop.

18            THE COURT:  Yeah.  Well, I wasn't really looking at

19     what exactly you need to do it.  That's what the computer

20     apparently is figuring out.  I was just curious about what's an

21     example of what the user wants in regular language, but maybe

22     that's not possible to say.  I don't know.  In which case we

23     can wait.  Maybe Mr. Woo can do it or whatever.

24         It's just easier if one doesn't have to think of all of

25     this at some super-high level and can get it down to something
```

 1  that at least somewhat equates with ordinary experience, but

 2  maybe you can't do that.

 3       In other words, as I look at that, that's gobbledygook.

 4  So it's gobbledygook in, gobbledygook out.  And it may be that

 5  somebody can say, "Okay.  The guy says he wants that.  When you

 6  push a key, something or other happens at the other end."  Then

 7  figures out, "Okay.  To do that you need something, hardware of

 8  some sort, latches or what have you."  But that's okay.  It's

 9  not critical.

10       **MS. THAYER:**  I can tell you that this is saying that

11  whenever this condition, so there's a condition that's attached

12  to this circuit, when it's true, send this value D to the

13  output Q.

14       As to how that then relates to whether or not you're going

15  to be able to filter sound coming into your phone a little bit

16  better, there's not that sort of one-to-one correspondence for

17  any of these circuits that I can give you; but perhaps when

18  Mr. Woo comes up, he'll be able to get it simplified.

19       Oh, yes, absolutely.

20       **MR. WOO:**  Good morning, Your Honor.

21       **THE COURT:**  Good morning.  Ordinarily I'm going to

22  have one lawyer do whatever that particular argument is; but in

23  this instance, I'm going to turn to you, Mr. Woo, if you think

24  you have an answer to this.

25       **MR. WOO:**  Thank you, Your Honor.

1      I apologize.  There is some confusion there, and I think

2  it may be simpler if we go back to some of the earlier examples

3  that were discussed in the tutorial because we actually tried

4  to provide those to you so you could understand the correlation

5  between what's on the left-hand side, the user description,

6  which goes into the synthesizer, and then what's on the

7  right-hand side, which in this particular instance --

8           THE COURT:  Yeah, I got that part.

9           MR. WOO:  Okay.  So if we go back --

10          THE COURT:  I'm just looking for an example other than

11  D plus Q; but if we can't do that, then we'll wait till later.

12          MR. WOO:  The simplest example is if we go back to

13  just the background for logic circuits.  And, so, what we were

14  intending there is here's an example.  I think the complex

15  level-sensitive latches are essentially what the Gregory

16  patents cover; but before that, other logic circuits existed.

17  So an adder circuit, for example, performs a particular

18  function.  So --

19          THE COURT:  I think my question is too simple.  Okay.

20  And everybody is making it more complicated and there may not

21  be an answer, but going back to these isn't going to help.

22          MR. WOO:  Okay.

23          THE COURT:  Okay.  I'm just letting you know that.

24          MS. THAYER:  At the break I'll see --

25          THE COURT:  It's possible that you can't say; in other

1   words, you can't put into computer language, "I want the

2   ultimate purchaser when they push a key to have a light come

3   on."  Okay.  Maybe you can't do that.  I was just curious what

4   kinds of things they're telling them other than some high-level

5   formula, which, again, brings it back to the abstract, but it

6   doesn't really matter.  It's probably not necessary to answer

7   it.

8           **MR. VANDENBERG:**  Your Honor, our tutorial will have

9   such an example dealing with a car warning signal that your

10  door is open --

11          **THE COURT:**  Oh, that's very interesting.

12          **MR. VANDENBERG:**  -- when you put your key in, so that

13  will come up.

14          **MS. THAYER:**  Okay.  Thank you.

15          **THE COURT:**  The reason I say that is I wasn't sure if

16  I was going to get here on time this morning because I had a

17  warning light on my car.  It wasn't the door's open.  It said I

18  had a low tire, it's a run flat tire and that made me nervous

19  that I was probably going to have to spend $500 to replace it;

20  but it turned out it was just low, and I was here in plenty of

21  time.

22      So, anyway, getting back, we'll skip what somebody wants

23  in ordinary language and just go on to the next slide.  Okay.

24          **MS. THAYER:**  So now I'm going to -- I mentioned that

25  the Gregory patents are long and they contain a number of novel

1   features and techniques.  One of them is use of hardware

2   description functions.

3       Right now I'm going to label them for you.  Again, this

4   tutorial is trying to orient you, not drill down on every

5   single one, but the ones that are critical to the claims we are

6   going to talk about in our next hour.

7       **THE COURT:**  Okay.

8       **MS. THAYER:**  So Table 9 is from the patent and you'll

9   see there are many tables in the patent that explain how it is

10  that the synthesizer takes the input and infers a particular

11  type of circuit from that input.

12      So we have asynchronous load function, and you see in

13  Table 9 we've got down there going across we have the hardware

14  description functions coming across here (indicating):  The

15  data function -- excuse me, asynchronous data, synchronous

16  load, synchronous data, don't care -- and for purposes of this

17  proceeding, you don't care at all about don't care because it's

18  not going to come up at all -- high impedance, both

19  asynchronous and synchronous.

20      So this is a concept that's introduced and the other

21  concept that's introduced is these assignment conditions.  Here

22  we see assignment conditions in the same table are in this row

23  for variable Q.  And it's the association of hardware

24  description functions and assignment conditions in the patent,

25  and that's why it goes on for many columns because it tells you

1  for each circuit that you're going to need in your ultimate

2  synthesized design what combination of assignment conditions

3  and hardware functions and variables do you need to be looking

4  for.

5      So we see each one of the hardware description functions,

6  which is this line (indicating), is associated with an

7  assignment condition for this variable Q.

8      **THE COURT:**  Wait a minute.  Can we go back to that for

9  a second?

10     **MS. THAYER:**  Yes.

11     **THE COURT:**  Okay.  Can you just run down -- okay.  The

12 "AL" is asynchronous load; is that right?

13     **MS. THAYER:**  Yes.

14     **THE COURT:**  Okay.  And that little chart that you have

15 there that you just went off of for a second.

16     **MS. THAYER:**  (Indicating.)

17     **THE COURT:**  Yeah.  Oh, that's above it.  Yeah, that's

18 fine.  Okay.  I just wanted to make sure I had those.

19     **MS. THAYER:**  Hopefully, this is the one that should

20 print out.  We don't build in your handout.  We just show the

21 completed --

22     **THE COURT:**  I have it, right.

23     **MS. THAYER:**  -- but there is an item for each one.

24     **THE COURT:**  Uh-huh.  No, I see that now.

25     Now, the assignment conditions, I'm not sure if this is

1    going to bear on your dispute or not, how are the -- not really

2    how, but who or where are the -- who creates these assignment

3    conditions?  Who specifies them?

4               MS. THAYER:  This is all in the synthesizer.

5               THE COURT:  The synthesizer is doing this?

6               MS. THAYER:  This is correct.  When you go back to the

7    patent, you'll see there's references to an assignment

8    condition generator, and that is in the synthesizer itself.

9               THE COURT:  Okay.

10              MS. THAYER:  And, so, this is really the essence of

11   how Mr. Gregory and his coinventor taught the synthesizer

12   software to utilize the input from the user in terms of

13   variables and other conditions to then synthesize these

14   circuits.

15       And each one of these tables you'll see in the patent

16   refers to a very specific type of circuit that then will be

17   inferred based on where the assignment -- you've got conditions

18   for the asynchronous load function, you've got conditions for

19   D; and all those -- to get down to what all those mean, we

20   would be here for six hours.

21              THE COURT:  No, I'm not asking for that.  Okay.

22              MS. THAYER:  And we don't need to because it is the

23   association of the hardware description function with an

24   assignment condition by the synthesizer that allows it, then,

25   to infer.

1        THE COURT:  Okay.  Going back further.

2        MS. THAYER:  Yes.

3        THE COURT:  All right.  You've got a variable and then

4   Q is your variable.  All right.

5        MS. THAYER:  Right.

6        THE COURT:  That's specified by who?  Is that, again,

7   the program doing it or is the user doing that?

8        MS. THAYER:  The user description can assign a value

9   to Q.

10       THE COURT:  Okay.  Now, where is the asynchronous

11  logic?  Why does it have the sign next to "AL"?  What is that?

12  In other words, "AL," what is that next to the "AL"?

13       MS. THAYER:  The subzero?

14       THE COURT:  Yes.

15       MS. THAYER:  I believe that connotes a logic zero.

16       THE COURT:  Okay.

17       MS. THAYER:  But, again, you're starting to get at the

18  level --

19       THE COURT:  Oh, okay.

20       MS. THAYER:  -- of data function and load function

21  that Mr. Woo --

22       THE COURT:  Okay.  So you've got these variables.  The

23  variable is Q.  Then you've got the load function zero, then

24  condition.  I don't at the moment understand what the

25  relationship is between those, how they're getting wherever

 1   they did get into this chart in the first place.

 2        MS. THAYER:  That's right.  The user is going to

 3   define Q.

 4        THE COURT:  Okay.

 5        MS. THAYER:  The synthesizer is then going to

 6   associate with that the hardware description function and the

 7   assignment condition.

 8      And, again, at this point in the tutorial, if we start

 9   getting too far in the weeds, I think I will lose you, not help

10   you; but when these come up in the claims, I do think it will

11   be a little bit clearer as to who's doing what.

12        THE COURT:  All right.  So right now the user defines

13   Q.  Everything else is done by the synthesizer; is that right

14   or not?  Not sure?

15        MS. THAYER:  It will flow from the program in the

16   synthesizer, yes.

17        THE COURT:  The answer is yes?

18        MS. THAYER:  Yes.

19        THE COURT:  Okay.  Fine.  Okay.

20        MS. THAYER:  I have tried to leave some subject matter

21   for my partner, Mr. Woo, to do, Your Honor, and I apologize if

22   we're doing a little back and forth here.

23        THE COURT:  No, I'm sure you've left him quite a bit.

24   I just figured this was basic and wanted to clear it up so I

25   can understand what's going on.

 1          **MR. VANDENBERG:**  If I can just point out something

 2   really minor here.  I think what was referred to as the subzero

 3   is actually an open parentheses and closed parentheses; and the

 4   patent explains that at '841, Column 16, line 10.  That's the

 5   notation for a hardware description function.  So it's

 6   parentheses.

 7          **THE COURT:**  Okay.  Thank you.

 8          **MS. THAYER:**  You will also see in the claims that

 9   those parentheses will then sometimes refer to the variable Q.

10   And this table we're going to talk about a lot in connection

11   with one of the claims where that parenthesis has the variable

12   Q in it, and it is referring actually to this specific logic

13   circuit.  So, again, once we get to the claims, I do think it

14   will be a little clearer.

15       And we have tried to build on this, Your Honor, rather

16   than throwing everything into the tutorial, and hopefully at

17   the end your questions will be answered.

18          **THE COURT:**  Okay.

19          **MS. THAYER:**  Another technique in the Gregory patents

20   is use of what they call flow control statements in the user

21   description.  So this is, anticipating your question, this is

22   something that the user input is going to reflect.

23          **THE COURT:**  Right.  You don't have to anticipate a

24   question -- well, yes, because this one answers it.

25          **MS. THAYER:**  Okay.

TUTORIAL

```
 1          THE COURT:  All right.  The diagram before did not.
 2   Okay.
 3          MS. THAYER:  Right.
 4          THE COURT:  All right.  So the user, anyway, says
 5   what?  All right.
 6          MS. THAYER:  And some of the statements that are
 7   referred to in the specification are "if," "while," "switch,"
 8   and you see in this example that there's an "if" used right
 9   then.  This is a flow control statement.  We're going to talk a
10   lot about flow control statements when we get to the dispute
11   over "GOTO."
12          THE COURT:  Right.
13          MS. THAYER:  Another technique that is disclosed that
14   we will not spend much time on, I don't believe, just briefly
15   with respect to the prior art, is something that's called a
16   control flow graph.  If you're wondering, is that right,
17   shouldn't it be flow control graph, this is right.
18          THE COURT:  Yeah, I did question that the first time
19   it came up.  I thought it was a typo, but after that I realized
20   that it wasn't.
21          MS. THAYER:  And this is another technique that is
22   described for what the synthesizer does.  It has a graph
23   generator as well, and the synthesizer will create these
24   relationships in order to carry out the inference with respect
25   to the logic circuit.
```

1    And now in my remaining minutes let me do a very quick

2    overview of the '420 or Seshadri patent.  This is about

3    synthesis of memory, not logic circuits.  The Gregory patents

4    will really just be talking about logic circuits.  And you

5    might recall earlier I showed you a depiction of a collection

6    of storage cells, and they will have hardware components in

7    each of those cells making up a memory circuit.

8        This patent talks about a particular type of memory or

9    type of operation, which is a reset.  And the patent says that

10   a reset function effectively clears the memory's unit -- excuse

11   me, the memory unit's cell word values.  So that would be the

12   values meaning there's a value in each cell.  So this is going

13   to clear the memory unit's cell word values to some reset

14   value; for example, an N wide value of zero.

15       So the cell -- each cell has a word value that's up to N

16   bits, and this is going to reset this memory unit's cell word

17   values.

18       So if it started out like this (indicating), you apply a

19   reset and it resets it to a reset value.  Here we've just reset

20   it all to zeros.

21       What the '420 patent is about is synthesis inferring a

22   resettable memory, and that means a memory that is capable of

23   being reset the way that I just demonstrated.  Not all memories

24   are.  Okay.  So this is inferring a resettable memory from a

25   user description.

```
 1        And here the user description will not identify resettable

 2   memory circuit.  Rather, it will have input, and it's hard to

 3   read from here, it will have behavioral input from which the

 4   computer then infers that the ultimate chip design will need to

 5   have a resettable memory in it.

 6        So that concludes my remarks.

 7             THE COURT:  Okay.

 8        MS. THAYER:  I will turn the tables over, unless you

 9   have more questions, hopefully, that I can answer.

10             THE COURT:  You know, it's like we tell jurors:  Wait

11   and see.  As the case goes along, hopefully your question will

12   be answered.  You already answered some of them, so let's just

13   wait then and get the next step.

14        MS. THAYER:  Thank you, Your Honor.

15             THE COURT:  Thank you.

16     Okay.

17        MR. LOVE:  Your Honor, Jeff Love of Klarquist Sparkman

18   for Mentor Graphics; and I have with me, I'd like to introduce

19   Dr. Sarrafzadeh and he is going to give our tutorial, and I

20   have tutorial binders here for the Court.

21             THE COURT:  Very good.  If you can give both to

22   Ms. Lucero, she'll deliver them.  That will be probably

23   easiest.

24        MR. LOVE:  Doctor.

25             THE COURT:  Thank you.
```

1          **DR. SARRAFZADEH:**  Good morning.

2          **THE COURT:**  Good morning.

3          **DR. SARRAFZADEH:**  With your permission, I want to

4     provide a technology tutorial on the basics of logical design.

5          We have all taken algebra in high school.  What they teach

6     us is X plus 2 is equal to 4 and we have to solve for X.  The

7     answer is 2.

8          In Boolean algebra, which is the basis for designing

9     circuits, we have a similar thing.  We have variables just like

10    X.  The only difference is the variables in Boolean algebra

11    take one of the two values, one or zero, also known as true or

12    false; whereas, in normal algebra, X will take values 5, 7,

13    182, you name it.  Here things are more restricted.

14         In normal algebra, we have operations.  We have

15    multiplication.  We have addition.  We have division.  In

16    Boolean algebra, we also have operations.  Operations, as an

17    example, would be the "OR" operation.

18         Here I'm showing a table; and given that the variable A

19    can be either zero or one and variable B can be zero or one, A

20    and B together could have one of the four combinations, zero,

21    zero; zero, one; one, zero; and one, one.  And that's it.

22    There is no other possibilities.  So we define the "OR"

23    operation in Boolean algebra as such:  Zero, one, one, one.

24         What is the use of this?  Let me provide an example.  I

25    have Ph.D. students who come to me when they are in their third

1    or fourth year of study and they say, "Dr. Sarrafzadeh, what do

2    I need to do to graduate?"  I say, "Among other things, you've

3    either got to publish a journal paper or a conference paper.

4    Then I'll let you graduate.  So either a journal paper or a

5    conference paper.  If you do both, you still pass.  You get a

6    one, true.  If you do one or the other, I let you pass,

7    graduate, get a Ph.D., and work somewhere.  And if you do

8    neither, back to square one.  You can't graduate.  Sorry."

9    They understand that.

10        We have other operations in Boolean algebra; for example,

11   "AND."  Again, that nothing changes, we still have four

12   combinations of variables C and D and the "AND" operation is

13   defined as zero, zero, zero, one.

14        Again, my graduate students in the first year they ask me

15   a similar question.  They say, "In our four years of study,

16   what do I need to do to get a Ph.D.?"  I say, "You've got to do

17   research and you have to pass all of your courses.  You've got

18   to do both of them in order to get true or pass.  If you only

19   do your courses, you are not ready to get a Ph.D.  If you do

20   neither, well, we ask you to leave actually.  That's bad.  But

21   if you do one of them, that's not good enough.  You've got to

22   do both."  So that's the "AND" operation that's used.  These

23   are the basics of circuit design.

24        Many years ago in the '50s and early '60s smart electrical

25   and computer engineers figured out a way to build these

 1   operations in silicon.  So for "OR" they built something like

 2   that (indicating).  This is the symbol they used, and this is

 3   nothing but the "OR" operation done at the circuit level.  I'll

 4   give you an example in a second.

 5       For an "AND" they also have a symbol.  So they can take

 6   all these concepts of "ORS" and "ANDS" and build them into a

 7   circuit and denote that by symbols of this type.

 8       As an example, engineers have figured out that if you put

 9   A and B here, if A is zero, B is zero, the output of this

10   circuit element is going to be zero; and the way they know that

11   is they look up that table that I showed earlier, and they're

12   able to build physical elements which does exactly this.  This

13   really started the revolution of circuit design back in the

14   '60s.

15       If B changes to one, X will change to one.  So this is a

16   wonderful device right here which does exactly what Boolean

17   logic tells us.

18       So what is logic design or circuit design all about?  It's

19   really taking many of these gates, "AND" gates and "OR" gates,

20   and connecting them up by these black things, horizontal and

21   vertical things, that are nothing but wires.

22       So the gate shown here in green is the "OR" operation in

23   Boolean algebra and the gate shown in red is going to be this

24   Boolean operation in algebra (indicating).

25       So I can express this art with X as a function of A, B,

1    and C as such if we already know how an "OR" gate works and we

2    know how an "AND" gate works.

3        Is this of any use, as you indicated earlier this morning?

4    I think it is.  So a company like Tesla or Ford will hire an

5    electrical or computer engineer and they say, "For safety

6    reason I want you to build a circuit for me that if somebody

7    leaves their door open, I want something on their dashboard to

8    warn the driver, 'Your door is open.'"

9        So an engineer who has been through these slides, he will

10   say or she will say, "Well, there are two doors in this car.

11   There is a driver side and a passenger side; and if either of

12   them is open, I want to know that."  So if the door is open,

13   the value B, the driver side door, changes to one; and,

14   therefore, the condition that is either of the doors open

15   becomes true.  So that's good.

16       Then the engineer say, "Should I put a warning sign right

17   there?"  And the answer is, no.  Maybe the car is parked.  You

18   don't need to warn anybody if I'm in my parking lot and trying

19   to unload the groceries.  That's okay to leave the door open.

20   Engineers get that.

21       So they know that when the key is in the ignition, is in

22   the car, is ready to go, that's when we have an issue.  So they

23   take -- they say, "If either of the doors is open and the car

24   is ready to be driven," which I had a one signal here, "the

25   output of the whole circuit is one, that's when I want to

 1  illuminate this sign."

 2          **THE COURT:**  What if it's a sedan?

 3                       (Laughter)

 4      **DR. SARRAFZADEH:**  Then it will have multiple of these

 5  doors.

 6          **THE COURT:**  Thank you.  It will be a separate circuit.

 7      **DR. SARRAFZADEH:**  Totally different design but similar

 8  concept.

 9          **THE COURT:**  Okay.

10      **DR. SARRAFZADEH:**  So as we have more complex design,

11  the number of these gates increases, but we engineers think of

12  them as step by step.

13          **THE COURT:**  Okay.

14      **DR. SARRAFZADEH:**  We don't think of a billion gates

15  all at the same time.  We really start at this basic level and

16  build up.

17          **THE COURT:**  Okay.

18      **DR. SARRAFZADEH:**  Now, later on when the door is

19  closed, this value becomes zero.  So are either of the doors

20  open?  No.  And I'm ready to drive.  Zero and one is zero, so

21  this sign is turned off.  So we don't need to warn anybody.

22      We have other type of logic circuits.  "AND" gates and

23  "OR" gates were two examples of them.  We also have what is

24  known as memory elements.  The purpose of memory elements is to

25  store values.  The two common form of memory or storage

1    elements are called latches, a latch is depicted here, or a

2    flip-flop.

3         Basically what either of them do is we set the value of Q

4    to the value D.  D is called the input of the latch or the

5    input of the flip-flop.

6         And who will decide when do we have to set these values?

7    When we have a latch, it's this signal (indicating), the enable

8    signal.  By setting enable to one, I will enable the latch for

9    Q to take the value of the D.

10        For a flip-flop, similar to an enable, we have a clock

11   signal.  So we have an enable or we have a clock, but basically

12   the fundamental operation of a latch or a flip-flop is to set

13   the value of Q to the value D and store that until further

14   notice.

15        So let's do an example.  Let's see the operation of a

16   latch step by step.

17        So here I have shown the same symbol.  I have shown the

18   signal enabled, which is shown here (indicating).  I've shown

19   the input D of the latch; and I'm showing what is stored in the

20   latch, also known as the output of the latch.

21        I will show step by step what is going to happen.  Bottom

22   line, when enable is equal to one or true, then Q is set to D

23   as shown up here.  At all other times Q maintains its value.

24   It doesn't change.

25        Let's see how it works.  So first here, as you see, enable

**TUTORIAL**

1   is set to one because, remember, these are all Boolean

2   variables.  Those are either one or zero.  So when enable is

3   one, the value Q is set to exactly what D is, meaning Q mimics

4   D exactly.  So, in fact, when we look at these two parts, D and

5   Q, they are precisely the same.  And this is true only because

6   I'm enabling it by setting EN to one.

7        Later on if I don't want to enable the latch, I will set

8   it to zero so the latch is not enabled, which means Q will take

9   here the last value it had.  So you see the value of Q in this

10  region is the same value that it had toward the end right here

11  (indicating) no matter what happens to D.

12       So Q is stored.  It remembers the value one because it's

13  the last thing that it saw when enable was set to one.  That's

14  really the fundamental operation of a latch.

15       And just to continue the example, if later on enable is

16  set to one, again Q will mimic D, meaning it will be set to the

17  value D.  That's all.  That's the operation of a latch.  This

18  is a fundamental element in every circuit design.  Just like an

19  "AND" gate and an "OR" gate, it works very simply in this

20  manner.  So, again, when designers put many of these latches in

21  their design, they truly do it one by one.

22       Let's see how a clock flip-flop works.  Very similar to a

23  latch with only one basic difference.  The enabling is called a

24  clock, which is a periodic signal which is one, zero, one,

25  zero; but basically whenever the clock is rising from zero to

1  one, on that exact moment, something will happen.

2      When I teach and the bell rings, in that exact moment

3  something happens.  All the students disappear.  During the

4  class, nothing happens.  After the class, they are gone.  In

5  that exact moment, something will happen.  Same thing, when I

6  start my class at 10:00 o'clock, at that exact moment everyone

7  is quiet, sits back, and listens to me.  It's that exact moment

8  that matters.  That's what a flip-flop does.

9      Let me show you an example.  So we have a clock signal.

10  At this exact moment shown with a dashed line here, the clock

11  rises from zero to one.  So Q will be set to value of D at that

12  exact moment.  Slightly after that exact moment nothing will

13  happen.  Q will simply remember its old value.

14      We keep going.  This is a periodic signal.  The clock,

15  later on it again changes from zero to one.  That's called a

16  rising edge.  At that exact moment, Q is set to the value of D,

17  and it happens the value of D is one; therefore, Q mimics or is

18  set to the -- at that exact moment.

19      Later on, as you see, in other parts of the clock Q simply

20  remembers its old value.  Again, when we have a rising edge

21  here of the clock, if D happens to be zero, Q will be set to

22  that value by being zero.

23      So it's very simple.  Only at that exact moment, which is

24  the rising edge of the clock, Q is set to D.  As simple as

25  that.  And at all other times, Q will remember its old value;

1   hence, the word "remember" or "storage element."

2       So the basic storage elements, flip-flops and latches, do

3   exactly this.  They are set to a new value as we saw here

4   (indicating), and at all other times they remember or they

5   store their old value as simple as an "AND" gate and an "OR"

6   gate, so on and so forth.

7       I live in Los Angeles.  Everything is far apart, 50 miles,

8   hundred miles.  I really want to know how far my friends live.

9   I have this obsession.  Every time I want to go out somewhere,

10  I have a trip odometer on my dashboard.  I go and push that.

11  That will reset the trip to zero.  Then when I get to my

12  friend's house, I look at that value, it's 43 miles.  I know

13  how far that is.  The next day, I push that button again, I

14  reset the odometer, and that shows me the trip value again.

15      In flip-flops we have the same thing.  We have something

16  in some type of flip-flops which is called the reset value here

17  (indicating) shown as R.  So when the reset value is zero,

18  which means I'm not resetting, meaning reset is not true, the

19  flip-flop works in the same old fashioned that we saw in the

20  previous slides.

21      But if I push that odometer button on this flip-flop,

22  meaning if I push that to one, the value of Q will be set to

23  zero.  I'm starting to do my trip.  I reset that.  That's all.

24  I can reset the value of this storage element by enabling R.

25      If I have many flip-flops on my design, I can push the

1  reset button once, set back to one, and make everybody equal to

2  zero.  So, you see, I have a wire reset that is connected to

3  three flip-flops here.  All of these are the same wire.  And by

4  pushing the reset, meaning setting that to one, all of these

5  values ones will be reset to zero.  Let's see that.

6      I make reset one.  All the values at the same time or

7  almost at the same time will be set to zero; therefore, I say I

8  have reset all of these storage elements or flip-flops at the

9  same time.

10     Okay.  So part of a design is circuit.  As I've been

11 emphasizing, it's very simple.  We take little things that we

12 have designed before.  This is the circuit we designed for

13 opening a door of a car and the warning signal (indicating).

14 This is a flip-flop with a clock that we introduced

15 (indicating).  We put these things together and we have a

16 circuit.  Let's see how it works.

17     So here I have A and B zero, which means one of the doors

18 is open.  The output, which I'm showing as the green variable E

19 is one, which says one of the doors is open.  I have the switch

20 in the car, the key in the car ready to go.  So the warning

21 signal should be one.  And I want to remember that in this

22 flip-flop.  So as soon as the clock is set to one on the rising

23 edge of that clock, the value Q or X is set to this value one

24 only on the rising edge.

25     So, you see, I'm taking everything about this circuit and

1  everything about the flip-flop putting it together.  Just

2  combining them in a very simple manner.

3       Later on I don't have a rising edge of the flip-flop.  The

4  key C transitions to zero, which means the key is not in the

5  car anymore, although one of the doors is open.  So value D,

6  which is the output of the "AND" gate is zero.  I don't need to

7  illuminate that warning signal anymore.  But the clock is one.

8  The clock has not done a transition from zero to one;

9  therefore, X doesn't -- is not allowed to change to zero yet.

10  It has to wait for the clock.

11       That's how I orchestrate the entire circuit.  These clock

12  signals orchestrate everything.  They say, "Everybody start

13  changing."  So this clock (indicating) hasn't allowed signal X

14  to change yet because it's not transitioning.

15       So later on clock returns to zero by transitioning from

16  one to zero, but that's transitioning from one to zero.  That's

17  usually not how flip-flops work.  They only work when you

18  transition from zero to one as we saw in the earlier slide.

19       So although we had a transition here (indicating), because

20  it's from one to zero, X is not allowed to change.  Clock is

21  not allowing the X to change.

22       After a few moments, the clock changes from one to zero as

23  we saw here, which is really telling Q, "Now you are allowed to

24  reset to the value of D."  So only when the clock goes from

25  zero to one Q can go and take the value of its input.

1       There is really nothing new in this slide.  It's really

2   the combination of this circuit (indicating) that I showed

3   before and the flip-flop.  The main purpose of this slide was

4   to show that you can put different elements together and make

5   the whole thing work.

6       So how do engineers design a circuit?  Typical circuits

7   may consist of tens of millions or hundreds of millions of

8   gates as listed on the last slide that I was expressing before.

9       Now, having 10 million gates here or probably many of the

10  computers in the courtroom, including the laptops, may have up

11  to 1 billion gates, so how am I going to draw all of these as

12  I'm engineer?  That takes a lot of time.  It's time-consuming

13  and it's hard to draw these.

14      So engineers wanted a method of being able to express this

15  circuit in a textual manner because it's easier to type than

16  draw.  That's really the fundamental reason.  So they invented

17  what is known as hardware description languages.  Hardware

18  description languages or HDL is nothing but a textual way of

19  describing the circuit shown before.  By writing text, I can

20  say "AND," I can say "OR," I can say "flip-flop."  That's

21  really what it is.  It's a language in textual format for

22  describing a logic circuit.

23      It also allows expression of time.  Why is that important?

24  Because in digital circuits we have clocks.  Clocks are very

25  important in digital circuit.  They synchronize everything.

1    They allow everything to work; therefore, I need to be able to

2    express time.  So hardware description languages allow

3    expression of time.

4        Today two of the most common hardware description

5    languages are Verilog and VHDL.  HDL, of course, is hardware

6    description languages and V stands for, unfortunately, VHSIC,

7    which is very high-speed IC.  Just a name for now, but that's

8    where the name comes from because they wanted to use VHDL to

9    design very fast integrated circuits or chips.

10       In contrast to hardware description languages, we have

11   programming languages, also known as software programming

12   languages.  Example of software programming languages are

13   Fortran, C, Pascal, and a number of others.  In the old days

14   people used to do Fortran a lot.  Now they use C and variations

15   more.

16       In writing a program, it basically consists of lines of

17   code that describes the functionality.  In one shot it says

18   multiply instead of going to each gate and describing them.

19   It's very high level.

20       There is no explicit mention of time like a clock.

21   Basically you do one operation, then you do next, then you do

22   next.  They go one after the other because it's not a circuit.

23   It's a high-level description.

24       In software languages there are many control values, like

25   if/else.  If something happens, set X equal to one; else, set X

1    equal to two, for example.  That's an if/else.

2        While we are writing part of a program, we may want to

3    break and go do something else because I have a virus in my

4    computer.  If I'm doing Excel, I want to stop that and go take

5    care of the virus.  The programming language says, "Break from

6    doing your Excel work.  Viruses are important.  Go take care of

7    that."  This is all part of a programming language, and there

8    are many other controls.

9        So let me contrast HDL with these high-level or software

10   programming languages.  In HDL you have fewer control

11   statements.  In programming languages we have a lot.  In HDL we

12   allow for timing to be expressed; for example, through clocks.

13   And HDL is primarily used for hardware design.

14       Whereas, in programming languages we have more control,

15   many more control statements.  There is no concept of timing.

16   It's, "Do this.  When you are done, do the next thing, and do

17   the next thing."  There is no clock here.

18       And programming languages are used to express algorithm

19   and high-level concepts.  Today every engineer that comes to

20   UCLA, they learn about programming languages.  Many physics

21   majors, almost all of them, learn about programming languages.

22   They learn Fortran and they learn our C programming and many

23   others.  So there are a lot of people today, and even in the

24   '90s and '80s, who learned programming languages.  In contrast,

25   there is a very small community of engineers who learn about

1  HDL or hardware description languages because it's very

2  specialized.  It's used for a very restricted set of designs.

3      What is synthesis?  Synthesis is really a conversion tool.

4  It takes logic from one form and transform it into some other

5  form.  It makes the logic simpler.  Sometimes it translates at

6  Boolean expression, at Boolean function into gates.  That's

7  what synthesis does.

8      Synthesis is rooted in Boolean algebra.  I learned about

9  synthesis back in 1979 when I took my first course in computer

10 engineering, and the book that I was using was probably 10

11 years old.  So the notion of synthesis is probably 150 years

12 old.  The techniques for logic synthesis are probably 40 and 50

13 years old before Silicon Valley was Silicon Valley.

14     The first technique that I varied was called K-Maps and

15 Quine-McCluskey.  Those were the fundamentals of logic

16 synthesis and what it does, it does a transformation from one

17 logic level to another.  That's what synthesis is all about.

18     I hope that the presentation provided some fundamental of

19 logic design and circuit design, and this concludes my

20 presentation.

21         THE COURT:  All right.  Thank you very much, Doctor.

22         DR. SARRAFZADEH:  Pleasure.

23         THE COURT:  All right.  Now, that was the tutorial

24 section, so to speak, of our morning and you each have, I

25 gather, one hour to then address the actual patents here.  Some

**CLAIMS CONSTRUCTION**

 1    of the disputes have been at least teed up in your respective

 2    tutorials.

 3         We would need to take a break for the reporter at some

 4    point, and this might be the best time.  I think it was

 5    suggested earlier this might be a time to take a break and then

 6    launch into the two presentations.  That way we won't have to

 7    stop the plaintiff's presentation midway for the reporter.

 8              **MS. THAYER:**  Thank you.

 9              **THE COURT:**  So what do you think, ten minutes?  Is

10    that good enough for the reporter?

11              **THE REPORTER:**  That's fine, Judge.

12              **THE COURT:**  Okay.  And for counsel, do you need any

13    more than ten?  Is ten okay?

14              **MS. THAYER:**  That's good with us.

15              **MR. MILLER:**  Ten minutes is fine.

16              **THE COURT:**  All right.  Take ten.

17              **MS. THAYER:**  Thank you.

18              **THE COURT:**  Thank you.

19                        (Recess taken at 10:31 a.m.)

20                   (Proceedings resumed at 10:45 a.m.)

21              **THE COURT:**  All right.  Ms. Thayer, are you taking the

22    laboring oar here or is someone else?

23              **MS. THAYER:**  Yes, I am at first.  Thank you,

24    Your Honor.

25              **THE COURT:**  Okay.

1        **CLAIM CONSTRUCTION**

2            **MS. THAYER:**  And just to briefly explain, we are going

3    to first deal with the issues with respect to the '420 patent.

4            **THE COURT:**  Okay.

5            **MS. THAYER:**  So we'll take that as a chunk.

6            **THE COURT:**  All right.

7            **MS. THAYER:**  And, so, when I finish, Mr. Love will

8    speak to those issues.

9            **THE COURT:**  All right.  I've got more materials here,

10   so just give me a moment.  I want to get the '420 in front of

11   me, which I now have.  And this has the limited number of terms

12   that we're talking about.

13           **MS. THAYER:**  That's right.

14           **THE COURT:**  Oh, okay.

15           **MS. THAYER:**  For all of the argument that we will be

16   making here today, of course Your Honor has written many

17   opinions in this area, you know the Federal Circuit law, I

18   still want to go over three of the principles that I think are

19   significantly significant for the disputes that we have here

20   today.

21       First of all, this case, like most, should not be decided

22   based on -- should be decided based on what the patents teach

23   and claim, not on expert opinions, unless there is some real

24   mystery left over once the patents and the file histories are

25   examined.

1          Second of all, it is both unnecessary and at times risky

2     to construe words that are well-understood plain English.

3     Simply swapping some synonym for a plain English word can

4     improperly alter the invention.

5          And then, finally, it is wrong to exclude from claims

6     subject matter called out in the specification absent a clear,

7     specific disclaimer during prosecution.

8          And, Your Honor, when we get to the Gregory patents, which

9     will be the next module, we'll see that this third bullet comes

10    into play, I believe, quite strongly.

11         Just to reorient, we're about synthesis in the EDA process

12    and, so, we're now going to be talking about user inputs

13    synthesis in the Gregory patents.  We're going to talk a little

14    bit about simulation, emulation; and just because some of my

15    slides later on do mention the materials related to the accused

16    devices here, I just point out that those products are the

17    Veloce emulator and the Precision synthesis software, so going

18    directly to the '420.

19         To summarize, Your Honor, you're right, there are limited

20    disputes.  The first one involves the word "inferring" in the

21    claims, and you'll see that in just a second.  And we believe

22    that there is an effort here to replace "infer" with another

23    English term and, thus, make the claim more susceptible to some

24    sort of invalidity defense.

25         With respect to resettable memory, we are going to see

1    that the effort to define "memory" as being just a single

2    storage cell is an effort to have it read on prior art that, in

3    fact, Synopsys created.

4        So here's the independent claims.  We have both method and

5    product claims in this patent.  Both terms are in both claims.

6    We're just going to focus on Claim 1 because the analysis is

7    the same for 11.

8        It's a method where the first step is inferring the

9    existence of a resettable memory from a behavioral or RTL level

10   description of a semiconductor circuit.  That's just another

11   way of saying a logic circuit.

12       So what is the difference between the proposed

13   constructions?  Synopsys first says there is no reason to

14   construe the term "inferring."  It's a word that is very

15   commonly used in this industry.  Both experts agreed on that.

16   It is a common English word.  The jury will understand it.  So

17   there's no need to construe it; but if there is, if you do

18   decide to try and find a synonym, "deduce" is far closer to the

19   concept of "infer" taught in the patent than the word that

20   Mentor uses, which is "recognizing."

21       The other problem that I point out with Mentor's

22   construction is, the term where construing is "inferring," they

23   are proposing a construction that isn't just recognizing, it's

24   putting into the claim term recognizing that a portion of a

25   circuit design -- now, that's on because the circuit design

1   hasn't been created yet.  The user is inputting functional or

2   behavioral language.  So they are inferring that a portion of a

3   circuit design corresponds to a specific hardware structure.

4        They're proposing to put that into this claim

5   (indicating), and it just simply does not fit.  So, in any

6   event, this construction here (indicating) cannot be right

7   because you can't put it into the claim itself.

8        Now, there's no dispute, as I said, the term "inferring,"

9   that what the synthesizer does infers these hardware components

10  or logic circuits from the user description.  Both Dr. Thomas

11  and Dr. Sarrafzadeh agree that, yes, it's used -- it doesn't

12  have any special meaning in this patent.

13       And then the specification uses the word "infer."  It's

14  not as though that word crops up first in the claims.  It is

15  here, and the patent says the use of a resettable memory is

16  automatically inferred -- and that's, again, the synthesizer

17  that's doing the inferring -- from the behavioral level or RTL

18  level description of the designer's design.  In fact, this

19  statement in the patent really is the crux of Claim 1.

20            **THE COURT:**  Okay.  Let me just stop you for a

21  moment --

22            **MS. THAYER:**  Sure.

23            **THE COURT:**  -- because this is the less complex of the

24  disputes that you have or even with this one patent.

25       First of all, the term in your joint claim construction

1    statement is just "inferring."  It was not taken as the whole

2    phrase "inferring, et cetera, et cetera," and then rewriting

3    it.

4        So if we're just dealing with "inferring," then the

5    question is whether you can even do anything else but just

6    either have it as the dictionary meaning of "infer" or some

7    other word that might be more commonly used by a juror; or

8    whether you can branch out, as you've pointed out the defendant

9    has done in this instance, to seek to describe more of the

10   process than just substituting "infer."

11       So that's a little bit something the defendant can be

12   thinking about as to the nature of the dispute here, whether

13   it's legitimate to even change anything but "inferring."

14       But assuming it were for a moment, one of the problems I

15   see is you want these terms, I guess, unless somebody prevails

16   on summary judgment, to be -- actually these terms to be used

17   by a juror.  And since you're probably going to excuse anyone

18   that actually purports to understand the field, you're going to

19   be left with trying to explain this to people who are new to

20   the area.

21       And I'm just wondering, if you read to them essentially

22   what the patent says almost verbatim, whether this is going to

23   be helpful for the jury or not.  And, so, that's just something

24   I'd like you to be thinking about, how is this going to be

25   used, who is going to use it, and under what circumstances.

1       Yes, "inferring" means "deducing."  "Recognizing" does

2  have an implication that you've seen something before and can

3  see it again now and know what it is.  They didn't use

4  "recognizing," I'll grant you that.

5       If I just wanted a tiebreaker, maybe we could use

6  something like "detecting," which means, according to

7  Webster's, to discover or discern the existence, presence or

8  fact of.

9       But I don't know if that really solves your dispute

10  anyway, so you can be thinking about that.  But I don't know

11  how much more you can say here.

12       You pointed out that they've added kind of more

13  descriptive language to what you have here, but then let's say

14  you just read this to somebody who's sitting in the jury box.

15  All right.  We're going to say that it means inferring the

16  existence of a resettable memory from a behavioral or RTL level

17  description of a semiconductor circuit.  Then their eyes are

18  going to glaze over and maybe you'll be able to explain what

19  that is during the trial.

20       If you can think of any other suggestions, unless there's

21  something really new and different here that you want to add, I

22  just want to put that concern that I have out there and then

23  leave you to kind of think about is there any way to solve that

24  problem other than just saying "infer" means what it means.

25       MS. THAYER:  Well, Your Honor is correct that we will

1   have several stages before the jury trial where some of these

2   issues and some of these words may not become so relevant to

3   the jury because of summary judgment.

4       For example, yes, I do have something new that's not in

5   the brief.  In showing you that the word "infer" is very

6   commonly known and used exactly in the industry the way it is

7   in this claim, I just provided you with some quotes from a

8   public version of the *Precision Reference Manual* where it

9   repeatedly uses the word "infer" to describe what it is that

10  the synthesizer is doing.

11      And I would say that this not only confirms that "infer"

12  does not need to be construed, but it also suggests that this

13  dispute may not actually make it to the jury, at least in terms

14  of infringement issues.

15      **THE COURT:**  Okay.  But the manual that you just made

16  reference to, what is that exactly?

17      **MS. THAYER:**  That is the reference manual that's

18  provided to customers of the defendant who utilize the

19  Precision synthesis tool.  That's one of the accused products

20  in the case.

21      **THE COURT:**  In other words, you're saying the

22  defendant themselves uses the word "infer"?

23      **MS. THAYER:**  Right.  And here it's talking about if

24  Precision synthesis does not infer the correct number of RAMs,

25  random access memory, ROMs, read only memories, et cetera,

**CLAIMS CONSTRUCTION**

1    et cetera.

2            **THE COURT:**  Okay.  I can read it.

3            **MS. THAYER:**  So I will move on.  I understand that you

4    have read the briefs.  You are up on those.

5            **THE COURT:**  Well, I just think this is one of the

6    less, perhaps, complex arguments that you're each making, and

7    I'll hear what the defendant has to say about this.  I may come

8    back to you.

9        But I'm just concerned that, I don't think anybody can

10   assume that they're going to win everything on summary

11   judgment; and if you can't, then somebody's got to be able to

12   understand this, and I'm the one who's going to have to be

13   telling them.  And you're going to say, "The judge said this is

14   what it means," and they'll get mad if they can't understand

15   it.

16       So, okay.  Let's go to --

17           **MS. THAYER:**  Point very well taken.

18           **THE COURT:**  -- the next word.

19       Okay.  Well, so now you are at the next term.

20           **MS. THAYER:**  Now I want to talk about the resettable

21   memory because what's being inferred is a resettable memory,

22   and there's two very important distinctions between the

23   proposed constructions.

24       Synopsys' says it is a memory unit with a plurality of

25   storage cells each with a unique address; and Mentor's, most

 1  importantly, says a memory, a resettable memory, comprises one

 2  storage cell or more.  And I want to focus on that, one versus

 3  many.

 4          **THE COURT:**  Right.

 5          **MS. THAYER:**  The patent when it's talking about the

 6  memory unit, and it talks about the memory unit consistently

 7  throughout the patent, it refers to it as having a plurality of

 8  storage cells.  And you will -- I pointed out earlier in the

 9  tutorial, it talks about the values, values plural, of the

10  cells in the memory.

11      See, this is what we saw before, where it says, "the

12  memory unit's cell word values," that itself implies the memory

13  unit is going to have multiple cells.

14          **THE COURT:**  Okay.  Let me ask you about this for a

15  second then.  Ordinarily, as you know, it's the plaintiff who

16  is arguing for the broadest and most inclusive definition and

17  the defendant who's trying to narrow it to a specification.  In

18  this instance you have, no pun, a flip-flop and one of you is

19  arguing the other's typical position.  You state somewhere in

20  your briefing that the reason for that is that the defendant is

21  hoping that if it's a broader definition, it will be covered by

22  a prior invention.

23      Now, the real issue here is whether every time they're

24  talking about memory unit 101 or 201, which they say is the

25  same as 101 in the diagram -- I don't know how many other

1    times, my guess they use a number for their memory unit in the

2    diagrams -- but is that just an exemplar or is this a

3    necessary, so to speak, part of the invention?

4          Is it the invention itself?  If it were, then you could

5    argue more this is -- or more easily, let's say -- this is what

6    it is, it's a multicell unit.  But here it's part of what the

7    invention is.  You have this unit and then you have what's not

8    resettable, and that's that one; and then you're going to have

9    this little resettable one.

10         But that seems to be the issue.  In other words, is this

11   just an example or is this it?  You know, is this the invention

12   or is this one embodiment of it?

13             MS. THAYER:  And, Your Honor, if you will -- if you

14   actually read every single column, as we have done, you will

15   see this is it; and not only is this it, the patent, for

16   example, in Column 7, line --

17             THE COURT:  Now, don't go too fast.  Wait a minute.

18             MS. THAYER:  All right.  Column 7.

19             THE COURT:  Wait a minute.  Wait a minute.  Okay.

20   Column 7.  I'm here.

21             MS. THAYER:  Line 14 --

22             THE COURT:  Okay.  Give me a second.

23             MS. THAYER:  -- talks about a memory unit cell.  It

24   talks about that cell again in line 40 and then again in line

25   59.  Everywhere where it's talking about, and we'll see in a

 1   minute, it's talking about where a register communicates with

 2   it, it's communicating with a memory unit cell.

 3        And, so, to read the memory unit to simply be a single

 4   cell or a register is simply inconsistent with the way that

 5   this patent explains what -- the operation of the synthesizer.

 6        It is not on a single storage cell.  And we see here, this

 7   is Figure 5 as well that is being talked about in this column.

 8   So memory unit is the group of storage cells, and it's defined

 9   in that first slide that I showed to you; but here Figure 5

10   it's being talked about when it says memory unit cell, that

11   individual storage cell, over and over again.

12        Each cell has this -- 511, this little R, that's a

13   register.  That's a register right there (indicating), and it

14   says so in Column 7 that I was just showing to you.

15             **THE COURT:**  Okay.

16             **MS. THAYER:**  And, so, when the patent wants to refer

17   to a register or a single unit, it will call that out as a

18   memory unit cell.

19        The claim is not to inferring a resettable storage cell.

20   It is referring to the inference of a resettable memory.

21        And I put it to you that calling a memory a storage cell

22   is just simply not permitted by the entire language in this

23   patent.

24        And, again, the reason that we're having this fight is

25   because Mentor does have examples from Synopsys' own earlier

1    work of a resettable register.  In filing this patent, Synopsys

2    was not trying to repatent a resettable register.  It was

3    trying to patent something that is more complex than that,

4    which is this memory unit with multiple storage cells each

5    addressable as we see by repeated circuits like in Figure 5.

6            THE COURT:  Okay.

7            MS. THAYER:  Finally, Mentor's proposed construction

8    requires that the reset occur in a single step, and you won't

9    find anything about that in the patent or the claim language.

10   That is, based on the opposition brief, that is based on -- if

11   you read the opposition brief, they say, "Well, look, here

12   you've just got one line, 619, and that's a single signal."

13   But somehow that gets transformed in their construction into a

14   single step; but if you again look at the description in

15   Column 7 about Figure 6, this is an operation that's going to

16   take place on every cell.

17       So from that, the construction is saying that it takes

18   place in a single step, reduces the complexity of what is

19   actually described.  Admittedly in each step there is a reset

20   signal, but to call that a single step in the construction

21   greatly oversimplifies this claim and is not supported by the

22   patent itself.

23           THE COURT:  Do you understand single step to go along

24   with the one, part of the one or more in their definition then,

25   or is that even a separate concept?

1      **MS. THAYER:**  I frankly don't understand it,

2  Your Honor.  I read the opposition brief and what I saw was

3  immediately a reference to single signals.  So maybe it is a

4  tie-in.  If there is a single cell, one would see a reset

5  signal and then in that step that would be reset, and that

6  certainly would be the case; but, again, the memory unit is not

7  a single storage cell.

8      **THE COURT:**  Okay.  Now, that was the Seshadri unit, so

9  to speak, or did you have more in this group by agreement

10  before we turn to the defendant?

11      **MS. THAYER:**  That is all I have for now.

12      **THE COURT:**  Okay.

13      **MS. THAYER:**  If you have any further questions of me,

14  I will be right here.

15      **THE COURT:**  No.  You didn't like "detect," right, the

16  possibility using "detect"?  I was trying to find it somewhere.

17      **MS. THAYER:**  On the fly, it -- I had written down --

18  I'm sorry, Your Honor.  I wrote it down and then my mind moved

19  on.

20      **THE COURT:**  The definition.  This was just one

21  definition, to discover or discern.  "Discern" is another word

22  that might come into play.  I don't know.

23      I'm more concerned, frankly, with just what's around the

24  word "infer."  I think the average juror can understand what

25  "inferred," "deduced" means, but then are they going to

**CLAIMS CONSTRUCTION**

 1   understand all of the rest of the stuff around it?  Maybe we

 2   don't have to worry about that because somebody can explain it

 3   to them when we --

 4        **MS. THAYER:**  Your Honor, we are concerned as well

 5   about how we will ultimately communicate.  There are many

 6   words, many, many technical words in these claims that have not

 7   even been brought to your attention yet for construction that

 8   we're going to have the same concern, and we will be developing

 9   with our experts and our graphics every tool we can and

10   glossaries to assist the jury because that is our job as well.

11        **THE COURT:**  All right.  Okay.  I'm just, you know,

12   thinking down the line having sat up here and tried to explain

13   to the butcher, baker, and candlestick maker that we have this

14   really fascinating case about computer programming.

15        So, okay.  Well, then, I think that I'm going to hear,

16   then, from the defendant at this time and see what they have to

17   say for Mentor Graphics.

18        **MR. LOVE:**  Thank you, Your Honor.  Jeff Love for

19   Mentor Graphics.

20        **THE COURT:**  Mr. Love.

21        **MR. LOVE:**  I've got our tutorial slides here as well.

22        **THE COURT:**  Okay.  Now, I've got -- oh.  Well, I have

23   one package from you.  I have your technology tutorial.

24        **MR. LOVE:**  Yeah.  I'm sorry.  This is the *Markman*

25   claim construction slides.

**CLAIMS CONSTRUCTION**

1      **THE COURT:**  Oh, this is the *Markman* slides.

2      **MR. LOVE:**  Yes.

3      **THE COURT:**  Oh, okay.

4      **MR. LOVE:**  And also inside there's also a copy of the

5  Seshadri patent, and it's color-coded.  I just highlighted some

6  of the portions that are mentioned in the slides and in the

7  brief.

8      **THE COURT:**  Okay.  Did you by any chance give a copy

9  of this material to Ms. Thayer or someone else over at the

10  other table?

11      **MR. LOVE:**  We did.  Yes, we gave them a copy of the

12  material.

13      **THE COURT:**  So they know what you've highlighted?

14      **MR. LOVE:**  Yes.

15      **THE COURT:**  Okay.  That's fine.

16      All right.  Now, this is the more, in my opinion, simpler

17  of the patent disputes, the word "infer" and then you go on to

18  the resettable memory.

19      **MR. LOVE:**  Yeah.  Do you want me to start with "infer"

20  or may I start with the one cell issue, which is the bigger

21  issue in our mind?

22      **THE COURT:**  If you don't care about "infer" that much,

23  then you can consider about "detect" or "discern"; and, anyway,

24  we'll go to --

25      **MR. LOVE:**  So we'll go to Slide 7.

1          **THE COURT:**  Okay.  Hang on.

2          **MR. LOVE:**  Slide 7.

3          **THE COURT:**  Oh, Slide 7, not to be confused with

4    Column or Figure 7.

5          **MR. LOVE:**  So page numbers are on the bottom right.

6    And for the patent it's referring, if you wanted to see it in

7    context, it's referring to Column 5 in particular.

8      But what you have here, and I've highlighted in yellow

9    where I'd like your attention to be drawn, is that inferring

10   the use of a resettable memory, it explains, is done by

11   identifying that a reset condition, that's simple enough, you

12   know, is being individually applied, and here's the kicker --

13         **THE COURT:**  Okay, but wait a minute.  I think I'm not

14   with you on where you're reading.

15         **MR. LOVE:**  Okay.

16         **THE COURT:**  Tell me where you're reading again.

17         **MR. LOVE:**  So this would be Slide 7.

18         **THE COURT:**  Now I'm on Slide 7.

19         **MR. LOVE:**  And then it's the yellow part is the part

20   I'm reading.

21         **THE COURT:**  Oh, here you are, "by identifying," yes.

22         **MR. LOVE:**  "Identifying" and then I want to skip over

23   to the more yellow part where it goes, "that a reset

24   condition" --

25         **THE COURT:**  Uh-huh.

1        **MR. LOVE:**  -- "is being individually applied to," and

2   then, one, if I were more skilled I would circle the word

3   "one," because that's the key point, "to one or more

4   variables."

5        So the point is, if one variable, just one variable is

6   being reset --

7        **THE COURT:**  Okay.  You're going too fast here.  I want

8   you to slow down.

9        **MR. LOVE:**  Yes, Your Honor.

10        **THE COURT:**  You're never going to make your point if

11   you just zip along.

12        Okay.  The point you are trying to make by whatever you're

13   reading to me is?

14        **MR. LOVE:**  That the patent discloses one-cell memory.

15        **THE COURT:**  All right.

16        **MR. LOVE:**  A memory with just one cell.

17        **THE COURT:**  Okay.  Now, I'm going to go back and look.

18   We are in Claim 59; right?  Is that right?

19        **MR. LOVE:**  We are in Column 5, line 59.

20        **THE COURT:**  Oh, wait a minute.  Column 5, line 59.

21   That will help.  Okay.  Column 5, line 59.

22        **MR. LOVE:**  Yeah, lines --

23        **THE COURT:**  Let's see what you did here.

24        **MR. LOVE:**  -- 54 to 59.

25        **THE COURT:**  Okay.  I'm just going to look at it.

1    Okay?  And the time I'm spending we will just assume isn't

2    going to, you know, your clock or other time.

3                        (Pause in proceedings.)

4         **THE COURT:**  Well, the "one or more" in the first part

5    you're reading modifies "variables" --

6         **MR. LOVE:**  Yes.

7         **THE COURT:**  -- not "cells."  All right.

8         **MR. LOVE:**  Then if you'll allow me to read on.

9         **THE COURT:**  Oh, I will.  I definitely will allow you

10   to read on.  Go ahead, please.

11        **MR. LOVE:**  So it's right below and it's also in

12   yellow.  So it's implemented in hardware as a data word that

13   resides within some type of storage cell.  So the cell houses

14   the variable.

15        **THE COURT:**  Yeah, I'm not sure that I'm totally

16   convinced that by making reference to a single exemplar of a

17   cell that they are saying you can have just one cell in the

18   unit.  I think that's really the issue is:  Does the unit mean

19   something a lot bigger than just one cell?  So that -- okay.

20   But fair enough.

21        **MR. LOVE:**  That's the issue.

22        **THE COURT:**  Yeah.  So keep going.

23        **MR. LOVE:**  And then down below on that same page,

24   again page 7, I have quoted the entirety of Claim 10 and I've

25   highlighted that Claim 10 also refers to this inferring step,

1   and it says you're going to infer resettable memory by

2   identifying a reset being applied to a variable.  It doesn't

3   say "a plurality of variables."

4          **THE COURT:**  No, but then are you equating the word

5   "variable" with the word "cell"?

6          **MR. LOVE:**  I am, yes, because a variable is going to

7   be stored in a storage cell.  That's what the storage cells do,

8   is they store variables, yes.

9          **THE COURT:**  Well, then, that would not mean a variable

10  is a cell.  A variable would be something contained in a cell.

11         **MR. LOVE:**  That's correct.  And, so, with respect to

12  the proposed constructions, when you have a unit comprising one

13  or more storage cells, that's our construction, that's what you

14  would build, and you build that to be able to -- so that each

15  cell can hold a variable.

16     And, so, when the patent is talking about inferring

17  resettable memory from a reset being applied to a variable,

18  which could include just one variable --

19         **THE COURT:**  Yeah.

20         **MR. LOVE:**  -- they're talking about this person having

21  described something in writing.

22         **THE COURT:**  Uh-huh.

23         **MR. LOVE:**  And what they're describing is going to be

24  the circuit that they want built, which is going to include a

25  memory cell, and they're going to describe that by identifying

1    a variable that's going to be housed within that cell.

2         And, so, the point is that because they disclosed

3    inferring resettable memory if you see just one variable being

4    reset, they're disclosing an embodiment of one-cell memory.

5    That's what a one-cell memory does, is it stores one variable.

6         **THE COURT:**  Okay.  All right.  And I'll confirm that

7    or not with Ms. Thayer, I guess.

8         So you're saying a one-cell memory stores one variable?

9         **MR. LOVE:**  One variable, that's correct.

10        **THE COURT:**  Okay.  Let me just make a note somewhere

11   where I can get to it later just so I know.

12                    (Pause in proceedings.)

13        **MR. LOVE:**  Okay.  Then if you're ready --

14        **THE COURT:**  Yes.

15        **MR. LOVE:**  -- to flip the page to another example;

16   and, again, this is an example of a one-cell memory described

17   in the patent.  And, so, this is with respect to Figure 5 and

18   it refers to, again I have it highlighted in yellow, Figure 5

19   calls a resettable register is used as a storage cell for the

20   memory unit with reset.  Now, a memory unit with reset is a

21   resettable memory.  And it has a storage cell; and we'll see,

22   as it says down below, it's showing an example with just one

23   storage cell.

24        And, so, it says for simplicity only, one storage cell is

25   shown.  And it says it may be repeated if you want to provide

1  reset capability for a plurality of cells, but that's optional.

2  That's why it uses the word "may."  It doesn't say "must."

3        THE COURT:  All right.  So far that's your best point.

4        MR. LOVE:  Thank you.  I like that.  I like to have at

5  least one good point.  If you ever play video games, if you

6  don't get any points, that's bad.

7        All right.  So I will move on before I lose my point and

8  then go to the third one, which is this one here.

9        THE COURT:  Background?

10       MR. LOVE:  Yeah.  So this is what the plaintiff relies

11  on.  And you mentioned the point earlier, that they're relying

12  on this one embodiment, Unit 101, and what it shows; and

13  they're trying to say that's the whole invention, is that one

14  embodiment.  So that the description of that one embodiment,

15  that's going to be limitations of the claims, even though the

16  claims use broader language.  So the claims just say a

17  resettable memory.

18       When the background talks about Figure 1, it says that

19  particular embodiment may be viewed as having a plurality of

20  storage cells.  And our point is, that's not saying "must" and

21  the claims are broader, and the claims could have been -- could

22  have been limited to a plurality of cells and they didn't do

23  it.

24       THE COURT:  Is "may be viewed" sort of patent speak

25  for "is" or "shows"?

1      **MR. LOVE:** No, I think it's exactly the opposite. I

2  work for a patent law firm, and most of the people I work with

3  are patent prosecutors; and you could say there's a list of

4  five things you try to avoid when writing the patent, and one

5  of them is saying "is," that the invention "is" something. You

6  want to say "it may be" and you want to say "an embodiment

7  shows this" because you want to keep it broad. I mean, that's

8  usually where the patent owners want to go.

9      **THE COURT:** But they don't say "may have." They say

10  "may be viewed."

11      **MR. LOVE:** Yes.

12      **THE COURT:** And, so, I'm not sure if they're just

13  being sort of polite saying, "You could look at this and read

14  it as," in effect, or whether they're saying that it may have.

15  I think the word "viewed" is what -- I'm just questioning a

16  little bit.

17      **MR. LOVE:** Well, first off, I agree that generally

18  patent prosecutors are very polite in anything and everything

19  they do, but I will also say that there's a method to their

20  madness. And if you read the way they write patents, it seems

21  crazy because they're not really very clear time and again, but

22  it's because they generally want to keep their disclosed

23  invention as broad as possible and force other people to try to

24  narrow it or narrow it in continuations.

25      And, so, when they say "may be viewed as," they're trying

 1  to -- I mean, a lot of times, of course, these patents there's

 2  a combination of the named inventor and then the lawyer; and

 3  the lawyer's job, they consider it to be keeping -- keep all

 4  options open.

 5          THE COURT:  Yep.

 6          MR. LOVE:  Okay.

 7          THE COURT:  Okay.

 8          MR. LOVE:  I would like to go on to the related issue

 9  of "addressable" unless you have questions about the one cell.

10          THE COURT:  Let me go back to what your definition is

11  for a moment.

12          MR. LOVE:  Sure.

13          THE COURT:  Why are we looking at "addressable"?

14          MR. LOVE:  Because I'll show you the two definitions.

15          THE COURT:  Well, wait a minute.  I mean --

16          MR. LOVE:  I've got them on Slide 6.

17          THE COURT:  This is still going to the plurality

18  issue, though; right?

19          MR. LOVE:  Yes.  Well, it's related in that if you

20  only have one cell, you don't need the addresses.  You know, if

21  there's only one house in the whole province, you don't need an

22  address.  It's the mansion.

23          THE COURT:  Okay.  So this is where "addressable" is

24  going to support your position?

25          MR. LOVE:  "Addressable" does support our position.

1          THE COURT:  I see.

2          MR. LOVE:  And, so, when it comes to "addressable,"

3     we've got a slide on that --

4          THE COURT:  Let's see, which one is this?  This is 8

5     or 9?

6          MR. LOVE:  That would be -- let's see, that would be

7     9, I believe.

8          THE COURT:  We were on -- yeah, okay.  No.  Wait.

9          MR. LOVE:  No, 9 doesn't require plurality.  Okay, 10.

10     So that's 10.

11          THE COURT:  10.  Yeah, okay.

12          MR. LOVE:  So 10 and 11 are dealing with

13     "addressable."

14          THE COURT:  Okay.

15          MR. LOVE:  So the main point is that, again, they rely

16     on that "may be" language; and we have our same point, it

17     doesn't say "must be."

18     But the second one is that the patent does disclose

19     embodiments that are not addressable; and in particular the

20     patent refers to something called -- it calls a shift register

21     in Column 1, and it does that as part of a paragraph where it's

22     giving examples of different kinds of memory units.

23     And it says that often -- now, again, I think this is

24     interesting in Column 1 that they refer -- they use the phrase

25     "often a memory unit is written to by providing an address."

1    That's like saying, "It may have an address."  Again, they're

2    keeping -- they're not saying "always."

3        And then it gives an alternative.  Here it gives an

4    explicit alternative.  It says:  (reading)

5            "Alternatively the write could be time based as in a

6            shift register or a mix of address and time-based writes."

7        So -- and it does the same thing with respect to reads.

8    So you write something into the memory, you read it from the

9    memory, but it's saying you can use addresses or you don't have

10   to use addresses.

11       And we have our -- and because shift registers, time-based

12   writes, reads, and so forth, is a matter an expert should talk

13   about, we had the experts talk about them.

14       And, so, on the next page we have the excerpt from our

15   expert Mr. Sarrafzadeh's declaration where he addresses this

16   very point.  And, so, he says flat out that some memories are

17   not addressable and the specification gives the shift register

18   example of memory, and that's not addressable.

19       THE COURT:  Are you saying you couldn't have a

20   plurality of cells that were not addressable?

21       MR. LOVE:  You can have a -- no, this is a related

22   issue, but it's not exactly identical.  A shift register could

23   have a plurality of cells, but they're not -- it doesn't use

24   addresses.  So this is an example for the addressable issue.

25       THE COURT:  Well, "addressable" is not a term that

1   anybody's chosen to have construed.

2        **MR. LOVE:**  But it is a term that the plaintiff has

3   asked to have placed in your construction.  So if you look at

4   their construction, it throws the word "addressable" in there

5   as a limitation.

6        **THE COURT:**  I see.  Okay.  Let me see about that.

7        Oh, wait.  I'm on the wrong term.  Just a minute.

8        **MR. LOVE:**  I can pull it up here.  There we go.

9        **THE COURT:**  Yeah, just a moment.

10                    (Pause in proceedings.)

11       **THE COURT:**  It says, "Each term associated" -- "each

12  cell," rather, "associated with a unique address."

13       **MR. LOVE:**  Right.  They want that thrown in there.

14  They made that up basically.  They did it.

15       **THE COURT:**  Okay.  So what you are -- all right.

16  You've got two points that you care about.  One is plurality.

17       **MR. LOVE:**  That's the one I care about most.

18       **THE COURT:**  The other is unique address.

19       **MR. LOVE:**  That's a related one and I care about it a

20  lot.

21       **THE COURT:**  Okay.  I hadn't understood when you

22  previewed going to "addressable" that you were talking about

23  that part of their construction that you feel is an adager that

24  doesn't belong.

25       **MR. LOVE:**  They are related in the sense that they're,

1  again, trying to exclude one-cell memory, such as a flip-flop

2  or a latch.

3          **THE COURT:** All right. And you were saying that they

4  are giving an example of an embodiment that doesn't have an

5  addressable or a unique address?

6          **MR. LOVE:** Yes. A shift register does not, yes, and

7  the patent itself refers to a shift register in Column 1 and

8  says that it can be time-based as an alternative to having

9  addresses.

10          **THE COURT:** Okay. Frankly, I didn't know where you

11  were coming from with this. So, okay.

12      Well, I may want to go back and see what you said before,

13  if you did say something before. Oops, this is it.

14                      (Pause in proceedings.)

15          **THE COURT:** Okay. All right. So you've got two

16  points here.

17          **MR. LOVE:** Now I'll go on to a third one. This is a

18  third dispute the parties have, and it has to do with the reset

19  value.

20      So "resettable memory" is the phrase. The patent talks

21  about inferring resettable memory by having a variable that's

22  being reset. Every example it gives of resetting that variable

23  value is resetting it to zero; but as the plaintiff points out

24  and the plaintiff argues, it is that -- the patent doesn't

25  flat-out say that it always has to be zero, but it doesn't give

1    any -- but our point is it doesn't give any example other than

2    zero.  Zero is how it's ordinarily understood in the art as

3    what a reset is, and only zero would perform the clearing

4    function described in the patent.

5        They don't in their proposed construction say what other

6    values it can have.  Their proposed construction is just to use

7    the phrase "a particular value."  So it would be reset to,

8    quote, "a particular value," end quote.  That's what they want

9    in the claim.

10        THE COURT:  Can there be any value but zero and one?

11        MR. LOVE:  That's unclear.  I mean, it's -- so we

12   raised it in our responsive brief, and their reply brief

13   doesn't tell us what they mean by it.

14       Our position is if they won't say what it means, it's

15   indefinite unless we can be clear to the jury about it.  And if

16   it can be any value, it's not a reset value anymore, it's just

17   a value.  I mean, there's nothing that unique about it as a

18   reset value.

19        THE COURT:  Well, if it was always reset to one?

20        MR. LOVE:  That would not be understood generally as a

21   reset value, and there's nothing in the patent that says it can

22   only be those two values.

23        THE COURT:  Okay.  Here you want it to be narrower.

24   Okay.  So we've got broader to the extent it can include one or

25   more, but be narrower to the extent that --

1        **MR. LOVE:**  Yes.

2        **THE COURT:**  -- it can only be reset to zero.

3        **MR. LOVE:**  Yes.

4        **THE COURT:**  In other words, cleared out.

5        **MR. LOVE:**  Yes.

6        **THE COURT:**  Okay.

7        **MR. LOVE:**  Let me use the example of the odometer or

8   the trip odometer that was used in the tutorial.

9        **THE COURT:**  Right.

10        **MR. LOVE:**  So it's not just a matter of zero or one

11   because, you know, the memory could have -- we say it can have

12   one just cell.  It can have a plurality of cells, too, and each

13   cell -- so it can have a lot of numbers in it.  It can have

14   numbers representing -- so the 500 miles that it took to go

15   from one place to another.

16        So the reset value we say is zero; but if it's not going

17   to be zero, it's not like, oh, is it going to be to zero or to

18   one so it's 1 mile, it can be to 50 miles, 43.  There's a lot

19   of numbers it can be reset to if it can be to any value, which

20   is what their proposal suggests.

21        **THE COURT:**  That's not what I understood the word

22   "value" to mean as at least described earlier --

23        **MR. LOVE:**  Right.

24        **THE COURT:**  -- as having a specific meaning for this

25   kind of an algebraic equation; and that it's zero, a one, and

1   that's all you can have.  And that's what your expert used and

2   he didn't have 500 miles in there even though he had a car.

3          **MR. LOVE:**  Right.

4          **THE COURT:**  All right.  So it sounds like zero is --

5   there's nothing there and one is something, but what that one

6   is is maybe specified in some way by somebody; but it's just

7   not totally up in the air, you can put any figure in there.

8   It's kind of an on-off idea, as best as I can tell, somebody

9   pointing out what's on and what's off; but if that's not right,

10  then I'll speak to the professor about it afterwards.

11     Okay.

12         **MR. LOVE:**  Okay.  With respect to "inferring" --

13         **THE COURT:**  Oh, you want to go to that now?  Because

14  that's really less important, it seems to me, than this other.

15     By the way, if it really was a situation, and I'll have to

16  decide this, that this patent is not limited to plurality of

17  cells but one or more --

18         **MR. LOVE:**  Yes.

19         **THE COURT:**  -- and they've got some patent that is a

20  one-cell patent, is that going to mean that because this has

21  one or more, that that's the end of this patent?

22         **MR. LOVE:**  I believe so.

23         **THE COURT:**  All right.  Because it covers something

24  that's already been done, they had a resettable memory with one

25  cell in an earlier patent?

1          **MR. LOVE:**  I believe that there will be resettable

2     memories with one cell that are going to be in the prior art

3     that we have shown them and will be able to show the Court,

4     yes.

5          **THE COURT:**  All right.  Well, so this is a pretty

6     important point.

7          **MR. LOVE:**  Yes.

8          **THE COURT:**  More important, it seems, than

9     "inferring."

10          **MR. LOVE:**  Yes.

11          **THE COURT:**  All right.  So if there's anything else

12     you want to say or point out about that, that's fine.  I'm not

13     saying you haven't said enough.  I just -- you know, I don't

14     want to cut you off there because "inferring," it seems to me,

15     is more of a tempest in a teapot.

16          **MR. LOVE:**  Yes.

17          **THE COURT:**  Okay.

18          **MR. LOVE:**  To some extent, we agree.  I mean,

19     "inferring" is much less important.

20          I did, though, make the points that I wanted to make with

21     respect to one or more.  It's basically I've got two

22     embodiments, as I discuss in our briefs and then in these

23     slides, that are saying, "Infer resettable memory if there's

24     just one variable being stored in the storage cell that's

25     subject to a reset."

1           **THE COURT:**  Okay.  Now, let me ask a question about

2   it, and you can go to "inferring" after that if you like.  But

3   you have to be really very, very forcefully really persuasive

4   to get me to pick "recognizing."

5           **MR. LOVE:**  Okay.

6           **THE COURT:**  I'm just going to tell you that.  You're

7   going to have to point to something very specific that they

8   limited themselves to this process being only, "I saw it before

9   and now I'm seeing it again."

10          **MR. LOVE:**  Okay.

11          **THE COURT:**  Then the other thing that I want to find

12  out, just as far as your agreement as to how to proceed, let's

13  say one or the other side raises something that's kind of a

14  catchy point here, provocative point, I'm going to want to

15  follow up with the other side to see if they have anything to

16  say in reply to that.

17      Did you have any agreement at all as to how that would

18  work?  Otherwise, I'm just going to say when I want to hear

19  from someone else.

20          **MR. VANDENBERG:**  I think we agreed to abide by

21  whatever Your Honor wanted to do.

22          **MR. LOVE:**  Right.

23          **MS. THAYER:**  Absolutely.  So if you have questions,

24  we're here to answer them.

25          **THE COURT:**  Okay.  So I may get back to one or the

 1   other of you after I've heard from one or the other of you.

 2       Okay.  And to the extent I don't think the clerk's really

 3   been keeping a clock here on your time and, so, I wasn't

 4   intending, however, that if I spend, you know, five minutes

 5   talking to you about some point, that that means that you're

 6   five minutes shorter.  Okay.

 7           MR. LOVE:  I appreciate that.

 8           THE COURT:  So just so you understand that.

 9       Okay.  Do you want to do "infer"?

10           MR. LOVE:  Real quickly.  First off, "detecting," you

11   want to go "detecting," I'd be okay with that.  I'm going to

12   make a pitch, though, for the second portion of our

13   construction.

14       But I want to let you know that when it comes to

15   "recognizing," "recognizing" is a word that's used in the

16   patent, it's used in the patent twice as a synonym for

17   "inferring," and we show the two places right here on this

18   slide.  They're both in Column 6.

19           THE COURT:  Let's assume that whoever wrote this

20   wasn't an English major.  Okay?

21           MR. LOVE:  All right.

22           THE COURT:  They may be using "recognizing" in a kind

23   of broad sense --

24           MR. LOVE:  Okay.

25           THE COURT:  -- instead of the more limiting dictionary

1   true sense.

2          MR. LOVE:  We do think "deducing" is the wrong word,

3   though, because it implies a level of uncertainty that isn't

4   correct.  It implies that you have to do some sort of detective

5   work.  That's not the way their examples work.

6          THE COURT:  I don't know about -- do you think

7   that's -- maybe "detect" sounds like "detecting."

8          MR. LOVE:  Well, it does.  See, if you're on the other

9   side that disagrees with it; but --

10         THE COURT:  I mean, that's what "detective" comes

11  from.

12         MR. LOVE:  -- because you're the judge, I'll agree

13  with it.

14         THE COURT:  I don't know.  You know, I think maybe to

15  me they were kind of using "recognizing" in the other part as

16  kind of being aware of kind of a concept more or less, you

17  know.

18      But, anyway.

19         MR. LOVE:  Okay.

20         THE COURT:  All right.  As I say, I don't think

21  whoever wrote it was an English major.

22         MR. LOVE:  The second portion, our only point is that

23  "inferring" is a word that's known by the jury and it also has

24  a very clear meaning to the experts.  It's not exactly the same

25  because "inferring," as the experts use it, it's part of this

**CLAIMS CONSTRUCTION**

1  process of looking at a description of a circuit and

2  identifying the particular circuit structures that are being

3  described there.

4        **THE COURT:**  All right.  How about "figure out," do you

5  want to use that instead?  It "figures out" how to do it.

6        **MR. LOVE:**  No.

7        **THE COURT:**  Okay.  Why don't you want to use that?

8        **MR. LOVE:**  Because that's -- I know that "identifying"

9  is also used in the patent.  "Finding" is used by the

10  Patent Office, "found."  "Recognize" -- but right now I want to

11  make a pitch for the second portion of our construction is it's

12  to have it explain that it's recognizing or detecting that a

13  portion of a circuit design corresponds to a specific hardware

14  structure or class of structures.  Because that's what

15  "inferring" means to people of skill in the art, and we think

16  reading plaintiff's briefs we see nothing that really disputes

17  that.

18        **THE COURT:**  Well, I don't know about the "portion"

19  part.  That's the part you want to put in, and I'm not so sure

20  that it's really limited.  Maybe they figure it out from the

21  whole design corresponds to something.  I don't know.  I don't

22  know enough about how these things work but, okay.

23        **MR. LOVE:**  Okay.  Thank you.

24        **THE COURT:**  All right.  Thank you.

25      Now, very briefly, I want to give you a reply to what I

**CLAIMS CONSTRUCTION**

1    said was one of his better points, and I have to go back to

2    that.

3             MS. THAYER:  I wrote it down, Your Honor.

4             THE COURT:  I believe it was Slide 8 where --

5             MS. THAYER:  Can we go to your Slide 8?

6             MR. LOVE:  Yes.

7             MS. THAYER:  Thank you so much.

8             THE COURT:  -- where he has here that something may be

9    repeated, et cetera, and also the issue of a shift register not

10   being addressable, which was his Slide 9 -- no, not 9.

11            MS. THAYER:  Yes, Your Honor.

12            THE COURT:  Sorry.  It's 10.

13            MS. THAYER:  Both this text and he pointed you to, I

14   believe, Claim 10 to say that there is an embodiment talked

15   about in the patent where there is the reset of a variable.

16        If you juxtapose that language with the language that

17   talks about resetting the memory unit, he makes the point for

18   us.  When the patent wants to talk about individual cells, it

19   talks about memory unit cells and storage cells.

20        So, let's, for example, look at, and I don't have a slide

21   for it, Claim 3.

22            THE COURT:  Okay.  Just a minute.  I'll go to 3.

23   Okay.  Method of Claim 1.

24            MS. THAYER:  Right, it's the method of Claim 1, and

25   then you read further down where it says, "that indicates

1   whether a storage cell within said memory."

2       All right.  And, so, we're further limiting Claim 1.

3   Claim 1 simply requires the inference of a resettable memory.

4   It does not talk about inferring resetting a single variable or

5   a single storage cell.

6       And then you get to Claim 10, which is what he brought up,

7   and Claim 10 says, "The method of Claim 1 wherein said

8   inferring," et cetera, "comprises identifying within

9   operational flow of said description that a reset is being

10  applied to a variable."

11      It doesn't say, and it couldn't say there "to a memory."

12  It's to a variable.  The memory unit is multiple cells and if

13  you want to reset a single variable in one cell, that's

14  Claim 10.  That is not Claim 1.

15      As for the shift register point --

16          THE COURT:  Oh, one second on that.  Just one second.

17      MS. THAYER:  Yes.

18          THE COURT:  So do you define "cell" and "variable" as

19  being the same or is the variable something in the cell?

20      MS. THAYER:  A variable is something -- as we saw in

21  some of the diagrams you saw earlier, there would be a Q that

22  would be a variable, for example, and it would be different

23  from other inputs and things about that particular circuit or

24  cell.  So the "variable" isn't synonymous with "cell."

25          THE COURT:  Okay.  Fine.  All right.

**CLAIMS CONSTRUCTION**

1        **MS. THAYER:** And then with respect to the shift

2    register, that comes out of a passage where the patent says,

3    "Often you can write the memory unit to," and then provides

4    examples, and one example is --

5            **THE COURT:** Okay. Where are you reading?

6        **MS. THAYER:** I'm sorry. Column 1, starting with

7    line 21.

8            **THE COURT:** Okay. Just a second.

9                    (Pause in proceedings.)

10            **THE COURT:** Okay, yeah. All right.

11        **MS. THAYER:** And the argument from Mentor is: Well,

12    because one of the things that are mentioned as what you could

13    write in memory unit 2 is a shift register and shift registers

14    don't have addresses, therefore, memory units don't have to be

15    a plurality of storage cells.

16        The problem with that, and our expert, Dr. Thomas,

17    explained it, is that in this context it's talking about a

18    circular shift register which, in fact, is addressable because

19    a shift register, as he explains it, and I can't explain it as

20    well as he does, in a shift register it's not just a single

21    cell, it's a series of registers that are interconnected and

22    you can clock as the values are shifted.

23        And you can say, "Okay. The address I want is three

24    shifts." So you don't say, "Line, row," to get to the address.

25    You say, "How many times have I shifted? It's that address

CLAIMS CONSTRUCTION

1   that I want to -- that I want to be dealing with."

2       And, so, again, it's pages 164 through 165 of the Thomas

3   deposition, and I've heard no rebuttal to his explanation that,

4   yes, indeed, you can write a memory unit to a shift register.

5   It is a circular shift register; and in that situation, the

6   shift register is addressable just as our proposed construction

7   states.

8           THE COURT:  A circular shift register.

9           MS. THAYER:  And it is, again, not just a single

10  register.  A shift register is multiple registers attached.

11          THE COURT:  Okay.  All right.  Let's leave this

12  patent.

13          MS. THAYER:  All right.  That's fine.

14      On zero versus one, Your Honor, I do not -- do you need me

15  to address that?

16          THE COURT:  Well, I don't know.  He was using 500 as

17  an example.  You could reset it to 500.

18          MS. THAYER:  We simply objected to the requirement

19  that the value be zero.

20          THE COURT:  I understand.

21          MS. THAYER:  All right.

22          THE COURT:  All right.

23          MS. THAYER:  Thank you.

24          THE COURT:  And according to the other argument, the

25  patent says it can be a particular value; and, so, he's saying

**CLAIMS CONSTRUCTION**

1    that it could be anything -- I'm sorry, that you could have a

2    value other than zero or one, but you're just objecting to the

3    zero part.

4         **MS. THAYER:**  That is right, Your Honor.

5         **THE COURT:**  Okay.  You don't care about whether it's

6    other types of things.

7         Okay.  Then we're going to, I guess, turn to the Gregory

8    patents.

9         **MS. THAYER:**  We're going to "GOTO."

10        **THE COURT:**  Pardon?

11        **MS. THAYER:**  We're going to "GOTO."

12        **THE COURT:**  Oh, "GOTO," yes.  All right.

13        **MS. THAYER:**  Yes.

14        **THE COURT:**  And the whole issue here is whether that's

15   being used in its generic or very particular sense.  You were

16   arguing the patent is distinguishing two types of statements,

17   conditional and unconditional with "if" being conditional and

18   "GOTO" meaning kind of a shorthand for unconditional; right?

19   That's your argument; correct?

20        **MS. THAYER:**  No, Your Honor.

21        **THE COURT:**  Well, you don't want to be limited to just

22   the thing saying "GOTO" is my understanding.

23        **MS. THAYER:**  That is correct, we are arguing that

24   they're conditional and unconditional statements.  "GOTO" is

25   one of them in a particular programming language.  There are

1   others just like --

2           **THE COURT:**  Yes, yes, I know.  That's what I'm trying

3   to find out.  I'm just confirming your argument that you're

4   using "GOTO" as a shorthand generic for all conditional --

5   nonconditional statements, unconditional statements.

6           **MS. THAYER:**  That is correct, Your Honor.

7           **THE COURT:**  All right.  And that that means that "if,"

8   as used in the claim, has to be a generic for any conditional

9   statements; correct?

10          **MS. THAYER:**  That is right, Your Honor.

11          **THE COURT:**  But nobody is arguing here that "if" is

12  stuck on "if" and only "GOTO."  The only argument is that

13  "GOTO" has to be a "GOTO" and not some other unconditional

14  statement that differs in some way by command; and nobody's

15  arguing, though, that there couldn't be other "ifs,"

16  interestingly.  I'm not quite sure why, but --

17          **MS. THAYER:**  I can explain why, Your Honor.

18          **THE COURT:**  Okay.

19          **MS. THAYER:**  But there is that argument; but the more

20  even fundamental argument, Your Honor, is that the preamble

21  absolutely is not limiting of this claim, and I'd like to jump

22  to that first --

23          **THE COURT:**  That's fine.

24          **MS. THAYER:**  -- or I can address "GOTO" as generic

25  first, whichever you prefer.

1      THE COURT:  Well --

2      MS. THAYER:  But the reason that we're not arguing

3  about "if" is because "if" is a flow control statement that is

4  found in the hardware description language used in the accused

5  products.  "GOTO" is not an unconditional flow --

6      THE COURT:  Okay.  Well, that explains it.

7      MS. THAYER:  Okay.

8      THE COURT:  But -- okay.  Now we can go to the

9  preamble, and I want to get a -- I guess I was using primarily

10  '841, but let's see if it differs very much from the one you

11  were using.

12      MS. THAYER:  Yes, I have the '841, Claim 1, on the

13  board, Your Honor.

14      THE COURT:  Okay.  Fine.  Go ahead.

15      MS. THAYER:  All right.  So what I've done here and

16  what the case law teaches to do is I have first highlighted the

17  preamble.

18      THE COURT:  Yes.

19      MS. THAYER:  And, so, we have to ask ourselves:  Is

20  this method -- so this is a method claim -- is this method

21  comprehensible, clear, and complete without reference to the

22  preamble?  And the answer to that --

23      THE COURT:  Okay.  You want to argue the preamble

24  isn't necessary first; is that right?

25      MS. THAYER:  Yes.

1      THE COURT:  Because that covers another term also.

2      MS. THAYER:  That is right.

3      THE COURT:  And I was thinking that probably the

4  preamble is necessary, and I haven't fully decided that, but it

5  looks like there may be references back to the preamble in both

6  instances.

7      MS. THAYER:  If I may attempt to persuade you

8  otherwise.

9      THE COURT:  Okay.  But let's just say you lost that.

10  Okay?  Just for argument's sake.  There wouldn't be any

11  problem, from the plaintiff's standpoint, in the Court if it

12  did, construe "GOTO" as an unconditional statement?

13      MS. THAYER:  That is correct, Your Honor.  That is

14  correct.

15      THE COURT:  All right.  So are you really worried that

16  you're going to lose your substantive argument, and that's why

17  you don't want me to consider the preamble?

18      MS. THAYER:  No, Your Honor, I don't believe that

19  we're going to lose that; but because it affects other claim

20  terms and because I'm a student of the law and I want to get

21  this right, I want -- so I do have two bites at the apple,

22  you're right.  I do want to win both of them because their case

23  law says that this preamble is not limiting.

24      THE COURT:  Okay.  Go ahead.

25      MS. THAYER:  And, so, if you will read -- if you will

1   read this phrase (indicating), "converting the flow control

2   statements and directive statements in the user description for

3   a logic signal Q...," that first clause is the first step of

4   the first step.

5        There is absolutely no reason to look back to the preamble

6   to understand that you "convert the flow control statements and

7   directive statements in the user's description for a logic

8   signal Q...." Stop right there.  You don't need to look up at

9   all.

10       In fact --

11           THE COURT:  Okay.  So let me ask you.  If any part of

12  the preamble is unnecessary, does that make all of the preamble

13  unnecessary?  Hmm.

14           MS. THAYER:  I believe, Your Honor, the law provides

15  that the preamble is limiting or is not, not that you pick and

16  choose.

17           THE COURT:  Okay.  Because you just picked part.

18  Okay.  But let's see where the rest of it shows up.  Okay.

19           MS. THAYER:  Well, this is Mentor's argument.  They're

20  saying you can't understand this clause without reference to

21  flow control statements in the preamble, but actually you can.

22       And if I might just move on just one second.  They want to

23  convert this to this (indicating).  They want to say,

24  "converting the flow control statements into an assignment

25  condition."

1        And I agree, if the claim said that, you'd go, "Wait a

2   second.  A method comprising converting the statements.  What

3   statements are we talking about?"  You'd have to look back to

4   the preamble to know, but that's not how the claim is written.

5        It's the flow control statements and directive statements

6   in the user's description for a logic signal Q.  That is

7   self-contained and there is no need to program it.

8        But, most importantly, Your Honor, this slide shows you

9   the text that corresponds to the method.  This is --

10          **THE COURT:**  Okay.  Let me just stop you for a minute.

11          **MS. THAYER:**  Sure.

12          **THE COURT:**  Here's the problem:  Can someone tell by

13   looking at just the body of the claim that this is hardware

14   independent?  That's the first part of the issue of whether

15   this preamble is necessary or not.

16        And then there's the question about whether "if" and

17   "GOTO" are the flow control statements in the user description

18   because they start by saying, "A user description that includes

19   these two types of statements or commands," and then the user

20   description is what's essentially being, at least arguably,

21   referenced up there.

22        Now, I don't know enough to understand if I read this, not

23   being a person skilled in the art, whether every single one of

24   the concepts of what makes this invention arguably unique are

25   actually shown in the body.  Okay.  That's what I can't tell.

 1  If I read it, I don't know.  In other words, I say, "Okay.

 2  Fine."  I don't know whether that's by its own language

 3  hardware independent.  That's the problem.

 4       MS. THAYER:  Well, but you may recall that I had said

 5  that this is a 60-column patent with multiple inventions, and

 6  it is not necessary for this particular claim to say anything

 7  about hardware independent or about "GOTO" because this claim

 8  is about a very specific method and we are prepared to defend

 9  its novelty without reference to the preamble.

10       We --

11       THE COURT:  Well, how do we see that it's novel?  In

12  other words, you're saying that if, if this patent needed

13  hardware description, that you would have an invention?

14       MS. THAYER:  I wouldn't say the patent, Your Honor.

15  It's claim by claim.  Each claim --

16       THE COURT:  If this claim required -- did not require

17  that somebody -- if this claim required some hardware, would it

18  fly?

19       MS. THAYER:  Not requires.  It's just neutral as to

20  whether it is hardware independent or not.

21       THE COURT:  Okay.  Well, that's part --

22       MS. THAYER:  It doesn't tell you whether you have to

23  or don't have to.

24       THE COURT:  -- that's part of the dispute about

25  hardware independent.

1      **MS. THAYER:**  Right.

2      **THE COURT:**  So maybe we should get off the idea of

3   whether this preamble is necessary or not until later and

4   actually go into what you've got here in terms of what

5   "hardware independent" means, what "GOTO" means.  Then we can

6   talk about whether we really have to construe them or not, in

7   which case you'll just have 10 terms instead of -- I mean,

8   you'll have eight terms instead of 10 to talk about if you

9   convince me.

10     But I don't want to get hung up on whether we need this

11  because I can't tell looking at it whether or not it works to

12  say it's fine if you don't say anything about hardware.  In

13  other words, if I read that claim, I can't tell that it says

14  that.

15     **MS. THAYER:**  Well, Your Honor, again, this claim

16  corresponds to a very specific teaching in the patent.  It's

17  here on this Slide 31.

18     **THE COURT:**  Okay.

19     **MS. THAYER:**  This is the teaching in the patent that

20  corresponds to this method where you convert flow control

21  statements into an assignment condition AL(Q), and the

22  synthesizer is doing this; right?

23     **THE COURT:**  Okay.  Isn't "flow control statement"

24  hardware independent?  Do people understand that term to be

25  hardware independent?

1    **MS. THAYER:**  Your Honor, we haven't really focused on

2    whether there is a use anywhere in the patent of a flow control

3    statement that is not hardware independent.

4        **THE COURT:**  Well, that's just an embodiment; isn't it?

5    In other words, if all you do is talk about examples, then

6    somebody's going -- you would ordinarily say, "Those are just

7    examples.  That isn't limiting us in any way.  That's just the

8    best way to do it."

9        **MS. THAYER:**  I'm just saying, as I sit here today, I

10   can't think of a flow control statement in the patent that

11   isn't hardware independent.

12       **THE COURT:**  Still, could it be?

13       **MS. THAYER:**  But, Your Honor, if you're just reading

14   this as a method claim comprising these steps, all right, you

15   don't have to decide at this juncture whether this is a novel

16   claim.  All that the Federal Circuit says you need to decide

17   is, is this an understandable flow of steps without looking at

18   the preamble, otherwise it's not a limitation.

19       And the case that they cite for you, *Catalina*, is

20   precisely on point because there the preamble said, "a system

21   for controlling selection and dispensing of product coupons at

22   a plurality of remote terminals located at predesignated sites,

23   such as consumer stores," and the Court said that is not a

24   limitation on the claim.

25       And how did it do it?  It looked at all the steps after

1  comprising and said, "Do you see any reason to have to refer

2  back to the preamble language?"  If not, that's the invention,

3  that's the method, and then we are called on to defend its

4  validity and we're prepared to do so whether or not the words

5  "hardware independent" are in that claim.

6      But as for "flow control statements," I don't think you're

7  going -- I don't think there are examples in the patent that

8  are not hardware independent; but the validity will come up

9  when Mentor brings up something using a method, and they've got

10  to show that you convert flow control statements into an

11  assignment condition.  That's one of the very novel aspects of

12  this patent.

13      And then you have these --

14      **THE COURT:**  I'm sorry.  What was the novel or one of

15  the novel?

16      **MS. THAYER:**  These assignment conditions that the

17  synthesizer --

18      **THE COURT:**  Okay.

19      **MS. THAYER:**  -- is assigning and these hardware load

20  functions.  This is a complicated method, regardless of whether

21  you talk about "GOTO" or "hardware independent" in the claim.

22      And, again, Your Honor, this is the text --

23      **THE COURT:**  Okay.

24      **MS. THAYER:**  -- that carries out that method, and

25  there is not a mention of "GOTO" in this text.

1          THE COURT:  Okay.

2          MS. THAYER:  And, so, if you read "GOTO" into Claim 1

3  at all, you are changing the nature of that invention because

4  here's where it's described and it doesn't have anything to do

5  with flow control.

6          In fact, this is Column 21 of the patent, the description

7  of the "GOTO" statement and what that is about; and the patent

8  does say it's a novel feature, that's in Column 12.

9          So jump to Column 21, and now you see this claim described

10  exactly how -- you see the asynchronous load function, all

11  that, this is telling you how to carry out that method and

12  there's no reference to "GOTO."  So that tells you, as a

13  practical matter, that what I'm telling you here is true.  You

14  don't need to look at the preamble to understand and carry out

15  this method and, therefore, we don't need to discuss "GOTO."

16          But since you would like to and I would, too, talk about

17  why is it that --

18          THE COURT:  You don't have to.

19          MS. THAYER:  Yes.  Why is it that "GOTO" is a generic

20  for an unconditional flow control statement and not G-O-T-O

21  found in the user description?  We first look at Table 26,

22  which is where this "GOTO" is implemented in the patent.

23          And you see "GOTO done" and then we have "done" down

24  there, see?  So here's a "GOTO" and then it's telling the

25  program, "We'll skip down to 'done' there."

1      And the patent tells us here at Column 39 where this

2  appears.  So processing not only jumps out of the "if"

3  statement that starts at line 8.  So we've got "if" that starts

4  there, "GOTO done" not only gets you out of this little

5  statement (indicating), it gets you out of this one

6  (indicating).  So it's sort of two jumps in one statement.

7          THE COURT:  I'm not sure I'm getting your point.

8          MS. THAYER:  All right.

9          THE COURT:  All right.  Are you --

10          MS. THAYER:  But the point is, the "GOTO" there tells

11  you, "Let's get out of the 'if' here and 'if' there, and we're

12  just going to go down to 'done.'"  Now, it doesn't specify the

13  line.  It just says, "GOTO done."

14          THE COURT:  Okay.

15          MS. THAYER:  This command, the patent says this is

16  C programming language command.  You already heard that

17  C programming language is not an HDL.

18          THE COURT:  Yes.

19          MS. THAYER:  All right.  It was not commonly used in

20  1990.  It's not an HDL, but the HDL had commands that would do

21  the same thing as "GOTO."

22      And, indeed, the patent tells you that this invention,

23  this patent, is about the use of HDLs.  Yes, it's telling you

24  in that one passage that you can use a "GOTO."  That would be

25  something new to use in the HDL; but, fundamentally, this is

**CLAIMS CONSTRUCTION**

1  from Column 9 of the patent, this is showing you the whole

2  synthesizer, the input, the description, synthesizer, and then

3  you get the design out, it's telling you what do you need to

4  carry this out:  (reading)

5          "Hardware description means 115 requires no specific

6      knowledge about the operation or structure of any logic

7      circuit."  That's what you heard in the tutorial.

8      "Rather, hardware description means, as described more

9      completely below, requires only a knowledge of the desired

10     circuit's operation and a general knowledge of the use of

11     HDL."

12  So this patent is telling the reader, "To carry out this

13  invention, you're going to need a knowledge of HDL."  And you

14  heard from Dr. Sarrafzadeh that is a specialized language for

15  hardware design.  It would make no sense to read into Claim 1

16  the words "GOTO" when the invention is taught as implementing

17  and using HDLs, which at the time and even today don't use

18  "GOTO."  They use "break," "return," "exit."

19  But to have that claim narrowed to the point just ignores

20  the teaching of the -- the fundamental teaching of the patent.

21          **THE COURT:**  Okay.  You know, while you were talking

22  about all this, it kind of brought to my mind in that preamble

23  that there's also this concept of including an "if" and a

24  "GOTO"; in other words, including unconditional and conditional

25  statements.

1    Does -- hmm.  Is this suggesting, at least in the

2    preamble -- and I understand that your argument is it's not

3    limiting in any way, but it says:  (reading)

4        "It's a user description that includes flow control

5        statements, including 'and,' 'if,' and a 'GOTO.'"

6    Could somebody argue it means that there has to be at

7    least one "if" and one "GOTO" in the description?

8        MS. THAYER:  Well, I think that is what Mentor is

9    doing here, saying that the user description must contain

10   "GOTO."

11       THE COURT:  No, no, no, no.  I know that's what

12   they're saying.  I'm just asking you if a description is always

13   going to have at least one unconditional and one conditional

14   statement.  Because if you just read this as generic,

15   "including a conditional statement and an unconditional

16   statement," would that mean if I incorporate the preamble as

17   being limiting, that what this -- this only can be used if the

18   user statement includes at least one conditional and one

19   unconditional?

20       MS. THAYER:  Well, again, the -- I'd say, no, because,

21   again, if you look at the embodiment that talks about how to

22   implement this, here's Table 8, it has an "if" but it doesn't

23   have a "GOTO," "exit," "return," whatever.

24   So it really is going to depend on this circuit element

25   that needs to be inferred as to which flow control statements

 1  and which directional statements you are going to be -- that

 2  the synthesizer is going to be looking at to infer that

 3  element.

 4       So I would say that this preamble has to be read, since

 5  the claimed method is about this, it has to be read as

 6  exemplary, not narrowing, because otherwise the claim doesn't

 7  make -- it doesn't make sense why you would do that.

 8            THE COURT:  Okay.  You would interpret "including" as

 9  e.g.?

10            MS. THAYER:  Yes, open-ended.  Exactly.

11            THE COURT:  Okay.  And that's only if I were to find

12  that there is a limitation here at all.

13            MS. THAYER:  Correct, Your Honor.

14            THE COURT:  Okay.  Now, you had "GOTO" and you had the

15  preamble.  We didn't really finish with the preamble.  You

16  showed how at least the first part is parroted back in the

17  first body of the claim.

18            MS. THAYER:  And I will --

19            THE COURT:  The rest is not there, and your argument

20  is it's not there because it doesn't have to be there, I guess.

21            MS. THAYER:  Yes.

22            THE COURT:  Okay.

23            MS. THAYER:  Well, and that's the -- that is the

24  criteria that the Federal Circuit applies.  It's not that I've

25  made it up because it's convenient.  It is that the

 1  Federal Circuit that says the preamble is just preamble unless

 2  you need it to complete the claim or breathe life into the

 3  claim.

 4      THE COURT:  Well, isn't the whole life of this claim

 5  that it's hardware independent however you want to interpret

 6  that claim, either as it can't have hardware or it can have

 7  hardware but nobody's going to pay any attention to it?  Okay.

 8  That's your interpretation.  It could be there, I guess, but it

 9  doesn't matter.

10      MS. THAYER:  Let's get to that.

11      THE COURT:  Okay.  Let me ask you:  If somebody

12  includes hardware in their user description, what will this --

13  is this a program essentially?  How would you describe what

14  this invention is?  Is it some kind of program?  Is it a

15  combination of programs?

16      MS. THAYER:  This invention, again I think we have to

17  be careful not to fall into the trap of saying, "The Gregory

18  patents have one invention."  They have three patents with

19  multiple claims, and each claim addresses a different invention

20  and not all of them require the same set of features in that

21  invention.

22      And, so, if we go to this method, yes, flow control

23  statements, as taught in this patent, that's in the user

24  description and those are hardware independent; but that

25  doesn't mean you wouldn't have a user description, as we said

**CLAIMS CONSTRUCTION**

1   in the tutorial, that could contain both hardware independent

2   and hardware dependent language.

3        **THE COURT:**  Yes.  Now, my question is:  What does this

4   method do with one of these combination descriptions?  My

5   understanding was that it essentially ignores the hardware

6   description.  Maybe it doesn't; it uses it in some way.  That's

7   what I'm trying to find out.

8        **MS. THAYER:**  If the user description set forth

9   level-sensitive latch you see right here (indicating) --

10       **THE COURT:**  Look, don't give me an example.  Let me

11  just ask you.  If they describe hardware, does the program use

12  that in some way or does it ignore it and make its own

13  calculations independent of that?

14       **MS. THAYER:**  It would use the user's description of

15  the hardware element.

16       **THE COURT:**  Fine.  Okay.  So it doesn't short out this

17  plan in any way if somebody puts hardware into it.  Your idea

18  is it simply doesn't need it.  If somebody just gave you

19  operational descriptions, that would be fine and this method

20  would work; right?

21       **MS. THAYER:**  Right.  And, so, if this -- see, it talks

22  about the method is going to generate a level-sensitive latch

23  and it's the synthesizer that is generating that circuit based

24  on flow control statements and directive statements that the

25  user gives.

1    Now, if the user has said in this one description,

2    "Level-sensitive latch, you're not going to use this method,"

3    but --

4         THE COURT:  At all?

5         MS. THAYER:  No, because you've already -- you know,

6    the synthesizer does not need to look at the description and

7    give an assignment condition and an asynchronous -- where they

8    say, "Oh, it's an asynchronous load function."

9         THE COURT:  Okay.  Which claim are we in now?

10        MS. THAYER:  We are Claim 1 of the '841.

11        THE COURT:  Okay.  So for Claim 1, if somebody gave a

12   specific piece of hardware in their description, this claim

13   would ignore that and do its own thing?

14        MS. THAYER:  Only if it gave this particular.  Only if

15   it's a user description for a level-sensitive latch where the

16   user description says "level-sensitive latch"; but, understand,

17   these inputs, many, many different inputs and, so, you have to

18   do it one at a time.

19        THE COURT:  You're saying, then, that some would be

20   ignored and some wouldn't.

21        MS. THAYER:  That's right -- no, they're not going to

22   be ignored.  The synthesizer will understand that in the HDL,

23   the hardware description language, there has been input, a

24   circuit, a specific circuit rather than behavioral.

25        THE COURT:  Okay.  It doesn't need it at that point?

1          **MS. THAYER:**  That is right, it's not needed to carry

2     out.  The synthesizer can do it without the user knowing that

3     what I need for this functionality is a level-sensitive latch.

4          **THE COURT:**  Okay.  So it simply doesn't apply at that

5     point?

6          **MS. THAYER:**  That's right.  In other words, we would

7     not accuse of infringement a user description that said

8     "level-sensitive latch."  We would only accuse if that

9     particular description was at the operational functional level

10    and the synthesizer was capable of then doing all of these

11    steps, particularly the assignment conditions and the hardware

12    load functions.

13         **THE COURT:**  Okay.  Let me ask you another question.

14    What is a synthesizer?  Just is this a program?  Is this some

15    machine?  What is it?

16         **MS. THAYER:**  It is software in a computer system.

17         **THE COURT:**  Okay.  It's software.  Now, you haven't

18    invented the software or you have invented the software here

19    since it's a method?  Are you just saying, "Get yourself a

20    synthesizer that will do this"?

21         **MS. THAYER:**  This --

22         **THE COURT:**  "Get yourself a software that will do it"?

23         **MS. THAYER:**  Well, when the patents were filed, they

24    actually had software code that went in with the patents, but

25    it doesn't constrict the user to a specific program.  It tells

**CLAIMS CONSTRUCTION**

1    you how to go about then and write the program and create the

2    program for the synthesizer.

3         **THE COURT:**  Okay.  The patent, then, has a method for

4    creating a synthesizer --

5         **MS. THAYER:**  Well, it's the --

6         **THE COURT:**  -- in effect.

7         **MS. THAYER:**  It tells you what the synthesizer has to

8    do.

9         **THE COURT:**  Okay.  Because you can't have a patent

10   that says, "Gee, it would be a good idea if you can figure out

11   how to do something," you know.

12        **MS. THAYER:**  That is correct.  That is why this patent

13   is 60 columns long, Your Honor.

14        **THE COURT:**  Okay.

15        **MS. THAYER:**  Because for every circuit that was not

16   known how to synthesize it at the time, you had a big

17   description of how to go about it --

18        **THE COURT:**  All right.

19        **MS. THAYER:**  -- and that's what we see here

20   (indicating).

21        **THE COURT:**  Okay.

22        **MS. THAYER:**  So this is telling you how you need to

23   program your synthesizer in order to make it work.

24        **THE COURT:**  Okay.

25        **MS. THAYER:**  One last thing before we go to hardware

**CLAIMS CONSTRUCTION**

1   independent.

2           **THE COURT:**  Okay.

3           **MS. THAYER:**  It's in our brief, but I did want to

4   highlight the patent itself tells you that "GOTO" doesn't mean

5   just go to, that it is exemplary.  You know, it says, "For

6   example, in the C programming language," that's not in HDL;

7   right?  And then it says, "The particular names assigned to

8   these statements are illustrative only."

9           **THE COURT:**  Okay.

10          **MS. THAYER:**  So let --

11          **THE COURT:**  Which one were you going to go to next?

12          **MS. THAYER:**  "Hardware independent."

13          **THE COURT:**  Okay.  And if I'm understanding, then, let

14  me go to the two definitions for a second.

15      Okay.  Yours is, if you were stuck having to, you know,

16  have this construed, a user description of the desired

17  operation -- oh, wait a minute -- yes -- of a logic circuit

18  independent of the specific hardware for implementing the logic

19  circuit.

20      So this is basically just saying, again, what the term

21  says, right, essentially; in other words, you just flipped the

22  words around?  That may be fine but, you know.

23          **MS. THAYER:**  Yes, Your Honor, because that's what the

24  specification does.

25          **THE COURT:**  Okay.

1      **MS. THAYER:**  And because what Mentor's construction

2    does is start building on all sorts of limitations that simply

3    aren't in the patent.

4      And let me -- we first say that you actually don't need to

5    construe this term because any construction that doesn't start

6    to change it or limit it is simply going to be what we did,

7    which is rearranging the words and adding a few to make it a

8    little bit more comprehensible.

9      By the way, I don't know what -- would you prefer to talk

10   about, first, the preamble versus the rest of the claim?

11     **THE COURT:**  I thought we covered the preamble already

12   or did you want to go back?

13     **MS. THAYER:**  One more word about the preamble and then

14   I'll move on.

15     **THE COURT:**  Okay.

16     **MS. THAYER:**  I've highlighted here that this claim,

17   just like the claim in the '488 patent, Claim 1 where this term

18   appears, uses the word "said" when the drafter wanted to refer

19   back to something in the claim.  You do not see the word "said"

20   anywhere in the first element, again because it is

21   self-contained and is intended to be self-contained.

22     **THE COURT:**  Okay.

23     **MS. THAYER:**  We asked Mentor's expert what does the

24   term mean, and he said, "Well, it's a user description that is

25   independent of hardware.  That's a perfectly good definition of

1  the term and doesn't need more qualifications."

2      The problem with Mentor's construction is, as I said, it

3  starts adding a lot of language that simply will not work, and

4  let me show you why it won't work because it changes the

5  invention.

6      First of all, it requires that the user description

7  contain only signal levels and the conditions under which they

8  are generated.

9      Well, let's look at Table 46.  This we already looked at.

10      **THE COURT:**  Is that the one with the comment or

11  whatever, the one with the comment or something?

12      **MS. THAYER:**  Right.  This is what they base it on:

13  There's got to be signals and conditions.  Well, in the patent

14  it says, "Operational characteristics, e.g."

15      **THE COURT:**  Right.  Okay.  So let's just say we're

16  only talking about "only" as being the main point that they're

17  trying to make here, the only -- in other words, containing

18  only things that aren't hardware.  Okay.  However you want to

19  describe what that is, and with some shorthand term or broader

20  term that gets passed that.

21      The phrase is used a lot in the patent itself in the

22  specification, but from what I understand not intended to be

23  that if someone had a user description that contained both

24  operational in the hardware statements or descriptions -- or

25  what's the word I should use here after?

1        **MS. THAYER:** "Descriptions" is fine.

2        **THE COURT:** "Descriptions."

3     -- that that wouldn't mean that the patent couldn't

4  operate at that point but that the method, if you will, here

5  would only come into play as to those parts where it was

6  needed --

7        **MS. THAYER:**  Correct.

8        **THE COURT:** -- in effect.

9     It could be that I -- you don't necessarily disagree with

10  the use of the word "only."  What you're afraid is how it's

11  going to be argued because the patent itself in the

12  specification was going, "Only.  Only." So I don't want to buy

13  into that kind of a fight with people getting up and arguing

14  what "only" means at the time that the case goes to a jury, if

15  it does.

16     So that's my concern.  Okay.  You may have convinced me as

17  to, if it's needed at all, that the user description, if

18  submitted with more than just operational descriptions, would

19  not take the use outside of the patent necessarily.

20     I just want to make sure that if you do convince me in

21  that way, that we don't, by using the word "only," have someone

22  get up and argue that a user description that their product

23  works on in some way can have hardware as well.  So that's my

24  only concern here.

25        **MS. THAYER:**  Okay.  I think I have followed that, and

1    I think it may be a point of contention between the parties.

2    I'm not certain.

3        In terms of the infringement analysis, we would point out

4    user descriptions that utilize this method, and they are

5    hardware independent.  They use the flow control statements,

6    et cetera.

7        We would not --

8        THE COURT:  Without any hardware at all in the user

9    description?

10       MS. THAYER:  In the particular user description that

11   we're focused on to generate -- that the synthesizer uses to

12   generate the --

13       THE COURT:  So you're not even worried about what I

14   was concerned about actually.

15       MS. THAYER:  Well, no, we are concerned that they may

16   argue that because in other places within the user input there

17   may be specification of hardware, that they would argue that

18   that only then exempts the product from infringing the method.

19       THE COURT:  Well, okay.  Then you do care.

20       MS. THAYER:  Yes.

21       THE COURT:  All right.

22       MS. THAYER:  And, so, that's why we want to be careful

23   about what "only" is modifying.

24       THE COURT:  Exactly.

25       Okay.  All right.  Well, then --

1          **MS. THAYER:**  I have two more slides on this.

2          **THE COURT:**  Well, you didn't like "structure"; right?

3          **MS. THAYER:**  Right.  And I need to point out

4     "structure" is prohibitive by the patent specification, and

5     this is on Slide 38.  This is the summary of the invention

6     says:  The synthesizer of this invention creates the logic

7     network not as in prior art, all right, but, rather, where the

8     choice of logic components is implied by the signals and

9     structure specified by the user.

10          That's a summary of the invention and, yet, Mentor's

11    construction of this method says it cannot contain any other

12    structures.  I don't know how you can square this language with

13    their construction.

14          **THE COURT:**  All right.  Now, just so that we're clear

15    here -- yeah.  Okay.  That's fine.

16          Keep in mind you're both going to go way over your hour

17    here that we set aside, and we'll probably have to take some

18    kind of break for lunch because you're hardly getting into

19    these terms.  We've done only part of "GOTO" and "hardware

20    independent" and the preamble, your part.  Okay.  We did the

21    Seshadri patent, and then there's a whole bunch of stuff left

22    here.

23          So I didn't limit you to less than 10 terms, which is the

24    default number in the patent rules, either because I simply

25    overlooked doing it or you convinced me you could -- you had to

1    have 10, but we've got a long way to go.  So if you want me to

2    not just stop at an hour, then we've got to move, though,

3    quicker.

4              MS. THAYER:  Yes, Your Honor.

5              THE COURT:  Okay.  What else was in this group?  Did

6    you have "operational characteristics" in this group?

7              MS. THAYER:  Yes, I have two more slides and then I

8    will be happy to pass the baton.

9              THE COURT:  All right.

10             MS. THAYER:  Because the arguments that I've made

11   about the preamble as to "GOTO" apply the same way for these

12   claims.

13             THE COURT:  Exactly.

14             MS. THAYER:  There is one argument that's made by

15   Mentor that I haven't touched on that is very, very important.

16   Mentor says that you've got to put the words "design entities"

17   into this construction because no matter what, the method

18   cannot -- the user description cannot make any use of design

19   entities.  And then they say, "Look at the prosecution history

20   design entities."  In fact, they say VHDL and Verilog were

21   disclaimed.

22             THE COURT:  Where are we looking at design entities

23   anywhere in their description or their construction?

24             MS. THAYER:  It is their revised construction.

25             THE COURT:  Oh, here it is.  I see it.

1          **MS. THAYER:**  I think it's the second revised

2   construction.

3          **THE COURT:**  I see it.

4          **MS. THAYER:**  All right.  So I've dealt with

5   structures.  I've dealt with signals and conditions.  I'm just

6   dealing with design entities.

7          **THE COURT:**  Well, "design entities" is not, of course,

8   one of the construed terms.  It's part of their description

9   that you want to take that out along with all the other things

10  that are there.

11         **MS. THAYER:**  Take that out, right.

12         **THE COURT:**  Okay.

13         **MS. THAYER:**  So if a user description makes reference

14  to what they call a design entity, which you don't see that

15  really in the patent, you don't see it in the file history,

16  their argument is based on taking little excerpts from several

17  responses to office actions that don't themselves even talk

18  about design entities.  So there is no express disclaimer.

19      And, again, I refer you to the *Catalina* case.  It really

20  dictates the result here, I believe.

21      What they are distinguishing in that office action is the

22  difference between simulation, which was in the prior art, and

23  synthesis, which is the focus of these Gregory patents.

24      So every quote, if you actually go back and look at the

25  file history, you will see this juxtaposition of this invention

1   is about synthesis, not simulation, where you start with a

2   design and then try and mock it up either in hardware or

3   software.  This is about creating the design in the first place

4   using the user descriptions and everything that we've already

5   gone through.

6           THE COURT:  What do you understand design entity to

7   be?  What is a design entity?

8           MS. THAYER:  Well, because it's not discussed very

9   much in these patents, my understanding is going to be very

10  high level, but it is a high-level abstraction of a way of

11  functionally representing circuits.

12      And, so, these hardware design languages that the patent

13  calls out saying, "You need to know about these in order to

14  implement this synthesis," they were developed earlier for

15  simulation, which is a different process but it uses some of

16  the same input.

17          THE COURT:  Okay.  All right.

18          MS. THAYER:  And then, finally, "operational

19  characteristics," and then this will be the last one that I

20  address.

21      We have used similar definition to "hardware independent"

22  because when you read the patent as a whole, those clauses are

23  really quite similar.

24      The problem, again, with Mentor's construction is they

25  throw in these only signal levels and conditions where Table 46

1  clearly uses comments, not just signals and conditions, and

2  talk about these other -- the structures which the summary of

3  the invention says the user will explain signals and structures

4  in the user description.

5      So can we talk --

6          THE COURT:  Is there any dispute at all about what the

7  word "hardware" means?  Is there any dispute at all as to what

8  the word "hardware" means?

9          MS. THAYER:  Not that I'm aware of, Your Honor.

10         THE COURT:  Because if there isn't, then one doesn't

11  have to further describe it.  If there is a known description

12  of it, at some point that could either be argued or fed into

13  the construction.

14     You're disagreeing with their, essentially, definition of

15  "hardware" because they have put all these examples of what

16  they're saying "hardware" is, and you don't agree that that's

17  an accurate definition of "hardware."

18         MS. THAYER:  Well, it's "hardware independent" not

19  just "hardware."  I understand that that implicates hardware;

20  but when you put two words together, sometimes it's more --

21  it's a little bit more than one plus one.  But what they are

22  saying is, all of these design entities, other structures, they

23  would not consider to be hardware independent.

24         THE COURT:  Right.

25         MS. THAYER:  But that is just not the case, and we

1  don't think either the file history or the patent teaches that

2  those other things are not hardware independent.

3       THE COURT:  Are not essentially hardware.

4       MS. THAYER:  That is correct.  They are not hardware.

5  They can't be hardware when the patent says that the signals

6  and structures from the user are themselves hardware

7  independent.

8       THE COURT:  Okay.  Well, but you're not saying the

9  patent has a specific definition of what isn't hardware; right?

10       MS. THAYER:  I'm not aware of that; but as I sit down,

11  if I see anything that I think would be helpful in this regard,

12  I'll bring it up to you.

13       THE COURT:  Okay.

14     All right.  Well, I think we should wrap these two up in

15  whatever way, plus the "GOTO," plus the preamble, and then

16  we're going to figure out where we are and how much more time

17  it's going to take everybody to deal with this.

18       MS. THAYER:  Thank you, Your Honor.

19       THE COURT:  Okay.  Thank you.

20       MR. VANDENBERG:  Thank you, Your Honor.  John

21  Vandenberg from Mentor Graphics.

22     I think I ought to be able to do this in 20 minutes or so.

23  Certainly we'll shoot for that, because that was the original

24  plan, to stay within the hour --

25       THE COURT:  Okay.

**CLAIMS CONSTRUCTION**

1      **MR. VANDENBERG:**  -- for this module.

2      **THE COURT:**  Okay.

3      **MR. VANDENBERG:**  I would like to start with "GOTO" and

4 in our *Markman* handout, I would invite the Court's attention to

5 Slide 37, which is --

6      **THE COURT:**  You know, before you get to the actual

7 definitions of "GOTO" and "hardware independent" and

8 "operational," et cetera, there's been a very detailed argument

9 made about why we shouldn't even be fooling around with these

10 terms because they're contained in the preamble and not in the

11 body of the claim.

12    So there was a strong reliance on *Catalina* by Ms. Thayer;

13 and if you feel that that case supports your position or you

14 want to say something about the preamble just to get that

15 going, you might want to do that.

16      **MR. VANDENBERG:**  Yes, Your Honor, and this slide is

17 directed to that issue of the preamble.

18      **THE COURT:**  Oh, okay.  I thought it was directed to

19 the term "GOTO" having decided that the preamble counts.

20      **MR. VANDENBERG:**  Right.  Sure.

21    And, so, here --

22      **THE COURT:**  So which is it?  Are you going to argue --

23      **MR. VANDENBERG:**  The preamble.

24      **THE COURT:**  Pardon?

25      **MR. VANDENBERG:**  Oh, I'm sorry.  This is --

 1          **THE COURT:**  Are you going to argue why I should even

 2   be looking at these terms at all or just defining them?

 3          **MR. VANDENBERG:**  The former --

 4          **THE COURT:**  Okay.  Fine.

 5          **MR. VANDENBERG:**  -- as to whether the preamble is

 6   limiting.

 7          **THE COURT:**  Fine.

 8          **MR. VANDENBERG:**  So this slide and one other slide

 9   speak to that point.

10          **THE COURT:**  Okay.  Good.

11          **MR. VANDENBERG:**  So on Slide 37, you see that, you

12   know, we've underlined in red in the body of the claim at

13   line 66 the reference to the flow control statements and

14   direct -- and then it goes on, "and directive statements into

15   the user description."

16      So what we have here in the body is it has incorporated by

17   reference three things from the preamble; namely, the

18   preamble's reference to flow control statements, the preamble's

19   reference to directive statements, and the preamble's reference

20   to user description.

21      So in three instances there is the incorporation by

22   reference that we cited in our response brief at page 4, the

23   *Bell Communication* case, in which it decided this preamble

24   limitation issue on that point, whether the body of the claim

25   refers back, for antecedent basis purpose, to the preamble.

 1  And that's exactly what's happened here.

 2       THE COURT:  Now, they don't stop with just the words

 3  "user description" where you might, then, take that to mean

 4  "the above-referenced user description."  They say, "For a

 5  logic signal Q."  In other words, they keep going.

 6       Does that mean that you don't really need the words up

 7  above because they're going on to say what type of user

 8  description it is?

 9       MR. VANDENBERG:  We would submit, no.  The fact that

10  it goes on and further narrows the particular purpose of this

11  user description, it goes on and says, "This user description

12  has to do with a certain variable and a certain condition."

13       THE COURT:  I see.

14       MR. VANDENBERG:  But, nevertheless, in order to know

15  what flow control statement you're talking about, you have to

16  go to the preamble to find out, "Oh, that flow control

17  statement is part of a hardware independent user description of

18  a logic circuit."

19       If one removed the entire preamble, as Synopsys is urging,

20  one would lose reference, you know, for instance, that it's a

21  description of a logic circuit.  You would lose the reference

22  that this flow control statement includes an "if" statement,

23  that it includes a "GOTO" statement.

24       We would submit that this lengthy preamble that is then

25  referenced by the body of the claim cannot simply be ignored,

 1   primarily -- not primarily, but, first, because it's

 2   incorporated by reference, in essence, per the *Bell*

 3   *Communications* case.

 4        Second, "GOTO" was included in the examiner's reasons for

 5   allowance.  Apparently the examiner thought it mattered because

 6   when the examiner recited the claimed subject matter that he

 7   was issuing a U.S. patent on, he included the word "GOTO."

 8        **THE COURT:**  He just included everything.  I think the

 9   examiner just repeated the entire claim or the entire patent

10   essentially and said, "Okay.  This looks fine to me."

11        **MR. VANDENBERG:**  But if the examiner -- that's true

12   that the examiner included the entire claim; but if the

13   examiner had in mind that the "GOTO" and "if" statement saider

14   from the preamble didn't matter, then presumably the examiner

15   would have been more careful and simply repeated the body of

16   the claim.  We're not saying that point itself is the only

17   argument, but we think that supports it.

18        **THE COURT:**  I didn't think that was a real strong one,

19   but your idea about whether the word "the" as opposed to "a" at

20   least had some, you know, force.

21        And I don't -- however, if I did find that this preamble

22   is limiting, I don't want to get into an argument about what

23   "including" means.  Okay?

24        So that are we going to have to have somebody who has both

25   an "if" statement, whether that's generic or specific, and a

1    "GOTO" statement, whether that's generic or specific, or

2    whether if somebody just gave you a bunch of "ifs"?

3         According to Ms. Thayer, she wants to interpret "includes"

4    to mean e.g., flow statements, such as, e.g., an "if"

5    statement, a "GOTO" statement, things like that.

6         And I think you want it to be a directive in a sense --

7    no, I don't want to use "directive" -- a mandate that this only

8    applies if there's a user statement that includes both types of

9    flow statements, conditional and unconditional, and let alone

10   get into whether it has to say "GOTO" or those specific words.

11        So if I were to accept your argument that you need the

12   preamble to give some kind of life to this patent, then I

13   really want to make clear what "includes" means and nobody has

14   really addressed that.

15        Okay.

16             MR. VANDENBERG:  If I can speak to that, Your Honor.

17             THE COURT:  Okay.

18             MR. VANDENBERG:  You know, generally the

19   Federal Circuit says that if a claim -- if a term in the claim

20   has not been construed, then it is given basically the lay

21   understanding, the jury would give the lay understanding.

22             THE COURT:  What would be your understanding?

23             MR. VANDENBERG:  Well, the normal meaning of both

24   "includes" and "including."  I think the preamble helps us

25   understand "including" because in the second line it has the

1    word "includes."  "Includes" there certainly doesn't mean e.g.

2    It is certainly clear in this patent that the user description

3    must have flow control statements.

4        It's also clear, we submit, that those flow control

5    statements must include, you know, "possess" or "include" and

6    "if" and they must possess a "GO" statement.  If they prefer to

7    say an "if" statement or a "GOTO," then they had to say "or."

8    They didn't say "or."  They said "including," "if" and a

9    "GOTO."

10        **THE COURT:**  So you're interpreting "including" to mean

11    including, but not limited to.  And I think people misuse the

12    word "including" all the time; and I don't know if it has

13    special meaning in patents or not, but in briefs people also

14    misuse it to mean all kinds of things, half the time meaning

15    exactly what is in something as opposed to something that is

16    part of but not necessarily all of whatever the list is.

17        Now, I don't know how people use it in patents, so I'm not

18    sure.

19        **MR. VANDENBERG:**  I would submit it's generally used,

20    and I believe there may be cases on this, generally used the

21    same as "comprising," which basically says if it's comprising

22    A, B, and C, A, B, and C are all required but you could have D

23    and E, too.  So it's open-ended.

24        **THE COURT:**  Including, but not limited.

25        **MR. VANDENBERG:**  So it's certainly not saying that

1    this claim is limited to "if" statements and "GOTO" statements

2    and nothing else, but it must be an "if" statement and there

3    must be a "GOTO."

4         **THE COURT:**  All right.  And that's the question that I

5    have more of a concern about than whether "GOTO" is generic or

6    not.

7         And if that's the case, I do want to give plaintiff a

8    clans to respond because I think they say there's some

9    exemplars here, embodiments, or one at least, that doesn't have

10   a "GOTO" in it.

11        **MR. VANDENBERG:**  Well, I could speak to that.  There's

12   about 23 tables examples in the patent of user descriptions.

13   Only two include a "GOTO" statement, Table 1 and Table 46.

14        Therefore, this claim is, you know, certainly not

15   supported by any of the tables that lack a "GOTO" statement.

16   So we'll certainly -- that's our position.

17        The claim was drafted -- you put words in a claim to try

18   to convince the examiner to allow the claim over the prior art.

19   This patent touted the "GOTO" statement.  They said, "One of

20   the ways we're different than the prior art HDL, than the prior

21   art hardware description languages, is that we have a 'GOTO'

22   and they didn't."

23        **THE COURT:**  Well, they do describe the prior art as

24   having just "ifs" running parallel and streaming out in

25   parallel as opposed to having different connections.  So it's

1    true they do do that.

2        But are there other claims, then, in the patent that would

3    cover the "GOTO" missing examples?

4        **MR. VANDENBERG:**  Yes -- not in this patent.  All the

5    claims in this particular patent they focused on having "GOTO"

6    and "if"; however, on the other patents in the family,

7    including the other two asserted here, they do not have the

8    "GOTO" statement.  All this argument about "GOTO" is over one

9    claim.

10       **THE COURT:**  Because, frankly, if they had an

11   embodiment that's set out in this specification, even if they

12   tried to save time by using the same one for all their

13   different patents, then you run into this argument that you

14   shouldn't interpret something to exclude an embodiment; and you

15   can't really look at their other patents to say, "Well, it's in

16   some other patent.  It's covered there."

17       So --

18       **MR. VANDENBERG:**  Well, I think, Your Honor, the law is

19   not that one has to construe a claim to cover all embodiments

20   in the patent.  One has to -- it's presumed that there's some

21   embodiment that would support the claim because it's common --

22       **THE COURT:**  Yeah, I'm going to look at that --

23       **MR. VANDENBERG:**  Yeah.

24       **THE COURT:**  -- to see.  I mean, why would somebody

25   give you an embodiment that isn't covered by the patent if it's

1    not an embodiment?

2         MR. VANDENBERG:  Because they know that there are

3    going to be continuation applications and divisionals.  That's

4    quite common.

5         It would be rare, I would submit, Your Honor, very rare,

6    for a patent claim to actually embrace all embodiments

7    described in the patent.  That would be unusual.

8         THE COURT:  Maybe in this field, but I haven't noted

9    that to be the case elsewhere.  So you may be right in this

10   particular instance, but it's not been my experience otherwise

11   that people include a bunch of embodiments that have nothing to

12   do with the patent or at least their idea of what their

13   invention is.

14        MR. VANDENBERG:  And, you know, part of the reality of

15   it is, of course, is when you file the application, it's one

16   year.  By the time the claims issue, it may be three, four, ten

17   years later.  So that's one reason there's sometimes a

18   disconnect.

19        THE COURT:  Maybe.

20        MR. VANDENBERG:  If I may stay on the preamble issue

21   but now I'm discussing the hardware independent, does that part

22   of the preamble matter, why does that matter, and that is at

23   our Slide 23.

24        And here we have the same points, but additional points.

25   Hardware independent was the number one marketing argument, one

1  reason why they got this patent.  This is what they touted.

2  They touted, if you look at the specification and the

3  prosecution history, what they touted was that VHDL, "You know,

4  hardware description languages exist.  We're doing something

5  different.  We are going to try to come up with an invention

6  that can be used by this broad array of software programmers

7  who don't know VHDL, don't know Verilog.  And we're different

8  because hardware description languages in the prior art at some

9  level describe the prior art -- sorry, at some level describe

10  the hardware.  They have a design entity.  They have predefined

11  components."  This is language the Gregory applicants used in

12  the prosecution history.

13       And they say, "We are unlike that.  We are fundamentally

14  different because our descriptions, all they do, all our

15  descriptions have are we say what the signal is and we say the

16  conditions, and we say nothing else."

17       And I mentioned 23 examples.  All 23 are consistent with

18  our view of hardware independent.  All they have is a signal

19  and a condition.  There's not a single example of VHDL in this

20  patent.  There's not a single example of Verilog.  There's not

21  a single prior art HDL.  And it makes sense because they were

22  doing something completely different, and they were saying,

23  "Let's bring in the software programmers."

24       So in the hardware independent, whether it matters, again,

25  it says, "a hardware independent user description," then it

1   refers to "the user description" referring back to that.

2        But there's more, is that the specification and

3   prosecution history tied that language to the invention.  They

4   kept referring to their invention uses a hardware independent

5   user description.

6        So if some method comes along and does something and does

7   not start with a hardware independent user description, then

8   it's not the invention.  It is not the claimed method.  It

9   cannot infringe.  We submit it's about as simple as that.

10       And counsel properly noted that this patent has multiple

11  inventions, and that's common.  I think they indicated it's,

12  like, 60 columns, which, of course, is true.

13       But hardware independent is in this patent.  The title in

14  this patent refers to using a hardware independent user

15  description.  It's the summary of the invention.  It was how

16  they got the patent.  And we submit one cannot simply erase it

17  now from the claim as if it wasn't the invention.

18       So that's our position on preamble.

19           **THE COURT:**  Okay.  Then let me go back to "hardware

20  independent" again.

21       Let us say that you have a situation where a user has

22  submitted, then, their description that includes both hardware

23  and operational descriptions of some sort, and there's a

24  program that then is applied to that description; and to the

25  extent that there's hardware, the program does nothing, accepts

CLAIMS CONSTRUCTION

1   whatever the user described; and to the extent that there are

2   operational descriptions, the program then turns that into

3   hardware.

4       Would that program be infringing, in your analysis, if it

5   did it the way the claim said as to the operational description

6   only?

7           MR. VANDENBERG:  It may be.  If it truly did not use

8   any of the hardware aspect of the user description, it may be

9   certainly fair to simply say, "Okay.  That was excess baggage.

10  Your method ignored it.  Your method did not improve on it, did

11  not depend on it at all, and simply relied on the signals and

12  conditions."  Then one may be practicing this claim, certainly.

13          THE COURT:  All right.  So that's what I want to go

14  back and clarify with Ms. Thayer, as to whether she is arguing

15  something that's even broader than that in some way.

16      Okay.  Now, let's see, where are we now?

17          MR. VANDENBERG:  Well, I could go to "GOTO" or go to

18  "hardware independent" if Your Honor has any preference, the

19  substance of it, why it means what we say it means.

20          THE COURT:  Well, I don't disagree that it's designed

21  to operate on hardware independent descriptions; and as long as

22  you don't say that those descriptions have to be totally

23  separated out from a hardware description and that if a user

24  chose to put in some hardware, that took the program that works

25  on it out of the patent.  I'm not so concerned about that.

 1      I want to see what her description is at this point to see

 2   how different it is, if at all.  It may not be.

 3      But as to "GOTO," I was reasonably persuaded by the

 4   plaintiffs that it's being used in a more generic sense to mean

 5   an unconditional type of statement, if you will, as opposed to

 6   simply literally if the user doesn't say "GOTO," then it won't

 7   work.

 8           **MR. VANDENBERG:**  Well, if I may speak to that for just

 9   a few minutes then, Your Honor.

10           **THE COURT:**  Sure.

11           **MR. VANDENBERG:**  Yeah.  Our position on that is that

12   plaintiff's construction is really rewriting the claim.  Words

13   matter a lot in patent law.  If the patent drafter wanted to

14   say "unconditional," that language was certainly there, but the

15   patent drafter chose instead to say "GOTO."

16      The specification itself uses "GOTO" in the narrow

17   traditional sense as being different from all of these other

18   statements.  So in this specification, our Slide 40, we see it

19   refers to "return," it refers to "break," "for," and "GOTO."

20   None of those things listed there are supposed to be generic

21   covering the other terms; rather, they're species of the genus

22   of flow control statements.

23           **THE COURT:**  Well, and of unconditional flow control

24   statements.

25           **MR. VANDENBERG:**  Actually both are mixed in here.

1    Some of --

2         **THE COURT:**  Well, "if" is conditional.  What about

3    "while"?

4         **MR. VANDENBERG:**  "While" would be part of sort of "if"

5    and "while," so that would be conditional.  The unconditionals

6    would be "return," "break," "GOTO," and "switch."

7         **THE COURT:**  All right.

8         **MR. VANDENBERG:**  So we have the queen and the pawn.

9    So "GOTO" is more flexible.  "GOTO," you can say, "GOTO," and

10   then you just fill in the blank.  It's like a blank check.  "Go

11   to any line in the control statement."

12        And that is much more powerful and flexible, albeit risky,

13   because a programmer can mess up the program by having it go

14   somewhere unintended.

15        "Break" and "return" are like a pawn.  They can only go,

16   you know, one place.  "Break" just breaks out and goes to the

17   inner loop.  "Return" goes back to where this function had been

18   called.  Those are not a "GOTO."  They are --

19        Plaintiff has -- one reason we like this analogy is that

20   plaintiff has pointed to something in the patent that said,

21   "Oh, you could take 'if' and 'GOTO' and you could use those to

22   basically do the function of 'break' and 'return' and the

23   others," and that's true but that's logically not sound because

24   a queen can certainly move like a pawn.

25        A "GOTO"," you could say, "Go to the end of this

1    statement," or, "Go to where I came from," but you can do so

2    much more.  And that was the applicant's point, is that prior

3    VHDL didn't have this more powerful flexible statement; and,

4    therefore, just because a queen can do what a pawn can do

5    doesn't mean that a pawn is a queen.

6           THE COURT:  Well, they didn't actually talk about

7    "break" and "return" I didn't think in the prior art so much as

8    "if" as being a different type of statement entirely.

9           MR. VANDENBERG:  Well, the next -- not the next slide,

10   but here they talk about "GOTO" is what was the big deal.

11          So we're at Slide 43.  Underlined they're saying the prior

12   art could not do what this edge, this diagram shows, they could

13   not do a "GOTO" and a "GOTO" is a significant advance.

14          So we submit this is an extremely poor candidate for

15   "return" to redefine because it was listed alongside other

16   types of flow control statements.  It's never used generically

17   in the patent.  They emphasize how different and special it is,

18   how powerful it is, and it's a major advance over the

19   invention.

20          And now because their invention was getting away from VHDL

21   but they're accusing VHDL, they need to walk away from this

22   statement and they need to walk away from hardware independent

23   because if "GOTO" is construed as "GOTO," we can't infringe

24   because we're VHDL.  We're using -- our customers use VHDL.

25          We're using what they disclaim, and that's why plaintiff

**CLAIMS CONSTRUCTION**

 1   is in the position of having to argue the preambles don't

 2   matter; "go to" doesn't mean "GOTO"; and "hardware

 3   independent," it's not clear what their position is.

 4        **THE COURT:**  Are they saying that this method is an

 5   alternative to VHDL or that it takes VHDL descriptions and goes

 6   further with them?

 7        **MR. VANDENBERG:**  It's the former.  There is not a

 8   single statement in this patent that refers to a VHDL user

 9   description.  Again, it wasn't just one, two, three examples.

10   There were 23 and there was nothing that was in their VHDL; and

11   Dr. Thomas, their expert, agreed to that and we've pointed to

12   that testimony, that there is no VHDL in this patent.

13        And they were emphasizing why -- and back up.  I mean, it

14   makes sense is that VHDL -- let's oversimplify what the Court

15   heard in our tutorial.  Let's say VHDL was understood by 10,000

16   designers.  Let's say computer software programming is

17   understood by 10 million.  Okay.  Probably exaggerating.  Let's

18   say a million.  A million to 10,000.

19        So what their point was that, "Hey, we want something, we

20   want to come up with an invention that can be used by the

21   million software programmers."

22        So what they did -- so you don't do that by taking

23   something super-complicated by VHDL and tweaking it.  That's

24   not going to help the software programmers.  What you do is you

25   take what they understand, such as C programming language that

1  we saw earlier here, and you move it toward hardware, and

2  that's what they did.

3      The Court heard in our tutorial that a software program

4  has -- it has code that looks like what we see in Table 1, but

5  it doesn't have timing in it.  So a computer software program

6  doesn't have timing.

7      Mr. Gregory added timing so he didn't simply take an old C

8  programming language.  He moved -- he converted that so that it

9  might help do hardware description.

10      **THE COURT:**  Okay.  All right.  I'll probably want to

11  get a brief reply to this, but let's just recap also -- oh, I'm

12  sorry.  Are you through with "GOTO"?  No?

13      **MR. VANDENBERG:**  On "GOTO," our construction of "GOTO"

14  is exactly what Dr. Thomas agreed to.  Again, Dr. Thomas is

15  Synopsys' expert.

16      **THE COURT:**  Yes, I read the depo.

17      **MR. VANDENBERG:**  Okay.  So those are the two

18  proposals.

19      And let me explain a little bit about our construction.

20  So our first initial construction, as we said, "GOTO" is its

21  meaning in programming languages that include that command.

22      We stand by that but, obviously, that may not help the

23  jury as much.  So, therefore, we added, "i.e., an unconditional

24  flow control statement."  So, "Unconditional flow control

25  statement," I think everyone now is agreeing on that, "that

1    expressly identifies the line to which control will be passed

2    in the form 'GOTO' label."

3         And that's Dr. Thomas' testimony.  We've gone over the

4    evidence we think supports that.

5              THE COURT:  What's "label"?

6              MR. VANDENBERG:  "Label" is that (indicating).  So in

7    our Slide 42, in the art when it says "GOTO statement," the

8    format of it is "GOTO" and then "label."  And the label can

9    either be a line number, so it could have said, "Go to 312"; or

10   it's a word, and the word is listed next to 312, in this case

11   "done," and that's just the label for where you're going.

12             THE COURT:  Okay.  That's the word that's used to talk

13   about the endpoint on a "GOTO" statement?

14             MR. VANDENBERG:  Correct.  It could have been, "Go to

15   aardvark."  It doesn't matter.

16             THE COURT:  Okay.

17             MR. VANDENBERG:  Yeah.

18             THE COURT:  Apparently that's a term of art of some

19   sort.

20             MR. VANDENBERG:  Yeah.

21             THE COURT:  Okay.

22             MR. VANDENBERG:  And, so, I just want to point out

23   that we certainly are fine and maybe it would be better to just

24   say, "GOTO statement is an unconditional flow control

25   statement," and not get into the programming language.  We're

 1   happy either way.

 2       The other thing is, just a minor note is, although this is

 3   new, we did propose this to plaintiff about two days before

 4   their brief.  We didn't give them a lot of time, but we did

 5   raise this before the briefing began.

 6           **THE COURT:**  Right.  And you do want to limit this term

 7   to the specific words "GOTO," not just an unconditional

 8   statement, e.g., "GOTO."

 9           **MR. VANDENBERG:**  Oh, certainly.  Right.  The most

10   important part and what they emphasize in the patent is that it

11   expressly identifies the line to which control will be passed.

12           **THE COURT:**  In the form of the words "GOTO."

13           **MR. VANDENBERG:**  In the form of the word "GOTO," yes.

14           **THE COURT:**  I just wanted to clarify that's your

15   point.

16       **MR. VANDENBERG:**  Yes.

17           **THE COURT:**  Because it sounded like you were backing

18   off it for a minute.

19       **MR. VANDENBERG:**  Oh, I'm sorry.

20           **THE COURT:**  All right.  Okay.  Let's recap or at least

21   figure out what's left to talk about here.

22       You've got "asynchronous data load" and "synchronous data

23   load."  You have "assignment conditions."

24       What else have we got, if anything?

25           **MR. VANDENBERG:**  Well, in this module I haven't spoken

1  to the meaning of "hardware independent," Your Honor.

2      **THE COURT:** Oh.

3      **MR. VANDENBERG:** Sorry.

4      **THE COURT:** I thought we already did in terms of

5  talking about it in the preamble but, okay.

6      **MR. VANDENBERG:** Well, I'll --

7      **THE COURT:** All right.  Go ahead.  Go ahead.  I don't

8  want to cut you off.

9      **MR. VANDENBERG:** Well, we can perhaps break for lunch

10  and I can take it up after that.

11      **THE COURT:** Well, we are going to break --

12      **MR. VANDENBERG:** Should I just do it then?

13      **THE COURT:** -- but I was hoping that you would finish

14  at least your presentation before we did, and I was actually

15  hoping we'd finish the module before we did.

16      **MR. VANDENBERG:** This is the end of this module.

17      **THE COURT:** But do we -- yes.

18      **MR. VANDENBERG:** For me.

19      **THE COURT:** Yeah, "the end" doesn't necessarily mean

20  "in brief."

21      Okay.  After you get through here, am I correct that there

22  are the "synchronous/asynchronous" collection of terms and

23  "assignment conditions"?

24      **MR. VANDENBERG:** And the "data" and "load" function.

25      **THE COURT:** Well, I said "terms."  In other words,

**CLAIMS CONSTRUCTION**

1  it's all that.  I said that earlier.  I was trying to shorten

2  it up.

3            MR. VANDENBERG:  Yes.

4            THE COURT:  Okay.  Then go ahead.

5            MR. VANDENBERG:  Okay.  I will move quickly,

6  Your Honor.

7            THE COURT:  Okay.  Don't talk faster, though.

8            MR. VANDENBERG:  No.

9            THE COURT:  Just be briefer.

10           MR. VANDENBERG:  Okay.  As we see, the patent summary

11  of the invention refers to description 110 as specifying only

12  the signals and circumstances under which the signals are

13  produced.

14      In our response brief, we quoted six other statements to

15  like effect.  They weren't saying e.g.  We did not cite the

16  e.g. part that the slide indicated.  They were saying that

17  that's what the user description does.

18      There's -- moving on here, our position is they disclaimed

19  the prior art description.  So here in the red underlining the

20  Slide 19 they say:  (reading)

21          "Not as in the prior art systems where the choice of

22          logic components for the synthesis was stated at least

23          partially explicitly, but rather where the choice of logic

24          components is implied by the signals and circumstances..."

25      That's a pretty clear statement of the difference between

1   what the prior art was and what they're saying their invention

2   is.

3        And when they say "at least partially explicitly," we

4   think they were alluding there to VHDL design entities, and we

5   will get to that in the context of the prosecution history.

6             **THE COURT:**  In this module?

7             **MR. VANDENBERG:**  Yes.

8             **THE COURT:**  Okay.  We'll take a break, then, for

9   lunch, I think, because this is going to go on longer than I

10  thought it was.

11       Now, the question is:  How much of a break do we need?

12       The cafeteria, by the way, is closed this week so you're

13  going to have to either go out or there's, I think, that coffee

14  and, I don't know, bagel place is open outside of the

15  cafeteria.

16       Ms. Lucero, is that right?

17            **THE CLERK:**  I believe so.

18            **THE COURT:**  And there is -- but it's really pretty

19  grim.  There's something on the 10th floor, but I don't really

20  think you want to go there.

21            **MR. VANDENBERG:**  It's a patent case.  We can do grim.

22            **THE COURT:**  It's grim.  I don't know.  I might do

23  that.

24       But there are places immediately outside the building that

25  you could go to, and maybe we should just -- you know, I was

1    originally going to say 40 minutes, but I'm wondering if we

2    shouldn't just round it off to an hour so you can go across.

3    For example, there's Turk & Larkin Deli and there's a place

4    across from where the driveway is into the garage for the

5    Federal Building on Larkin that's about, I guess it's

6    mid-block, between Golden Gate and McAllister.  Something, you

7    know, just if you want to get out of here.

8        Because we still have so much more to do.  I don't know

9    that it's just worth knocking ourselves out to press forward.

10   And at a certain point I'm not going to absorb what you say,

11   you know, if you're going to get into the prosecution history,

12   you know.  At that point I think this may be the breaking

13   point.

14       So we could either say 1:30 or past.  Do you want to just

15   try for 1:30 or do you want to make it longer?  I don't care.

16   I'm sort --

17       MR. VANDENBERG:  I think 1:30 will be fine for us,

18   Your Honor.

19       MS. THAYER:  Whatever works for you and the court

20   reporter.  I understand we should take everybody --

21       THE COURT:  Let's do this:  Right now that clock, if

22   you synchronize on that, it's I'm going to call it 10 to.  Why

23   don't we just come back at a quarter to 2:00.  Okay?

24       MS. THAYER:  According to that clock?

25       THE COURT:  According to that clock.

1      **MS. THAYER:**  Okay.

2      **THE COURT:**  All right.  So we'll be in recess till

3  then.  That will give you a chance, too, to kind of synthesize

4  whatever you've both said about these points and maybe you want

5  to address them further.

6      **MR. VANDENBERG:**  And we'll work on being briefer.

7      **THE COURT:**  No, that's all right because we're going

8  to take a break now.

9      All right.  Thank you.

10     **MR. VANDENBERG:**  Thank you, Your Honor.

11     **THE COURT:**  We're in recess.

12         (Luncheon recess taken at 12:53 p.m.)

13 **Afternoon Session**                                **1:50 p.m.**

14     **THE COURT:**  Okay.  All right.  So we're back on the

15 prosecution history.  I endeavored not to think about your

16 presentations too much over the lunch break so I would not be

17 tired when I came back out here.  So we'll see what you have to

18 say now.

19     **MR. VANDENBERG:**  Okay, Your Honor.  I think both sides

20 will certainly attempt to move swiftly, move swiftly once we're

21 ready to move.

22     So just 15 seconds before getting actually to the

23 prosecution history.  So there was a point that plaintiff made

24 talking about "hardware independent" and our point that all the

25 examples, all 23 examples of user descriptions, had only

1  signals and conditions; and plaintiff's counsel pointed to

2  Table 46, which I don't have on the screen, but in Table 46,

3  which appears at Column 40 -- well, 39 to 40 of the '841,

4  there's one line that after the word "done," which was the

5  label for "GOTO," it says, "Point where 'GOTO' goes to," and

6  plaintiff was pointing to that.

7      That's simply helping describe the signals and conditions.

8  That's simply saying what "done" means.  "GOTO done" is one of

9  the flow control statements that was setting forth the signals

10  and conditions.

11      So we submit if that's their only example of something

12  that's contrary to our claim construction, that supports our

13  claim construction.

14      **THE COURT:**  So are you saying that "hardware

15  independent" is something even narrower than things that aren't

16  hardware, so to speak?

17      **MR. VANDENBERG:**  It was defined this way -- yes.  The

18  answer is yes.  They defined "hardware independent" as being

19  limited to two things.  You can only describe two things in a

20  hardware-independent description; and if you describe a third

21  thing, you are no longer a hardware-independent description.

22      **THE COURT:**  What else could there be that wouldn't be

23  traditionally considered hardware that somebody could

24  potentially use to describe what they want?  Hmm.

25      **MR. VANDENBERG:**  I cannot think of a good example of

CLAIMS CONSTRUCTION

1  that.

2       THE COURT:  Yeah.  I mean, we may be just arguing

3  about something that doesn't exist.  In other words, if all

4  there are are signals and -- what's the other term?

5       MR. VANDENBERG:  Conditions.

6       THE COURT:  -- conditions, yeah, then that would be

7  what's left over after hardware; and, thus, what isn't

8  hardware?

9       MR. VANDENBERG:  Well, our -- if I'm tracking well,

10  our construction in a sense makes the same point twice, but

11  it's important because that is what happened in the prosecution

12  history.

13       We're saying, the first part of our construction focuses

14  on the seven statements in the specification that said, "Our

15  user descriptions are only signals and conditions."  The second

16  part of our construction is embracing what in the prosecution

17  history where they clarified that and they said that, "If you

18  have a VHDL design entity or you have a component or you have a

19  logic element, if you have any of those things, you are

20  fundamentally different from our invention.  You are not

21  hardware independent."

22       So we think it's critical to tell the jury this to make

23  sure that when they understand only signals and conditions,

24  they also understand that that disclaims and excludes design

25  entities, components, and the logic circuit elements.

1    And my next slides will point to that language in the

2  prosecution history that did that, and both experts agree on

3  what the prosecution history said.  That's significant, we

4  submit.

5         THE COURT:  Okay.

6         MR. VANDENBERG:  Okay.  So the prosecution history,

7  turning to Slide 26, it's improper to construe a claim to

8  include what was disclaimed in the prosecution history,

9  particularly where the prosecution history statements were tied

10 to that claim language or concept.

11   Here they disclaimed VHDL and similar prior art HDL in

12 both the specification and the prosecution history, and they

13 distinguished the VHDL prior art on two grounds.  Plaintiff's

14 counsel mentioned one ground.  One ground was that the VHDL

15 references were focused on simulation, not synthesis.  And that

16 was one argument that the patent attorney for Mr. Gregory

17 focused on.

18   The second argument was the operational characteristics

19 and hardware-independent point, and that's the distinction in

20 the Patent Office -- in the prosecution history that we are

21 focused on and that Dr. Thomas, their expert, agreed was

22 important.

23   He agreed, as noted here, that the applicants distinguish

24 the invention from VHDL as described in these two references.

25 He agreed that those distinctions were important to

**CLAIMS CONSTRUCTION**

1   understanding the very claim term we are now discussing.

2        And he agreed that when the applicant said what was

3   fundamentally different, a person of skill in the art, which is

4   the perspective we have here in *Markman*, the person of skill in

5   the art would have considered that to stand out.  And, again,

6   both experts agree on this.

7        **THE COURT:**  The VHDL does or does not figure out

8   hardware from you could say simple descriptions?

9        **MR. VANDENBERG:**  Well, the VHDL that was being

10  discussed in the prior art, VHDL in 1989 and VHDL today

11  perhaps --

12       **THE COURT:**  Well, let's use then.

13       **MR. VANDENBERG:**  Well, right.  So this is an example.

14  VHDL primarily used design entities and it used these design

15  entities that would, as plaintiff's counsel referred to them as

16  sort of an abstract form of an element, we would say, as

17  Lipsett says here, "A design entity models hardware; for

18  example, may model a logic gate or a flip-flop."

19       **THE COURT:**  From what?

20       **MR. VANDENBERG:**  It models it in an abstract way.  It

21  defines in an abstract way.  It says, "Okay.  I have this

22  design entity."  You give it a name and it has an interface.

23       **THE COURT:**  What's the user getting?

24       **MR. VANDENBERG:**  I'm sorry, Your Honor?

25       **THE COURT:**  I'm trying to figure out what is the user

1   putting in.  Are they inputting this VHDL or does the VHDL go

2   to work on what the user describes?

3       **MR. VANDENBERG:**  Right.  The sophisticated hardware

4   design engineers who understand VHDL, they are putting in a

5   description using the VHDL language.  So they put in VHDL.

6   VHDL is like Latin; right?

7       **THE COURT:**  All right.  So they write in Latin or they

8   write in VHDL, and then what does that method do or whatever,

9   Lipsett, what would he do with that?

10      **MR. VANDENBERG:**  Well, the end results of VHDL, if it

11  were used for synthesis, would be identical to the end result

12  in these patents.  So essentially it is synthesis.  It can be

13  used and it was used in the prior art for synthesis.  The

14  distinction is:  What does the starting description look like?

15      **THE COURT:**  Exactly.  That's what I'm asking.  What is

16  the distinction?

17      **MR. VANDENBERG:**  It's not the end result.  The end

18  result has to be your circuit.

19      **THE COURT:**  What is the starting point?

20      **MR. VANDENBERG:**  The starting point is someone

21  describes a circuit using VHDL language.

22      **THE COURT:**  Okay.

23      **MR. VANDENBERG:**  That is the prior art.

24      **THE COURT:**  Okay.  Does that VHDL -- what

25  distinguishes it from this method now?

1          **MR. VANDENBERG:**  It uses mechanisms that are not in

2    the Gregory patent that the Gregory patent said they don't want

3    to use.  I overstated a little bit.

4          **THE COURT:**  Hardware?

5          **MR. VANDENBERG:**  Design entity is a good example.  The

6    most basic aspect of VHDL is a design entity.  That's where

7    people start, the sophisticated hardware engineer thinking

8    about, "I want to describe" --

9          **THE COURT:**  Okay.  What's a design entity?

10          **MR. VANDENBERG:**  Okay.  A design entity is -- it's

11    in -- it's described in Lipsett at A008, and it's a drawing

12    that simply says a design entity has two parts to it.

13          This explanation will not be very helpful, but I'll

14    proceed.

15          **THE COURT:**  Okay.

16          **MR. VANDENBERG:**  It has two parts to it.  One is the

17    interface.  It says:  Okay.  I have this design entity.  I may

18    call it -- I may call it, oh, I don't know, door -- you know,

19    door open, or something.  So I have this concept, design entity

20    of door open.

21          And then it says:  Okay.  It has an interface to this

22    other module, which may be dashboard, and it has another

23    interface with this other module, which may be control board or

24    control circuitry.

25          So the design entity in an abstract way just defines the

**CLAIMS CONSTRUCTION**

1  interfaces, this module with other modules, and then it says

2  something about what's inside.  But what it doesn't do, it

3  doesn't say, "Oh, I have this 'AND' gate and this 'OR' gate."

4  It doesn't get into specifics, narrow, tie my hands to a very,

5  very specific design.  Rather, it's more abstract and a high

6  level; and that's the best I can do with it, I'm afraid.

7       **THE COURT:**  All right.  So then what turns that

8  abstract high-level description into something somebody can

9  use?

10       **MR. VANDENBERG:**  Well, in theory in a classroom the

11  professor's head will take that design on one side of the

12  whiteboard and look at it and say, "Okay.  Here is the circuit

13  on the right side of the whiteboard."

14      But at Intel or in the real world it is a synthesis

15  program -- a synthesis program, a computer running a synthesis

16  program which program is designed to take VHDL as the input and

17  then output either a circuit diagram schematic or a so-called

18  net list.

19       **THE COURT:**  Okay.  And whatever that person gave, that

20  would be farther down the road toward the description of the

21  ultimate hardware than this patent claims it needs?

22       **MR. VANDENBERG:**  Precisely.

23       **THE COURT:**  Okay.  Fine.  Okay.

24       **MR. VANDENBERG:**  So at Slide 29, we have two quotes

25  from the prosecution history if we may.

1          Here they were distinguishing Lipsett.  The examiner had

2     rejected some early claims in the parent application over

3     Lipsett, which was the VHDL.

4          This is the attorney representing the applicants,

5     Mr. Gregory, and it says in Lipsett:  (reading)

6               "The designation of the behavior of a predefined

7          component" --

8          And a predefined component is another reference to the

9     design entity.  Lipsett equates those two.  (reading)

10              "This is fundamentally different from the applicants'

11         invention, which synthesizes a logic network using a

12         hardware independent description means."

13         This is saying that VHDL, the most basic part of VHDL

14    design entity is fundamentally different from the invention.

15    Not only that, because it's not a hardware-independent

16    description.

17              THE COURT:  Yeah.

18              MR. VANDENBERG:  And if I could, just a small aside --

19              THE COURT:  Yeah, before you get to the aside, why is

20    this all essentially different than the argument you were

21    making before we took a lunch break?

22              MR. VANDENBERG:  The argument --

23              THE COURT:  In other words, I think the patent itself

24    is replete with references to hardware independent; the

25    prosecution history, hardware independent.  So, I mean, I get

1   the idea that that's been a mantra for getting this particular

2   patent approved.

3       And if that's good enough to incorporate the preamble as a

4   limitation, then fine; and if it isn't, then it's nice

5   historical abstract reference, but it's not going anywhere.

6       **MR. VANDENBERG:**  Right.  Well, you mentioned the

7   *Catalina* case.  The *Catalina* case says if you argued about a

8   claim term to get the patent allowed, then it counts.  It's a

9   limitation, but --

10      **THE COURT:**  Okay.  So I'm going to read that case

11  again in some detail.

12      **MR. VANDENBERG:**  But I'm not arguing -- I'm sorry.

13      **THE COURT:**  Yeah.  I'm going to read it again in some

14  detail; but I'm just wondering, you know, I gave you folks time

15  limits, which you've in no way endeavored really to stay

16  within, unless my questions have so thrown you off that you've

17  just gotten totally off track.

18      Now I still want, you know, the help from counsel because

19  I have to decide this thing in some fashion, so I'm not going

20  to cut you off in terms of being able to describe the terms and

21  discuss your argument but, you know, there comes a point where

22  you've just got to stop saying the same thing over and over,

23  okay, which this sounds like.

24      **MR. VANDENBERG:**  So the earlier discussion, I was

25  talking about whether the preamble mattered.

1        **THE COURT:**  Right.

2        **MR. VANDENBERG:**  Now I'm talking about the proper

3    construction of the term "hardware independent" and

4    specifically our construction, so if I just go to our

5    construction --

6        **THE COURT:**  Right.

7        **MR. VANDENBERG:**  -- our construction, the second part

8    of our construction:  (reading)

9            "Hardware independent says without describing the

10        logical elements, design entities, components, or other

11        structures for implementing the logic circuit."

12    I was hoping to show Your Honor where the patent

13    applicants expressly distinguished logical elements, design

14    entities, and components from their invention.

15        **THE COURT:**  How about other structures?

16        **MR. VANDENBERG:**  The other structures, we had

17    structures -- the prosecution history I don't believe uses the

18    word "structure"; however, Lipsett and/or Gilman used the word

19    "structure."

20        **THE COURT:**  Okay.

21        **MR. VANDENBERG:**  "Structure" is not a great word in

22    this patent.

23        **THE COURT:**  Okay.

24        **MR. VANDENBERG:**  One could substitute, we're happy

25    with "structures," "or other hardware."

1      **THE COURT:**  All right.  So if you've got hardware --

2   if everybody knows, for example, if everybody agrees that

3   hardware includes logical elements, design entities,

4   quote/unquote, components, I don't know, whatever else you come

5   up with, then there's really no problem in simply saying

6   "hardware independent."

7      If you're going to try to essentially say everything it

8   doesn't do as opposed to what it does, I think you're running

9   into some problems.  So I'm just saying.

10      **MR. VANDENBERG:**  Two answers if I may.  The parties

11   don't agree on that point.  The parties do -- plaintiff will

12   not agree because their infringement contentions point to

13   design entities.  So they cannot -- they're not in a position

14   to agree that a VHDL design entity is excluded from their

15   claim.  That's what they distinguished in the prosecution

16   history and it's what they're accusing now.

17      **THE COURT:**  All right.  Let me just tell you, I don't

18   have the slightest idea what a "design entity" is.  After you

19   described it, I still don't know what it is, and I'm not going

20   to put it in a construction when I don't know what it is.

21   Okay.  So that's where we are with that.  Nobody tried to

22   earlier ask that that term in any way be interpreted.

23      What you've got is essentially for every one of these

24   terms the equivalent of a Russian doll where it just keeps

25   opening up, getting smaller, smaller, smaller, smaller, with a

1   million fights over all the words that people are using to

2   construe the word that you're disputing, at least arguably,

3   within your 10 terms, and at some point it just gets too

4   involved.

5       So if we end up with a million terms that nobody can even

6   agree on within any given proposed construction, I'm probably

7   not going to go with that construction because I just see

8   buying into too many other fights down the road.

9       So unless it's just patently clear that something means

10  something in this particular way, I'm hesitant to start

11  throwing things in when I'm not sure where they come from.  I

12  just want you to know that.  If you can make it very, very

13  clear possibly, but I think we're probably going to have a

14  problem getting too far afield here.

15      **MR. VANDENBERG:**  All I can say on that is I would

16  submit that the experts at trial would agree on what a "design

17  entity" means.

18      **THE COURT:**  Okay.

19      **MR. VANDENBERG:**  The dispute is between -- and "design

20  entity" was a critical term used by the applicants' attorney in

21  defining the invention.  So, therefore, even though it's not a

22  lay term, it is the term that helped define the invention, and

23  the experts will not dispute what "design entity" means.

24      **THE COURT:**  Okay.  Where specifically in the

25  prosecution history, then, does the applicant say, "We're doing

1    this independent of design entities"?  And then if you just

2    point me to that, I'll look at it and we'll see.

3          **MR. VANDENBERG:**  In our appendix, it's at A33.  It's

4    in our Slide 30 where they say:  (reading)

5              "Predefined design entities is unlike the applicants'

6       specification."

7          **THE COURT:**  Well, "predefined design entities"?

8          **MR. VANDENBERG:**  Right.  And they're referring to

9    Lipsett, and Lipsett defines it was all about design entities,

10   and they refer to that as a predefined design entity; and,

11   therefore --

12         **THE COURT:**  And what slide is that?

13         **MR. VANDENBERG:**  And that was our Slide 30, and it was

14   referring to the appendix at A33.

15         **THE COURT:**  Okay.  I'll just make a note of that.

16   I'll go back and look.

17         **MR. VANDENBERG:**  And then we have, briefly,

18   Dr. Thomas' testimony, which you indicated, you know, the

19   Court's indicated, you know, the Court has reviewed, where --

20         **THE COURT:**  Yeah.  Not maybe every single section

21   called to mind, but what are you relying on?

22         **MR. VANDENBERG:**  Right, just 30 seconds, if I may.

23      Dr. Thomas agreed that the Gregory applicants were

24   distinguishing their alleged invention from the VHDL concepts

25   described in Figure 4 of Gilman.  Figure 4 of Gilman dealt in

**CLAIMS CONSTRUCTION**

1  part with design entities, and that was Slide 32.

2      Slide 33 Dr. Thomas, plaintiff's expert, agreed that the

3  Gregory applicants were distinguishing their invention from

4  what Lipsett described as VHDL purely behavioral description;

5  and then Dr. Thomas clarified:  (reading)

6          "By calling attention to predefined design entities,

7      yes."

8          **THE COURT:**  I don't understand that.

9          **MR. VANDENBERG:**  So this is plaintiff's expert saying

10  that the applicants distinguished the invention from VHDL

11  predefined design entities.

12          **THE COURT:**  Ah, maybe.  Okay.  Who's "they"?

13          **MR. VANDENBERG:**  "They are doing" is the Gregory

14  applicants.

15          **THE COURT:**  Okay.  The Gregory applicants are

16  distinguishing their invention from VHDL by calling attention

17  to predefined design entities?  Calling attention to them?

18          **MR. VANDENBERG:**  Yes.

19          **THE COURT:**  What's that supposed to mean?

20          **MR. VANDENBERG:**  That's referring to here

21  (indicating).  So this is what Dr. Thomas was referring to.

22  This is -- this statement is by the Gregory applicants, more

23  specifically their attorney.  They are responding to a

24  rejection over Lipsett.  They quoted part of Lipsett where

25  Lipsett was talking about a component, which also is a design

1    entity.

2            THE COURT:  But it doesn't say "design entity."

3            MR. VANDENBERG:  Well, the Gregory applicant said,

4    "The components are predefined design entities."

5            THE COURT:  Okay.

6            MR. VANDENBERG:  And then they just said, "This is

7    unlike applicants' specification."

8            THE COURT:  Okay.  What slide is that?

9            MR. VANDENBERG:  This is Slide 30.

10           THE COURT:  Okay.  I'll look at that and see.

11           MR. VANDENBERG:  Right.  So Slides 30 and 33 go hand

12   in hand.

13           THE COURT:  Okay.

14           MR. VANDENBERG:  And then, again, the experts agree

15   this is important to a person of skill in the art.  This is

16   their expert, Dr. Thomas:  (reading)

17       "Q.  And you agree that a person of ordinary skill in the

18       art would consider this passage important in deciding what

19       was the proper meaning of 'hardware independent user

20       description'?

21       "A.  Yes."

22           THE COURT:  Okay.

23           MR. VANDENBERG:  So both experts agree that this is

24   important in what a person of skill in the art looking at this

25   patent would understand.

**CLAIMS CONSTRUCTION**

1      **THE COURT:**  All right.  Then we're going to exclude,

2  according to your argument, "design entities" and several other

3  things.

4      **MR. VANDENBERG:**  Right.  This is our proposed

5  construction and we would submit that the words "component,"

6  "design entities," and "elements" you will find in our

7  slides --

8      **THE COURT:**  Hold on.  "Logical elements" is hardware?

9      **MR. VANDENBERG:**  Yes.

10     **THE COURT:**  Things like latches and stuff like that?

11     **MR. VANDENBERG:**  Correct.

12     **THE COURT:**  Do you want to go back to where you were

13  for a minute?

14     **MR. VANDENBERG:**  I'm sorry.

15     **THE COURT:**  Thank you.

16     **MR. VANDENBERG:**  Yes.

17     **THE COURT:**  All right.  "Logical elements" are we'll

18  call latches, flip-flops, stuff like that?  Yes?

19     **MR. VANDENBERG:**  Those are examples, yes.

20     **THE COURT:**  "Design entities" are something a little

21  less concrete --

22     **MR. VANDENBERG:**  Yes.

23     **THE COURT:**  -- if you want to put it that way, but in

24  some fashion trying to convey a concept of hardware in some

25  way?

1      MR. VANDENBERG:  Yes.

2      THE COURT:  "Components" could be anything.

3  "Component" is a very general word and unless somebody used

4  that specifically in the history, that would be, it seems to

5  me, something of a problem; and "structures" as well.

6      You're apparently afraid that somebody is going to say

7  "design entities" are okay for what this particular invention

8  uses, and I'm not sure.  I will ask them.

9      MR. VANDENBERG:  Okay.  And plaintiff's description --

10 I'm sorry, Synopsys' proposed construction says:  (reading)

11          "A user description of the desired operation of a

12      logic circuit," well, that's fine as far as it goes,

13      "independent of the specific hardware for implementing the

14      logic circuit."

15     Our problems with that are it doesn't define "hardware,"

16 it doesn't define "independent," and it throws in "specific

17 hardware" but the patent didn't -- that wasn't the invention.

18 The invention wasn't, "Oh, as long as you define your hardware

19 in a broad, generic sense, you're okay."  No.  The invention

20 was only signals and conditions.

21     THE COURT:  Okay.  Let me make just a note on the

22 focus on the word "specific" for just a minute.  Okay.

23                  (Pause in proceedings.)

24     THE COURT:  Okay.

25     MR. VANDENBERG:  Thank you, Your Honor.

1          **THE COURT:**  Thank you.

2      All right.  Ms. Thayer, only a limited amount of time

3  back.  And let me ask you a couple of quick questions here on

4  this issue of design entities.  Are you putting that in the

5  operational box or the hardware box?

6          **MS. THAYER:**  It is definitely not hardware.  It is

7  hardware independent.

8          **THE COURT:**  All right.  So there's a fight right

9  there, okay --

10          **MS. THAYER:**  Yes.

11          **THE COURT:**  -- that I had not been aware of as being

12  this pronounced.  So, okay.

13          **MS. THAYER:**  And just to set up the dispute very

14  concretely, you will not find any reference in the patent to

15  design entities to the exclusion of design entities.  You'll

16  find nothing in the patent that says, "We are covering a method

17  of using HDLs, except for those design entities that are used

18  in VHDL."  That does not exist in the patent.

19      The patent says "hardware independent" on the one side and

20  describes that as operational characteristics, behaviors, the

21  sorts of things that we've talked about.  There is no

22  disclaimer of design entities anywhere in the patent that we're

23  talking about, either the '488 or the '841.

24          **THE COURT:**  Is this not something in essentially the

25  art that people either put in one category or another, design

CLAIMS CONSTRUCTION

```
 1    entities either in hardware or not in hardware?
 2          MS. THAYER:  Well, I actually believe that the expert
 3    would agree -- experts would agree that design entities
 4    absolutely were not hardware.  We don't have them here to
 5    testify, but that's what they would testify to, I believe.
 6          THE COURT:  And they didn't testify to it during
 7    discovery?
 8          MS. THAYER:  No, Your Honor.
 9          THE COURT:  Because nobody asked them; right?
10          MS. THAYER:  I believe that that question just wasn't
11    asked.
12          THE COURT:  Okay.
13          MS. THAYER:  As you have observed these --
14          THE COURT:  Maybe you didn't know you were going to
15    have this fight.  All right.  But as I say, every one of these
16    constructions is fighting over multiple words; and, so, that's
17    something that the Court will have to consider.
18        You had said the patent says what it does operate on, all
19    right, and felt that that was sufficient without the preamble.
20    And just going back to that for a second just to double-check
21    how that works -- wait a minute.  Where is the patent?
22                      (Pause in proceedings.)
23          THE COURT:  Well, I'm not sure at this point.  Oh,
24    here we go.
25        All right, we're using '841; right?  Okay.
```

1        Okay.  I don't see -- the patent uses the phrase "flow

2   control statements and directive statements."

3        **MS. THAYER:**  Yes.  Yes.  And could I please -- can you

4   toggle over?

5        That statement itself connotes hardware independent, and I

6   can show you in two slides why you don't need to go to the

7   preamble to pick up hardware independent.  It is -- next slide.

8   I don't have -- oh, I do have a clicker.  Sorry.

9        Okay.  The first step is converting flow control

10   statements and directives into an assignment condition.  All

11   right.  This is the text where it introduces flow control

12   statements, and --

13        **THE COURT:**  Okay.  When you say "this," where is it?

14        **MS. THAYER:**  This is, sorry, Slide 26 from our *Markman*

15   presentation and it's --

16        **THE COURT:**  Do I have your *Markman* presentation up

17   here?

18        **MS. THAYER:**  Yes, you do, Your Honor.  We did pass it

19   up, but --

20        **THE COURT:**  Let me just double-check.  I have -- yeah,

21   that's the one that's titled "Plaintiff Synopsys, Inc.'s, Claim

22   Construction Presentation"?

23        **MS. THAYER:**  Yes, Your Honor.

24        **THE COURT:**  Okay.  As distinct from your tutorial.

25        **MS. THAYER:**  Yes.

1      **THE COURT:**  All right.  So that was slide what?

2      **MS. THAYER:**  This is Slide 26 where flow control

3  statements are introduced and explained as being part of the

4  statements that constitute the description, right, the user

5  description.

6      And it tells us to look at the element 110 in the figure,

7  so let's look at what the specification says about hardware --

8  that there's hardware description 110.  It tells you that the

9  user does not include any hardware-specific limitations in

10  description 110.

11      And, so, Your Honor, earlier you were concerned that the

12  method, if you don't have the preamble, would not embody this

13  concept of hardware independence; but it does denote that --

14  connote that, excuse me, by virtue of the entire specification,

15  which tells you what a flow control statement is.

16      And if you -- sorry -- if you look at the figure where

17  it's --

18      **THE COURT:**  Yeah, you're just jumping around, by the

19  way, and you may be or maybe the person at your table is

20  jumping around, I just can't tell you or they; but --

21      **MS. THAYER:**  It's me.

22      **THE COURT:**  -- if you expect me to look at this later,

23  you're going to have to say where this is coming from.  If it

24  isn't in a slide, then whatever column it's coming from.  If it

25  is in a slide, then whatever slide it is because I'm not going

 1   to have total recall of every word that somebody said here in

 2   the last four or five hours --

 3        **MS. THAYER:**  Fair enough, Your Honor.

 4        **THE COURT:**  -- okay, which was supposed to be

 5   essentially about three hours.

 6        **MS. THAYER:**  So I had shown you the specification in

 7   our Slide 26 that introduced the concept of flow control

 8   statements, which is an element in the claim language; and this

 9   specification in the same patent at Column 10, lines 9 through

10   17, explains to you and to the reader of the Claim 1 that we're

11   trying to interpret, that the user does not include any

12   hardware specific limitations in description 110.

13        And that, again, is the user description that contains

14   this flow control statement; and, again, the flow control

15   statement is an element of the claim.

16        After the preamble, you don't need the preamble in order

17   for this notion of hardware independence to be part of that

18   claim, and we have not urged that the method is hardware

19   dependent.  Quite the contrary.  All we have urged is you do

20   not need the preamble to understand the claim and, thus, it

21   doesn't limit it.

22        **THE COURT:**  Okay.  Now, keep in mind this is coming

23   from a question I have, not an invitation to start all over

24   with your presentation.

25        So on the issue of this design entity idea and whether --

1  and that apparently is what this fight is about on this

2  particular term, and the defendant wants to have in their

3  construction that you're not covering design entities; if

4  design entities are part of somebody's description, then they

5  don't feel this patent is applicable.

6       And you say, "Oh, yes.  Design entities are fine.  If

7  somebody gives us a design entity, as long as it isn't a latch

8  or a switch or whatever, then that's just swell with us."

9       And I'll go over it and look and see whether or not I

10  agree that you have managed to define whatever the method is

11  working with sufficiently that one can say that it does exclude

12  something, and then I won't include it if it's clearly

13  excluded; but if not, then we'll have to wait and see.

14       **MS. THAYER:**  I understand.

15       **THE COURT:**  Okay.  That's one.

16  I'm not sure what else we're dealing with here.

17       **MS. THAYER:**  Two more concepts.  The patent tells you

18  that HDLs are part of the invention.  They are in the intended

19  input for the invention two places at least.  Slide 27 from our

20  *Markman* deck tells you that what you need for, again, the user

21  description, the hardware description means down here

22  (indicating), you need a knowledge of the circuit's operation,

23  not a knowledge of the specific hardware, operation and a

24  general knowledge of HDL.  And Verilog and VHDL were the two

25  HDLs known in 1990 when this was filed.

1    You heard --

2        **THE COURT:**  Okay.  Just a moment.

3    So if you -- yes, and I heard already that "GOTO" isn't

4    part of the Verilog.  All right.  Fine.

5        But getting back for a moment, just in terms of how you're

6    saying this works and how the defendant is saying it works,

7    because they're saying this is a totally different process

8    separate from HDL, you're saying you start with HDL and do

9    something with it.

10        **MS. THAYER:**  That's what the patent says, Your Honor,

11   not me.

12        **THE COURT:**  Okay.  Excuse me.  Let's not get into a

13   distinction between you and the patent for a minute.  I just

14   want to get clear, and that was not an invitation for you to

15   jump in --

16        **MS. THAYER:**  Okay.

17        **THE COURT:**  -- or for your opponent to stand up or

18   anything else.  All right?

19        So let's just get back to where we were here because if I

20   lose my train of thought, you lose your point, okay, all the

21   way around.

22        All right.  Now, getting back to this, if HDL is used in

23   the method that you have, even though it's distinguished from

24   your method in some fashion because it's got to be different

25   than HDL -- doesn't it?  I mean, if --

1    **MS. THAYER:**  Correct.

2    **THE COURT:**  Okay.  It's got to be different or it's

3  not new.

4      Okay.  And you're saying, but it isn't just that we've got

5  an alternative to it, we're going to take people who know it,

6  have them use that to a certain extent, and then we're going to

7  go on from there?  Yes?  No?  Simple answer.

8    **MS. THAYER:**  Yes.

9    **THE COURT:**  Thank you.

10    All right.  And how is it going to do that?

11    **MS. THAYER:**  By using the techniques that we talked

12  about earlier, the assignment conditions and the hardware

13  description functions and interrelating those to create the

14  inference, but the input is the HDL.

15    **THE COURT:**  Okay.  But HDL includes some hardware or

16  not?

17    **MS. THAYER:**  It can.

18    **THE COURT:**  And if it does, is your method going to

19  use that hardware or is your method simply going to say, "Okay.

20  That's fine.  That's that part of it and now we're going to

21  figure out what else you need"?  Yes or no.

22    **MS. THAYER:**  Both, depending -- because there will be

23  a user, multiple-user description.  So some may specify the

24  hardware and that will go into the synthesizer and it will use

25  that.

1          **THE COURT:**  It is going to use the hardware?

2          **MS. THAYER:**  If that is what is specified, but it

3     doesn't have to be specified and that's what the invention

4     provided to designers.  You don't have to specify the logic

5     circuit.

6          **THE COURT:**  Well, okay.  I had understood earlier that

7     you were saying, and I probably misunderstood you, then, at one

8     point or the other, you were saying that if somebody gives

9     hardware in their description or specifies it, then this

10    invention doesn't operate on that part of the description.

11         **MS. THAYER:**  That part, correct.

12         **THE COURT:**  Okay.  Fine.  That's all we want to get

13    clear or I do.  I'm not sure what you want to get clear.

14         All right.  What's your next point?

15         **MS. THAYER:**  So that -- and, again, it's not -- it's

16    the patent that says you use HDL as the input.

17         This is the slide the defendant showed you.  This is a new

18    slide.  I'm just quoting from the '488, Column 10, where it

19    says:

20              Consequently, the HDL synthesizer, sometimes referred

21         to as the logic network synthesizer, creates the logic

22         network, the logic circuit -- right? -- not as in the

23         prior art but, rather, where the choice of logic

24         components is implied by signals and circumstances,

25         et cetera.

1          HDL is the input.  Verilog and VHDL are two types of HDLs.

2               THE COURT:  I got that.

3               MS. THAYER:  Okay.  So when somebody stands up here

4     and says, "This invention was meant for those millions of

5     software programmers that didn't understand HDL," that's a pure

6     fiction, Your Honor.  You will see that nowhere in the patent,

7     nowhere in the file history that this invention is intended for

8     those millions of software programmers and not the folks that

9     used HDL, understood it but had never used it before to

10    synthesize a design.  They had used it before to simulate.

11              THE COURT:  Okay.  And by "simulate," how would you

12    define "simulate"?

13              MS. THAYER:  Simulation, and you saw it in Slide 30,

14    takes a predetermined or predefined design and mocks it up.

15    Synthesis is going to create your circuit design from the

16    behavioral -- or the VHDL/HDL language.

17              THE COURT:  The particular display that you have right

18    now on the screen, is that one of your slides or is that just a

19    reference to a column?

20              MS. THAYER:  That was one of the defendant's slides.

21              THE COURT:  Okay.

22              MS. THAYER:  Can you --

23              THE COURT:  That's okay.

24              MS. THAYER:  Can you please look up which slide this

25    was?

1        **THE COURT:**  That's okay.  I'll just put the '488,

2   Column 10, 8 to 25.

3        **MS. THAYER:**  This is --

4        **THE COURT:**  That's okay.  I'll look at it in the

5   patent.

6        **MS. THAYER:**  And, so, it is simply fiction to say that

7   these patents were designed for something other than HDLs.

8        **THE COURT:**  All right.  Fine.

9        Now, that was, I think, your last point that we were going

10  to go over?

11       **MS. THAYER:**  Yes.  My last point, we heard over and

12  over about the prosecution history.  You've just got to exclude

13  "design entities" because of the prosecution history.  The

14  prosecution history of the patents-in-suit don't use the term

15  "design entity" anywhere.

16       What you saw, Mentor scoured the file histories of all of

17  these patents and they found one reference to "design entity."

18  That was their Slide 30 that was up on the board.  That's the

19  only place that word was used; and if there's going to be an

20  express disclaimer in a prosecution history, it's got to at

21  least appear in the prosecution history and it's got to be

22  clear.  That's what the *Catalina* case says.

23       Slide 30, I can't put it up there, but like what I have

24  here, this is my Slide 38 from the presentation, are the full

25  quotes, not quotes where they get a little bit of a language

1    and then they say VHDL and then quote a little bit more

2    language.  These are the full quotes and you will see the

3    distinction being made is between "simulation" and

4    "synthesis" --

5            THE COURT:  Okay.

6            MS. THAYER:  -- not between the language being input

7    for synthesis and design entities.

8            THE COURT:  Okay.

9            MS. THAYER:  All right.

10           THE COURT:  This you showed before, so I'll go back

11   and look at that again, obviously.

12           MS. THAYER:  All right.

13           THE COURT:  Okay.

14           MS. THAYER:  And then the last thing on "GOTO" is just

15   simply to point out, they want you to read "GOTO" in but they

16   have no explanation as to how it can be that the patent

17   description of that method makes no reference whatsoever to

18   "GOTO."  And, by the way, makes no reference in Table 8 to any

19   kind of unconditional statement, but that is the description of

20   the claimed method in that Claim 1 that we've been studying.

21           THE COURT:  Okay.

22           MS. THAYER:  Thank you, Your Honor.

23           THE COURT:  All right.

24           MR. VANDENBERG:  Can I have 60 seconds, Your Honor?

25           THE COURT:  I'm going to count them and this is it.

1  And I may take them off of one of your other arguments if it's

2  not helpful.  All right.

3        **MR. VANDENBERG:**  Okay.

4        **THE COURT:**  The clock is ticking.

5        **MR. VANDENBERG:**  I'd like the Court's attention, on

6  the point of that pure fiction, our position is based on '841,

7  Column 2, lines 11 to 24.

8      Your Honor asked me to define "design entity."  Our expert

9  in his declaration defined "design entity," "VHDL design

10  entity," at paragraph 84 in connection with the discussion of

11  the prosecution history.

12      Counsel indicated with reference to Table 8 that Table 8

13  didn't have an unconditional statement.  I'll move on from

14  that.

15      The last point is with reference to HDL, the specification

16  does define -- does refer to its user description as a hardware

17  description language.  When you describe only signals and

18  conditions, you are describing the signals and conditions that

19  are supposed to be generated by the hardware.  So, yes, it is a

20  hardware description language.

21      What it is not --

22        **THE COURT:**  Okay, that's 10.  Sorry.  60 seconds.

23  That's it.

24        **MR. VANDENBERG:**  All right.

25        **THE COURT:**  All right.  Now, we could go back and

1  forth on this forever and I know you only had 25 pages to make

2  your arguments, but nonetheless.

3      Now, going to what's left, which terms had you grouped

4  together, if any, Ms. Thayer?

5          **MS. THAYER:**  We had grouped the final four together,

6  but I would like to offer that we will not -- we will not make

7  more argument on "synchronous/asynchronous."  We will submit

8  that on the briefs.  We believe that is fully covered unless

9  you have questions.

10         **THE COURT:**  Now, that has to do with the issue of

11  whether the timing device has to be a clock edge --

12         **MS. THAYER:**  A clock edge, yes.

13         **THE COURT:**  -- versus a broader range of --

14         **MS. THAYER:**  A timing signal.

15         **THE COURT:**  Timing signals, okay.

16     In the Mentor Graphics tutorial, they had the word

17  "clock."

18     Don't leave here.

19         **MS. THAYER:**  Yes, Your Honor.  I was going to get my

20  notes.

21         **THE COURT:**  Okay.  Get your notes --

22         **MS. THAYER:**  I was trying to --

23         **THE COURT:**  -- then get back up here.

24     They had the word "clock."  Did you understand that to be

25  the equivalent in their argument of "clock edge" or is there a

1   distinction in your understanding between "clock" and "clock

2   edge?"

3           MS. THAYER:  I don't understand the distinction that

4   they are making.  I don't understand the battle here since --

5           THE COURT:  No, no, no.

6           MS. THAYER:  Okay.

7           THE COURT:  Simple term.  Do "clock" and "clock edge"

8   mean the same thing?

9           MS. THAYER:  I don't believe so, but I don't know if

10  they're trying to make a distinction about that.

11          THE COURT:  Okay.  Because in their display earlier

12  for the tutorial they had a, quote/unquote, "clock"; but in

13  their proposed construction, they used the term "clock edge."

14  I don't have the slightest idea what a "clock edge" is, so

15  that's something if anybody does know they can tell me what

16  they think a "clock edge" is.

17      You've mentioned that there are other types of timing

18  devices.  You don't use "clock" in the claim, though there is

19  "clock edge," I think, used in the specification in a number of

20  embodiments.

21          MS. THAYER:  It is used at times and at times it is

22  not used.  With respect to high impedance, for example, it is

23  not used.  It's just synchronous high impedance versus

24  asynchronous.

25          THE COURT:  Okay.

**CLAIMS CONSTRUCTION**

1    **MS. THAYER:**  But as to the difference between a

2    "clock" and a "clock edge," "clock" is more general and would

3    be less objectionable to us.  The "clock edge," Dr. Sarrafzadeh

4    did explain to you about clock signals going from zero to one

5    and back down to zero; and the edge is where the clock is

6    either going up or going down, not the little bit of time in

7    between.

8              **THE COURT:**  In between, okay.  So the edge is where

9    it's doing something essentially?

10             **MS. THAYER:**  That's right.

11             **THE COURT:**  Up, down.

12             **MS. THAYER:**  Exactly.

13             **THE COURT:**  Okay.  I hope I can remember.

14        So thank you.  On that particular point, you're not going

15   to go further.  That one you'll submit.

16        What else do we have here that was in your brief?

17             **MS. THAYER:**  Do you want to hear --

18             **THE COURT:**  Well, no, I don't want to hear back on the

19   "synchronous/asynchronous" if it's part of a group.

20             **MS. THAYER:**  It is, but now Mr. Woo gets to take the

21   stage.

22             **THE COURT:**  Yeah, well, that's fine.  Mr. Woo can come

23   up here and do the balance of the group.  All right.  Okay.

24   And you can take a breather.

25             **MS. THAYER:**  Thank you.

**CLAIMS CONSTRUCTION**

1      **THE COURT:**  So all right.

2      **MR. WOO:**  Good afternoon, Your Honor.  Philip Woo.  I

3  was going to say "good morning," but it seems we've lapsed into

4  that, so I'll try not to take too much of your time.

5      **THE COURT:**  I'd be happy if you could say "good

6  morning," but I don't think it would be appropriate.

7      So are we dealing -- wait a minute.  You're already in

8  "predetermined."  Are you going to do "assignment condition" or

9  are you going to do "predetermined"?

10     **MR. WOO:**  I'm sorry.  I'm going to go to "assignment

11 condition" first.  That would be --

12     **THE COURT:**  Okay.  Because "predetermined" is tacked

13 on.  I will want to ask you some questions about

14 "predetermined" other than just saying "before," but -- or

15 "earlier" or something.

16     But on "assignment condition," let's go to that, and give

17 me a second here to get to that.

18     **MR. WOO:**  Yes, Your Honor.  It's page 51 in our slide

19 deck.

20     **THE COURT:**  Okay.  So your definition is:  (reading)

21        "The condition under which the hardware description

22        function, e.g. AL or AD, is true for a particular

23        variable, e.g. Q, in the user description."

24     Okay.  Now, hmm, I don't know that that's terribly

25 meaningful for someone who's not really skilled in the art.

 1    There's got to be other suggestions or --

 2          **MR. WOO:**  Well, the reason --

 3          **THE COURT:**  -- are you sticking with this?

 4          **MR. WOO:**  Well, Your Honor, I agree maybe that's not

 5    the most easy definition to understand for a layperson, but it

 6    is a definition that is actually given in the specification.

 7          So if we go to the next slide here, this should be an easy

 8    one, Your Honor, because the patent itself says an assignment

 9    condition is the condition under which a hardware description

10    function is true for a particular value.

11          Our proposal is the verbatim of that definition, so it

12    comes right out of the specification.  And what we've done to

13    that proposal, we've given the examples of some of the hardware

14    description functions that are used in the claims.  So "AL"

15    stands for asynchronous load function, "AD" stands for, using

16    the exemplar, for asynchronous data function.  We've also

17    given, for clarification in the context of the claims, an

18    example of the variable, which could be Q.

19          So our construction comes right from the specification; no

20    additions, nothing else.  Just plain and simple.

21          **THE COURT:**  Yeah, let me just look at one other thing

22    for a moment that I had a question about.  Let me see if I can

23    find it.

24                      (Pause in proceedings.)

25          **THE COURT:**  Now, have you got a copy of the patent

1   somewhere handy?

2          **MR. WOO:**  I do.

3          **THE COURT:**  Are we using '841 or can we use that?

4          **MR. WOO:**  We can use the '841 patent, yes, Your Honor.

5          **THE COURT:**  All right.  Now, if you'll go to Column 3

6   and at line I guess it's 37, it starts a paragraph, "In one

7   embodiment."

8          **MR. WOO:**  Yes, Your Honor.

9          **THE COURT:**  All right.  And then toward the end

10  there's a sentence that includes the following phrase:

11  (reading)

12          "... with the assignment conditions which are the

13       values of the hardware description functions."

14  Now, is that supposed to define "assignment conditions" in

15  general or for just that one embodiment?  And if it were the

16  one embodiment, it shouldn't be different than what an

17  assignment condition ordinarily is, so....

18         **MR. WOO:**  Okay.  If I may, Your Honor.

19         **THE COURT:**  Yes.

20         **MR. WOO:**  That passage actually is explaining the use

21  of how the assignment conditions are used in conjunction by the

22  synthesizer of the present invention in order to generate the

23  logic elements.

24         **THE COURT:**  So --

25         **MR. WOO:**  So that is not a definition of "assignment

1     condition."  That is just concerning how the assignment

2     conditions are used with the hardware description functions.

3              THE COURT:  Hmm.

4         MR. WOO:  And actually the very next term I'd like to

5     take is the hardware description functions, "data function" and

6     "load function," that will be coming because I think an example

7     might be useful or might be helpful for you there.

8              THE COURT:  All right.  Well, go ahead if you want to

9     try that.

10        MR. WOO:  Okay.  Would you like me to go to that or

11    would you like me to just finish?

12             THE COURT:  However you had planned to, go ahead.

13        MR. WOO:  So actually I'll just finish up "assignment

14    condition."

15             THE COURT:  Okay.

16        MR. WOO:  So the other thing just to note is, besides

17    that our definition comes right out of the specification, is

18    that Mentor's discussion for "assignment condition" does not.

19        So you see here the express definition -- the starting

20    point is the express definition, and Mentor seeks to add two

21    additional limitations to the "assignment condition."

22        Unfortunately, I'm not sure that it appears very well in

23    the slide deck there, but you can see it here in the

24    presentation.

25        First you'll see that what Mentor's done is added this

**CLAIMS CONSTRUCTION**

1    first limitation, "used to create or select a hardware

2    element," to the express definition.  So one additional

3    limitation there.

4         And then it also adds another limitation to the express

5    definition, and that is, "by determining the logic OR" --

6              THE COURT:  You're going to have to slow down a little

7    bit.

8              MR. WOO:  Oh, I'm sorry.

9         The point is that Mentor does not follow the express

10   definition from the specification.  It adds two other items to

11   the express definition.  So they're wrong, first, just because

12   they aren't part of the express definition, and they're also

13   wrong for other reasons.

14             THE COURT:  Do people say "logic O-R" or "logic OR"?

15             MR. WOO:  "Logic OR."

16             THE COURT:  "Logic OR."  And what exactly is "logic

17   OR"?

18             MR. WOO:  It's a function.  It's a building operation

19   like one of those that Dr. Sarrafzadeh described this morning,

20   but it's just an operation like "AND," "OR," "NOR," and "NAND,"

21   those types of operations.

22             THE COURT:  Okay.  Does the assignment condition also

23   determine "logic ANDS"?  In other words, is this too narrow to

24   say "logic OR"?

25             MR. WOO:  It is generic, Your Honor, and I'll tell you

**CLAIMS CONSTRUCTION**

 1    why.  Actually, if you look at the patent -- go down to

 2    Slide 56, please -- well, here's your answer, Your Honor.  The

 3    assignment condition here is not limited to just "logic OR."

 4              **THE COURT:**  Okay.

 5              **MR. WOO:**  It's a passage taken right out of the

 6    patent.

 7              **THE COURT:**  Yes, it does say that.

 8              **MR. WOO:**  Okay.  So does that answer your question?

 9              **THE COURT:**  It appears to.  I'll have to -- I don't

10    want to commit myself to anything while I'm sitting up here,

11    frankly.

12              **MR. WOO:**  Okay.

13              **THE COURT:**  All right.  So, all right, now did you

14    want to say more about "assignment condition" or did you want

15    to go to "predetermined" now?  Where are you?

16              **MR. WOO:**  We can go to "predetermined" if that would

17    help you.

18              **THE COURT:**  Well, no.  I mean, wherever you're going

19    to go.

20              **MR. WOO:**  "Predetermined" is fine.

21              **THE COURT:**  I don't, you know, have a preference.

22    It's just you're on that term and this is adding one more word.

23              **MR. WOO:**  Right.

24              **THE COURT:**  For "predetermined" the dispute seems to

25    be here over whether the predetermination has to be made by the

1  user or whether it is made by, what, the synthesizer or --

2       **MR. WOO:**  That's correct, Your Honor.

3       **THE COURT:**  The synthesizer.

4    Okay.  And if it were going to be made by the synthesizer,

5  is there a reference point for saying before whatever it is as

6  opposed to just beforehand in the abstract which, yes, in the

7  dictionary would be meaningful but in trying to understand a

8  process would not be very helpful?

9       **MR. WOO:**  Okay.

10       **THE COURT:**  Okay what?

11       **MR. WOO:**  So I think, Your Honor, that I think that

12  the second bullet actually answers that.

13    So the assignment condition predetermined before what?

14  Determined before the synthesizer generates a requisite

15  hardware or logic circuit.  I think that because it's part of

16  the process that the synthesizer employs to generate the

17  ultimate logic circuit.

18       **THE COURT:**  Okay.  Let's see, you would argue, then,

19  that "beforehand" could mean "determined before the synthesizer

20  generates the requisite hardware."

21       **MR. WOO:**  Yes, Your Honor.

22       **THE COURT:**  And the synthesizer is, though, doing the

23  work of predetermining in some way?

24       **MR. WOO:**  The synthesizer is doing the work of

25  generating the assignment conditions.

1          Our next slide, if you go to Slide 58, here explains that

2     the patent explains that the synthesizer in one embodiment,

3     this is Figure 2 from the '841 patent as well as the '488

4     patent, but the synthesizer itself includes a preprocessor

5     element 122 and the logic circuit generator 124 in this

6     embodiment; and you see in the passage that follows underneath

7     the figure, that the logic circuit generator, which is part of

8     the synthesizer, itself may include an assignment condition

9     generator.

10          So the logic circuit element -- I'm sorry, the logic

11     circuit generator has the assignment condition generator within

12     it, and that's what's generating the assignment condition

13     within the synthesizer.

14          THE COURT:  So if you did not have -- do you always

15     have a predetermined assignment condition or are there

16     instances where it is not predetermined?

17          MR. WOO:  I think that there would be instances where

18     they're not predetermined because you also have -- well, the

19     patent has a distinction -- well, the patent uses in some

20     instances just purely "assignment condition" without the

21     qualifier "predetermined"; in other instances it does use

22     "predetermined" to modify "assignment condition."  So they are

23     distinct, they're different kinds.

24          THE COURT:  Okay.  Assuming they're different, where

25     would a nonpredetermined assignment condition be generated?  I

1   mean, it sounds like somebody -- the user tells somebody --

2   tells the software what the user wants, and then the software

3   determines the assignment conditions that then create the

4   network or no?

5         **MR. WOO:**  That's correct, Your Honor.

6         **THE COURT:**  Okay.  And, so, are there two different

7   times within this process that assignment conditions are

8   generated, one earlier than the other, or anything like that;

9   or are these just -- is the word "predetermined" just, in your

10  definition, superfluous?

11        **MR. WOO:**  Actually, I don't believe it's superfluous.

12  Let me pull it up.

13                    (Pause in proceedings.)

14        **MR. WOO:**  Actually, if you would give --

15        **THE COURT:**  I'll give you a minute.

16        **MR. WOO:**  Okay.

17        **THE COURT:**  In lay terms, would an assignment

18  condition be what the user wants the -- whatever they're trying

19  to do, let's say it's the display on a dashboard, is it what

20  they want the display to do; or --

21        **MR. WOO:**  It's not, actually, and I can give you look.

22        **THE COURT:**  Okay.

23        **MR. WOO:**  And you raise a good point, Your Honor,

24  because I think the very next slide we have shows, as I think

25  you understand it, where Mentor would propose that the user

 1  description include -- where, I'm sorry, where Mentor would

 2  have the assignment condition be generated or be included; and

 3  that's in the user description, which is item 110.  Same figure

 4  from the patent that the user description is the item 110,

 5  which is the thing that goes into the synthesizer.

 6          THE COURT:  Yeah.  But now your point is, by looking

 7  at this --

 8          MR. WOO:  So the point is that when --

 9          THE COURT:  -- can the user description include an

10  assignment condition?

11          MR. WOO:  It cannot.

12          THE COURT:  It cannot?

13          MR. WOO:  It cannot, that's right, because the

14  assignment conditions are part of the things that are generated

15  by the synthesizer during the synthesis process.  If it was

16  inside the user description, it would sort of obviate the need

17  for having the synthesizer.

18          THE COURT:  I think the defendant in their briefing, I

19  think, pointed out someplace where it did say "predetermined by

20  the user," but now I'm not sure where it is.

21          MR. WOO:  I think the language the defendants cited to

22  you was not with respect to an assignment condition but with

23  respect to some other item.  So the modifier "predetermined" in

24  that instance doesn't go back to "assignment condition."  It

25  means something else.

1      **THE COURT:**  Oh, okay.  You don't remember where that

2    was; right?  That's okay because they'll point it out.

3      **MR. WOO:**  They will, I'm sure.

4      **THE COURT:**  And then you can comment, if you have to,

5    or maybe your comment will cause me to look anyway.

6      So did we decide whether there's any difference between

7    "assignment condition" and "predetermined assignment

8    condition"?

9      **MR. WOO:**  Well, it is a term that they asked to be

10   construed.  We thought "predetermined" should have its

11   plain-and-ordinary meaning because "assignment condition" was

12   already separately construed.

13     **THE COURT:**  Well, I'm just wondering in actuality

14   whether there's any assignment condition that isn't

15   predetermined before somebody creates the network.  I mean, if

16   you've already created the network, what's the good of doing

17   something with the assignment condition after that

18   ex post facto?

19     So I'm just curious whether there are various points along

20   the way before the network is generated.  In one I think you

21   said it was combined at the same time as the network --

22     **MR. WOO:**  Logic circuit generator, that's right,

23   Your Honor.

24     **THE COURT:**  Yes.  Okay.  Well, all right.

25     Now, I think we -- I wouldn't want to just say

 1    "beforehand" because before what is what the big fight is

 2    about.  Before you get the user description or at the time you

 3    get it, you know.

 4         **MR. WOO:**  Before you -- it would be before the logic

 5    circuit is ultimately generated.

 6         **THE COURT:**  So I think if I went with your concept

 7    that it isn't the user that predetermines but the software,

 8    then I would want to say -- I would want to add that language

 9    if that doesn't totally run afoul of your concerns here.

10         **MR. WOO:**  Thank you, Your Honor.

11         **THE COURT:**  Okay.  All right.  Now where else?  Do we

12    have another term in this group?

13         **MR. WOO:**  We do, so I'll go back and we'll cover the

14    data function and the load function terms.

15         **THE COURT:**  Oh, yes.  Okay.

16         **MR. WOO:**  Actually, there's only two terms left and

17    I'll ask you, Your Honor, what you would prefer to cover.

18    Actually, let's cover "load function/data function" because

19    they relate to the "assignment condition."

20         **THE COURT:**  I've got to -- first of all, I've got to

21    find where I have some notes about them.  So give me just a

22    second.

23              (Pause in proceedings.)

24         **THE COURT:**  And we already talked about or didn't talk

25    about "asynchronous" and "synchronous."

 1          Okay.  So now we're on "data function" and "load

 2   function."  Just looking for a moment at what you have here,

 3   you were arguing that Mentor Graphics doesn't distinguish

 4   between the words "load" and "data."

 5          **MR. WOO:**  Well, actually between the hardware

 6   description functions, "load function" versus "data function,"

 7   that's our argument.

 8          **THE COURT:**  Now, you describe it, or your client, as a

 9   hardware -- well, look at "data":  (reading)

10           "Hardware description function for data specifying

11        the condition or conditions under which the variable is

12        assigned a value."

13   And then "load" as a:  (reading)

14           "Hardware description function for load specifying

15        the condition or conditions under which the variable is

16        assigned a value."

17   Well, okay, those sound very much alike.  So what's the

18   difference between "load" and "data"?

19          **MR. WOO:**  Well, let me give you an example.  That's a

20   very good question, Your Honor.

21          So actually go back to slide -- the one right after -- go

22   back here (indicating) and, Your Honor, is an actual example of

23   load functions and data functions.  They're both hardware

24   description functions, which we've talked about and Ms. Thayer

25   covered that earlier in the tutorial, and I'll try and give you

1  a little bit more explanation; but --

2       THE COURT:  Actually it shows on there.  It doesn't

3  say what they are.

4       MR. WOO:  Right.  Exactly, but I just do want to give

5  you a flavor of the different hardware description functions

6  that the patent teaches because "load function" is different

7  from "data function."

8       So we'll --

9       THE COURT:  Are they both hardware descriptions?

10      MR. WOO:  They are both hardware description

11  functions --

12      THE COURT:  Oh, okay.

13      MR. WOO:  -- but the patent discloses many more types

14  of hardware description functions beyond "data function" and

15  "load function."  They also describe, if we move on, the "don't

16  care function," which we don't care about, and the

17  "asynchronous high impedance function," as well as the

18  "synchronous high impedance function."  All of these are

19  hardware description functions and they're all used during the

20  synthesis process when the synthesizer of the Gregory patent

21  creates the logic circuit from a user description --

22      THE COURT:  All right.

23      MR. WOO:  -- but they perform different functions.

24      THE COURT:  Yes.  What do they do?

25      MR. WOO:  So moving on to the next, here's an example.

CLAIMS CONSTRUCTION

1          THE COURT:  It's like pulling teeth here.

2          MR. WOO:  I'm sorry.  Here's an example and I hope,

3    Your Honor, and I pray that this will actually help to answer

4    your question maybe earlier this morning.

5          So here's an example of the type of logic circuit that's

6    generated by the patent.  It's a level-sensitive latch.  It's a

7    more complicated circuit than the types that were generated

8    before, and I'll tell you exactly what the level-sensitive

9    latch -- level-sensitive latch circuit is in terms of an

10   analogy if that would be helpful.

11         THE COURT:  At the moment, yeah.  Well, let me just

12   see here.

13         MR. WOO:  Okay.  Look at the --

14         THE COURT:  Because "data" relates to input.

15         MR. WOO:  The "data" relates to input, right.

16         THE COURT:  But "load" doesn't relate to output?

17         MR. WOO:  The "load" relates to the "COND," condition,

18   C-O-N-D.

19         THE COURT:  Yes.  All right.

20         MR. WOO:  So it's a control signal.

21         THE COURT:  But they're both inputs.

22         MR. WOO:  They're both inputs, they are, right.

23         THE COURT:  So input does not distinguish between

24   them?

25         MR. WOO:  Input -- yes, Your Honor.  Input itself

**CLAIMS CONSTRUCTION**

1  doesn't distinguish, but the concept of "load" and "data"

2  actually do.

3       So, if I may, with respect to this latch circuit, I have

4  two small kids.  They're 6 and 8.  And when I went to buy a

5  car, a very important feature for a car for me was to make sure

6  that I had the window locks in the car so that my two kids

7  couldn't play with the windows and open them up, and --

8            **THE COURT:**  Fall out.

9            **MR. WOO:**  -- fall out was the biggest concern.

10           **THE COURT:**  Okay.

11           **MR. WOO:**  So a window lock control, if you have one in

12  your car, allows whether -- allows the --

13           **THE COURT:**  I know what they do.

14           **MR. WOO:**  -- the buttons, right, to operate or not.

15       So the latch circuit, this level-sensitive latch circuit,

16  also known as a flow-through circuit, actually is like the

17  window lock of a car.  So if the condition -- so condition can

18  be either on or off.  It's a control signal.  It is the analog

19  to the window lock.

20       So if you put -- if you switch the condition to one

21  location, the signal from the passenger windows will operate.

22  So that is like D.  D is the data signal going through.

23       So if --

24           **THE COURT:**  Is D like the window goes down or --

25           **MR. WOO:**  Exactly.  It's the button.

1       THE COURT:  All right.  D is the window is going

2   down --

3       MR. WOO:  Right.

4       THE COURT:  -- and that's the data.

5       MR. WOO:  That's the data.

6       THE COURT:  All right.  And the condition or load is

7   when it happens?

8       MR. WOO:  The condition or load is the control signal

9   that allows the data to control the window.  So if I -- if I

10  may, all right --

11      THE COURT:  All right.  When it can operate?

12      MR. WOO:  When it can operate, right.  So if I have

13  the condition off means the windows are locked.  If my kids

14  play with the window button, nothing goes through to the

15  outside or certainly the other end.  That's Q.

16      THE COURT:  Okay.

17      MR. WOO:  Q is sort of the end result, does the window

18  go up or down.  So if the window lock is on, data will not

19  operate to make the window go up and down.

20      THE COURT:  Okay.  So the difference is, one is the

21  function and the other is what allows it or doesn't allow it to

22  operate?

23      MR. WOO:  Right, the control.

24      THE COURT:  Okay.  I'll just make a note.

25      MR. WOO:  One is control, right, and the other is sort

**CLAIMS CONSTRUCTION**

1  of the input data function.

2          **THE COURT:**  "Data" is the function.

3          **MR. WOO:**  It's the end signal.

4          **THE COURT:**  The signal.

5          **MR. WOO:**  Exactly.  You had asked whether they're both

6  input signals.  I think technically they are; but I think in

7  the industry, you often distinguish between data as one type of

8  signal and control as another type of signal.  So I would say

9  the condition is a control signal, and data is an input signal,

10 and then Q is the output signal.

11         **THE COURT:**  Okay.  So you're really not trying to

12 construe the term at all.

13         **MR. WOO:**  I'm not trying to construe "data" and "load"

14 per se.  I'm just making -- what we would say is that, if we

15 move on to the next slide, that our construction, because they

16 are used differently, "data function" is one type of hardware

17 description function, "load function" is another type of

18 hardware description function, they do sort of different

19 purposes during this synthesis process.

20         In order to capture that concept, we use the very terms

21 that are included in the language.  We're not arguing that

22 "data" has to have, like, a particular meaning or "load" has to

23 have a particular meaning.  The fact is that the terms

24 themselves say "data function versus load function."  We make

25 that distinction.

 1      **THE COURT:**  Not really.  I mean, not significantly for

 2  anyone.

 3      **MR. WOO:**  Well, if you would look at theirs, then,

 4  please take a look at Mentor's proposed construction because it

 5  doesn't distinguish at all between "data function" and "load

 6  function."

 7      **THE COURT:**  Well, all that you've said is they're both

 8  functions for specifying the condition under which a variable

 9  is assigned a value.

10      **MR. WOO:**  But one is for "data" and the other one is

11  for "load."

12      **THE COURT:**  Yes, and I think that's patently clear,

13  too, because one says "data function" and one says "load

14  function," but you don't really distinguish in either case

15  between what "load" or "data" is.  And, so, I don't know, maybe

16  you're just having a fight over not much of anything, but let's

17  look here at the defendant's for a moment.

18      You know --

19      **MR. WOO:**  If you think ours is unclear --

20      **THE COURT:**  As long as somebody can ultimately

21  distinguish between "data" and "load," I suppose it's fine, or

22  maybe it doesn't matter.

23      But in each instance you're saying "under which the

24  variable is assigned."  Well, they're saying "assigned a logic

25  one," so that's really the fight here.

1          **MR. WOO:**  That is one difference, yes, Your Honor.

2          **THE COURT:**  So you do not have any value.  You just

3    have a value.

4          **MR. WOO:**  A value.

5          **THE COURT:**  That means it could be zero or one?

6          **MR. WOO:**  It could be zero or one.

7          **THE COURT:**  And I think you may have pointed in the

8    briefing to where somewhere there was an embodiment or an

9    example that had a zero in it?

10         **MR. WOO:**  Exactly, Your Honor, right, and that's our

11   very next slide shows that.

12         **THE COURT:**  All right.  Fine.

13         **MR. WOO:**  So here is an example --

14         **THE COURT:**  I'm jumping ahead.

15         **MR. WOO:**  -- of a synchronous data function, and you

16   see that the variable V is assigned to constant logic zero

17   value.  So that's contrary to Mentor's proposal because it

18   would have the data option be limited only to logic one.

19         **THE COURT:**  Well, it's a signal and do you have a

20   signal that doesn't do anything or doesn't signal?  I don't

21   know, maybe I'm getting too -- anyway.

22       Okay.  All right.  Anything else you wanted to say about

23   that particular point?

24         **MR. WOO:**  No, Your Honor.

25         **THE COURT:**  Okay.  Now did we get through all those

**CLAIMS CONSTRUCTION**

1    terms?

2         **MR. WOO:**  We did.

3         **THE COURT:**  Okay.

4         **MR. WOO:**  And the only term that's left, if this

5    brings any relief to you, is the "flow-through latch/

6    level-sensitive latch."

7         **THE COURT:**  We have to get back to that afterwards.

8         **MR. WOO:**  Okay.  All right.

9         **THE COURT:**  I'm going to keep that as a separate --

10        **MR. WOO:**  Okay.

11        **THE COURT:**  -- because the way the dispute was teed

12   up, it really seemed to me at the time to be over whether there

13   was a disagreement as to literally taking "level-sensitive"

14   versus "flow-through" and now it sounds like everybody agrees

15   that it was intended to be "flow-through" for all three times

16   in that passage that it was used; but that now it sounds like

17   there's a disagreement as to what "flow-through" means in the

18   context of that claim.

19       And I'm not sure if there's an ordinary meaning for

20   "flow-through" and now somebody wants to bring up a different

21   meaning because of how it's used or what, and I don't want to

22   talk about that yet because it doesn't seem to me that this was

23   really quite described the way I thought it was going to be

24   described.  So we'll get back to that.

25        **MR. WOO:**  Okay.  Well, I'm done then, Your Honor,

 1    unless you have any further questions for me.

 2              THE COURT:  All right.  Thank you, Mr. Woo.

 3              MR. WOO:  Thank you.

 4              THE COURT:  Then we'll go back here and, I don't know,

 5    wherever you want to start is fine.

 6              MR. VANDENBERG:  Just one second, Your Honor.

 7                        (Pause in proceedings.)

 8              MR. VANDENBERG:  Your Honor, I'd like to address

 9    "synchronous," and then "data function," and then "assignment

10    condition" in that order if I may.

11              THE COURT:  Okay.

12              MR. VANDENBERG:  And I think going across all of

13    those, our position is that the patent specification really

14    defines the terms and we would like to use that definition.

15    With "assignment condition" we feel it is also something in the

16    prosecution history that's helpful.

17              THE COURT:  Okay.

18              MR. VANDENBERG:  And our position would be it's

19    important to actually define the terms and tell the jury what

20    these terms mean the best we can.

21         So starting with Slide 47, this is the plaintiff's

22    proposed construction of "synchronous," and our position is

23    that "triggered by timing signal" is too broad.  The timing

24    signal is too broad.

25         And turning to the patent specification, we submit it's

**CLAIMS CONSTRUCTION**

1  quite clear.  It talks about "synchronous" and then it says

2  "HDF," that's hardware description function.  So:  (reading)

3          "'Synchronous' applies to assignments made to

4      variables only on clock edges.  'Asynchronous' apply to

5      all other assignments."

6      So referring back to the tutorial that you heard, there

7  was explained what it means when a clock edge, a variable, is

8  assigned a value on a clock edge.  And that's basically when

9  the variable in a flip-flop, in an edge-controlled flip-flop or

10  edge-sensitive flip-flop, the output value does not change

11  until the next time that the clock goes from zero to one.

12      And Dr. Sarrafzadeh explained that that is called a

13  positive edge, and that that's one way you're able to

14  synchronize, you know, tens or hundreds of elements, circuit

15  elements, at the same time, is that they do not update their

16  value until the next rising clock edge.

17      Your Honor had asked a question of plaintiff's counsel

18  about the difference between "clock" and "clock edge," and

19  essentially a clock creates the entire clock signal where

20  you're at zero, you go up to one, then you go down to zero, the

21  periodic signal.

22      The clock edge is one feature of that clock signal that is

23  created by the clock; namely, the clock edge is when the bell

24  goes off at the end of the class and everyone rises and goes

25  out of the classroom, the clock edge is that instant where the

1   clock signal goes from zero to one.

2        And what this patent is saying, it's saying you have two

3   classes of hardware description functions.  Some are

4   synchronous, some are asynchronous.  The synchronous ones are

5   the ones where a variable's value is updated on a clock edge.

6   Everything else it considers asynchronous.

7        The patent says that in the portion we cite here, and in

8   our brief we point to two other statements where they make the

9   exact same point that's tying synchronous to clock edge.  Never

10  in this patent do they define "synchronous" with relation to

11  the broad term "timing signal."

12       Every single time they define it, they say it is when --

13  hardware description function is synchronous if the value is

14  updated, the variable's value is updated on a clock edge.

15       And we don't say "positive clock edge" because the patent

16  has a segment that says, although in their examples they use "a

17  positive clock edge," they say it could be a "falling clock

18  edge."  So we're not trying to narrow it to "positive clock

19  edge."  We're simply following exactly what this patent says

20  here.

21       Dr. Thomas, their expert, agreed that these were true

22  statements, the statements we're relying on were true

23  statements a person of skill in the art would consider and they

24  were not contradicted elsewhere.

25       So the experts are in agreement that a person of skill in

1    the art looking at this patent would agree that a

2    synchronous -- well, that's overstated.

3        The persons -- the experts are in agreement that persons

4    of skill in the art would understand this statement to be true

5    and not contradicted elsewhere.

6        **THE COURT:**  Where you have this language, for example,

7    in Column 16, is this just describing, though, one of their

8    embodiments where that's where it happens?

9        **MR. VANDENBERG:**  Well, it is -- we concede that

10   Column 16 that we're quoting is certainly in the section of the

11   patent that's called "Detailed Description of the Embodiments,"

12   more specifically, "Detailed Description," beginning at

13   Column 9; however, it is defining the term for the purpose of

14   the entire patent.

15       It's not saying -- Your Honor will recall I mentioned they

16   have 23 examples.  They didn't say, "Oh, for Examples 1

17   through 5, this is the definition."  They define this globally

18   for the entire patents.  And as Dr. Thomas said, there was

19   certainly nothing inconsistent with this definition.

20       **THE COURT:**  What other kinds of timing signals or

21   devices would there be?

22       **MR. VANDENBERG:**  Well, the parties seem to agree there

23   are timing signals that go beyond clock edges.  One or both of

24   the experts in the papers refer to strobe signals; and I can't

25   go beyond the record on that, but the parties seem to agree

 1  there are timing signals.  And our position, again, is to

 2  follow what the patent says.

 3      Now, in our construction we said "occurring on a clock

 4  edge."  We've discussed with Synopsys that we're also fine with

 5  saying "triggered by a clock edge."  "Trigger" is a good

 6  technical term, so we came closer but we didn't bridge the gap

 7  between "clock edge" and "timing signal."

 8      So whether it's occurring on a clock edge or triggered by

 9  a clock edge, we think that is the most fair construction in

10  view of the specification and Dr. Thomas' admissions.

11          THE COURT:  If you had one of these other type signals

12  instead of a clock edge, how would that work?

13          MR. VANDENBERG:  That would be -- the patent would

14  refer to that as asynchronous and rather clearly so.

15          THE COURT:  Asynchronous?

16          MR. VANDENBERG:  Asynchronous because it says here,

17  "Synchronous made to variables only on clock edges;

18  asynchronous all other assignments."  So that's pretty clearly

19  dividing the world into two groups.

20      If the value -- and there's certainly technical reasons

21  for them doing this.  A flip-flop, which this patent refers --

22  if Your Honor were to search through the patents for the word

23  "edge sensitive" or for "flip-flop," one would see multiple

24  instances where they talk about an edge-sensitive flip-flop.

25          And the flip-flop, as was discussed in the tutorial, is

1  edge sensitive because its value updates on the edge of a

2  clock.

3      So this was not just, you know, willy-nilly saying

4  "synchronous" -- "a synchronous hardware description function

5  is only on clock edges" because it makes sense to divide these

6  functions into synchronous and asynchronous because if it's

7  synchronous, then you know, oh, a flip-flop may come into play.

8  Because if it's synchronous you know it's a clock edge updated

9  value, that suggests a flip-flop.  If it's something other than

10  that, then it probably doesn't suggest a flip-flop.

11      So this definition that they chose was not by random.  It

12  complies with basic logic design that a flip-flop is clock edge

13  sensitive; therefore, synchronous hardware description function

14  was clock edge sensitive.

15      If I may turn to "data" and "load" functions.

16          THE COURT:  Sure.

17          MR. VANDENBERG:  Okay.  So, again, Mentor's position

18  is to follow what the patent says on this.

19      This is plaintiff's construction; and as the discussion

20  earlier perhaps alluded to, their construction simply repeats

21  the words "for data," "for load."  It doesn't explain what they

22  mean and we think it's contrary to the express definitions

23  again.

24      So Slide 53, we're quoting from the patent, also

25  Column 16, and the patent says that a load function is when

**CLAIMS CONSTRUCTION**

1    it's assigned any value, a variable is assigned any value.  A

2    data function is when assigned the value one.  And we'll show

3    an example of that, how that works in this patent.

4         Another way -- and this is confusing, to say the least;

5    but when it says, "The load function tells the condition under

6    which a variable has been asynchronously assigned any value,"

7    what it really means is a load function says when a variable is

8    assigned a value.  It doesn't -- the load function doesn't care

9    what value.  It's really when.  When is this variable going to

10   be updated with a value?  That's what the load function is.

11   When are we going to load a value into this?  When are we going

12   to update value?

13        The data function is completely different.  The data

14   function wants to know when, under what conditions, will that

15   value be true, under what conditions will the car door

16   indicator be open, under what conditions will that variable get

17   the data value of one indicating true.

18        So they're very different.  Load is when something will be

19   updated, but it doesn't care about what the value is.  It could

20   be zero.  It could be one.  It could be don't care.  It could

21   be high impedance.  It could be anything.

22        The data function is very specific.  It's when the

23   condition -- condition under which a variable has been

24   asynchronously assigned the value of one.  And, as usual, we

25   got Dr. Thomas to agree that this statement was true and not

1  contradicted elsewhere.  I'll get to that in a second.

2      This is another example on Slide 54 where the patent makes

3  the same exact point.  Load, any value; data, value one.  In

4  our brief on page 13, we cite to three other statements saying

5  the exact same thing from the patent specification.

6      They cite to one paragraph, and we wouldn't normally have,

7  you know, such a long amount of text on one slide, but this is

8  the paragraph they cited to; and I would simply say that in our

9  brief, we explain why this paragraph supports us, not them.

10  And we could go through it, but it doesn't seem like a good use

11  of time.

12      Big picture is this, again, says that a data function,

13  which here is SD, so S synchronous data function is logic one

14  value.  It then explains that in order to figure out the

15  conditions that go into this, to figure out when a logic one is

16  applied, you have to sometimes do a lot of math.  Some of the

17  math includes logic and, et cetera, but the end result is

18  you're evaluating the logic OR function.  You are evaluating

19  all the conditions under which the variable gets the assigned

20  value one.

21      So we discussed that in our brief.  We submit that

22  paragraph is completely consistent.

23      So if I may just sort of go through the difference

24  between -- it may be easier if Your Honor had the patents --

25  paper patent in front of you to follow this, but it's Tables 3

1    and 4 are from Columns 18 -- Table 3 is in Column 18 toward the

2    bottom, and that's a user description; and then Table 4 is the

3    corresponding matrix of assignment conditions.

4            **THE COURT:**  Yeah.  I have it here.

5            **MR. VANDENBERG:**  Okay.  So what I want to demonstrate

6    here is why -- how the patent determined that -- how the patent

7    determined that the load condition -- let me back up.

8        I'm only going to be talking about the variable P.  So P

9    appears in the user description.  It appears in the first row

10   of the assignment condition matrix.

11       This AL is the asynchronous load.  Next to it is

12   asynchronous data.  The value of the assignment condition for

13   variable P for the assignment load -- the load function, sorry,

14   is one.  The data function is condition one.  So for the time

15   being we just note that they're different.

16       So why are they different?  Going up to the user

17   description, we see in this user description it says, "If

18   condition one is true," and let's say condition one means the

19   left door is open, "If condition one is true, a variable P

20   equals one."  So P is assigned the value one only when

21   condition one is true.

22       All right.  Well, as we defined and as the patent defines

23   "data function," data function is when a variable is assigned

24   the value one; and, therefore, one would expect and one would

25   find that the data function here is condition one.  That's

1    because that's the only time P gets the value one.

2       But we see P is always assigned to some value because if

3    condition one is true, P gets one.  If it's not true, P gets

4    zero.  So the car door is either open or it's not and,

5    therefore, P will get some value always; and because it gets

6    some value always, the load function is true, meaning P will

7    always get some value.

8       One would never have any idea of this difference if one

9    had the other side's claim construction.  Our claim

10   construction follows that idea.  I'll just jump ahead.

11      Our claim construction says, as does the patent, that the

12   data function is specifying the conditions under which the

13   variable is assigned a logic one.  Load function is when it's

14   assigned a value.

15      By "a value" we mean any value, we mean some value, we

16   mean when it's assigned a value.  We're not sure the best way

17   of phrasing that concept.  The concept is very clear in the

18   patent.  We think this is a good way; but if the Court thought

19   that "any value" made sense there or "some value," the point is

20   that load function is when some value is assigned.  Data

21   function is when logic one is assigned.

22      And, again, I mentioned Dr. Thomas agreed with us on this.

23   He agreed that this language we quote is true, a person of

24   skill in the art would consider it, and it's not contradicted

25   elsewhere.

1          **THE COURT:**  Okay.  So you're distinguishing between

2     the two terms, "data function" and "load function," by the

3     values they can be assigned --

4          **MR. VANDENBERG:**  Yes.

5          **THE COURT:**  -- as opposed to what they do generally

6     or -- in other words, do you -- well, do you agree with Mr. Woo

7     that data is some kind of signal?  Data function, is that a

8     signal?

9          **MR. VANDENBERG:**  I wouldn't put it that way.  A data

10    function is describing really what happens to a variable, and

11    the data function is -- it's really -- it's describing Boolean

12    algebra in a way.  It's describing when values are assigned,

13    but specifically the data function in this patent specifies

14    when it gets a logic one.

15         **THE COURT:**  Okay.  But ordinarily it wouldn't

16    necessarily have to be assigned to one; it's only that you say

17    this patent says it has to be assigned to one?

18         **MR. VANDENBERG:**  Right.  Ordinarily you would choose,

19    you know, zero or one, for instance, and specify in your

20    protocol, or whatever your specification, you would specify,

21    "Okay.  Here a data function is going to be zero"; or, "Here a

22    data function is going to be one."  And here they define "data

23    function" -- I mean, "data function" being one.

24         And our expert declaration described that.  In his

25    declaration he said, "'Data function' ordinary meaning."  He

 1   explained what data was; and then he said, "Okay.  But in this

 2   patent they defined it clearly, and for good reason, and that's

 3   what it means and it's consistent."  And, again, the expert,

 4   Dr. Thomas, agreed with that.

 5        So generally -- you know, I guess our position generally

 6   here is, you know, again words matter.  They chose their words

 7   carefully in the specification and in the claim, and it's too

 8   late to erase them or change them.  If you say "load function"

 9   and "data function" are that different, you're not entitled to

10   a claim construction that conflates the two.  That's our bottom

11   line.

12        **THE COURT:**  Okay.  All right.  So I understand where

13   you're coming from, then, with that because in some of these

14   instances, you know, I'm not sure whether something can be a

15   particular way; and then the argument is, "But they decided not

16   to do it that way," or whether it simply can't work in a

17   particular way.  And then if something can't ever be a

18   particular way, then I guess nobody would be worrying about

19   infringement because it couldn't happen that way anyway.

20        All right.  Okay.  So --

21        **MR. VANDENBERG:**  I could move on to "assignment

22   condition."

23        **THE COURT:**  Yes, we could.  And, you know, when I was

24   asking about that particular part that you pointed out that had

25   the user, I guess that was the "predetermined" part, I think I

**CLAIMS CONSTRUCTION**

1  found where that was.  I think it was Column 15.

2      So if plaintiff wants to look at that for a moment, it

3  looks like it's lines 26 to about 28.  Oh, no.  Wait.  Forget

4  it.  That's not where it is.  No.  No.  No, that's the clock

5  edge part.

6      Okay.  Forget that.  All right.  Sorry.

7      **MR. VANDENBERG:**  On "predetermined" -- well,

8  "assignment condition" our position is, again, we're following

9  what the patent says but amended or amplified by the

10  prosecution history.

11      "Predetermined," we're not sure what it means, so we'll

12  get to that, but "assignment condition" is much more important.

13      So the dispute really is what portion of the spec defines

14  the term.  Both parties look at one portion of the

15  specification.  We look beyond that.

16      And then the second dispute is:  Should the construction

17  capture the inherent properties that the Gregory applicants

18  cited to the examiner to get the patents allowed?

19      One issue is, this is plaintiff's construction, they say,

20  "The condition under which the hardware description function is

21  true for a particular variable."  One concern we have is that

22  saying "the condition" may be ambiguous.

23      We agree that "assignment condition," there's a single

24  assignment condition for each variable in each hardware

25  description function.  However, that assignment condition may

**CLAIMS CONSTRUCTION**

1   capture and often captures many so-called activation conditions

2   that are all sorts of different conditions that need to be

3   accounted for when you come up with your assignment condition.

4        The way the patent phrases it, the patent says, "The

5   assignment condition may be complex."  This is the

6   specification, the top one that both parties cite to,

7   "Assignment condition is the," which is consistent with their

8   construction, "condition under which the hardware is true for a

9   particular variable."

10       Then the patent says multiple times, "Assignment condition

11  is the logic OR function of all conditions under which

12  variable V was assigned," in this case to logic one because

13  it's a data function.

14       The point is that the assignment condition will only work

15  if it accounts for all the conditions under which a variable is

16  assigned a value.

17       Your Honor asked about the sedan.  Well, if the circuit

18  was set up so that there was a circuit that monitored, you

19  know, four circuits for four doors or four sensors for four

20  doors and you were going to assign a value to door open, you

21  better be sure that you account for all four doors or you're

22  going to take off with the back right door and the groceries on

23  the ground.

24       So that's the assignment condition has to be

25  comprehensive.  You can't just pick one or -- you know, one and

1    ignore other conditions.  That's our clarification.

2        THE COURT:  But in juxtaposing these two portions of

3    the '841, one of them is, I think, pretty clearly definitional

4    and then the other seems to follow in, at this point, an

5    embodiment where they are going on at great length about that

6    particular embodiment, which is, you know, several columns

7    later.

8        So I'm not sure that one can say -- that one can tack

9    together a general definition and then a limitation or at least

10   a limiting description or a different description that's in the

11   embodiment.

12       MR. VANDENBERG:  I understand that concern.  The

13   patent, we cite to three other statements where they say the

14   same thing.  So it's not just one aberration.  I think a total

15   of four times they talk about "assignment condition" and link

16   it to all conditions.

17       And in terms of embodiment, I wouldn't necessarily say

18   they were describing a single embodiment.  They were talking,

19   however, about a specific type of hardware description

20   function.  So here it's an asynchronous data function.

21   Elsewhere they might have made the same point about a

22   synchronous data function.

23       Nowhere did they suggest and plaintiff certainly hasn't

24   cited Your Honor to anywhere in the patent or in the record to

25   suggest that an assignment condition may be incomplete.  That's

 1   our whole point.  The assignment condition needs to be

 2   complete.

 3        So --

 4           THE COURT:  By "complete" you mean then?

 5           MR. VANDENBERG:  I mean that it has to account for all

 6   of the conditions under which the variable is assigned a value.

 7   It has to account for all four doors or else it can't work.

 8        And I don't know that plaintiff necessarily would

 9   disagree.  If plaintiff's -- you know, if plaintiff's, you

10   know, position really is that the assignment condition only

11   really needs to account for some of the conditions under which

12   a hardware description function is true, then I would expect

13   they would point to an example of that in the patent or to some

14   technical reason why that could work.

15        How could it possibly work if the assignment condition did

16   not account for all the conditions under which the variable was

17   assigned?  I guess that would be the -- you know, that would

18   possibly be a question.

19           THE COURT:  Yeah, I might ask that.

20           MR. VANDENBERG:  Now, this -- let me jump ahead.

21        So, again, Dr. Thomas, their expert, we pointed to one of

22   these examples, and he said it was a true statement and a

23   person of skill in the art would have considered it.

24        That's the first part of "assignment condition."

25        The second part is:  How is the assignment condition used?

1   Our proposed construction adds language about how the

2   "assignment condition" is used, and their proposed construction

3   does not.  So that's a second dispute.

4        The patent is consistent that, and this is just

5   Figure 3B -- whoa, I can't keep my buttons straight -- that you

6   have this assignment condition generator, and then those

7   assignment conditions are used to generate hardware.  So that's

8   fairly consistent.  You take the assignment conditions and then

9   you move on to the next step of coming up with the specific

10  hardware elements.

11       Now, this came up in the prosecution history.  The

12  examiner rejected claims.  The applicants said, "Oh, but this

13  prior art doesn't have assignment conditions and there's

14  something very important about -- there's something about the

15  assignment conditions in our patent that you need to consider,

16  Mr. Examiner; and that is," and they pointed to this portion of

17  the specification that says, "Assignment condition is used in

18  the generation of logic network, a hardware generator."

19       And, again, the assignment conditions for that variable

20  are used to generate logic circuit elements.  And obviously we

21  added the underlining there.

22       They went on, they pointed to that, and then they said,

23  and this is the Gregory applicants, they talked about their

24  "specification describes numerous examples of how the

25  assignment conditions are generated and used.  These portions

1    of the specification are important because the inherent

2    properties of the conversion to assignment conditions are

3    described.  In considering the invention, the examiner is

4    required to consider these properties."

5        So they argued how assignment conditions are used; and,

6    more specifically, right above this statement, immediately

7    above, they quoted this part of the spec emphasizing that

8    they're used to generate hardware.  And that is why in our

9    proposed construction we not only say -- we say "a condition

10   used to create or select a hardware element" because that's

11   what they said was an inherent property of assignment

12   conditions.  They argued it to get the claims allowed, so

13   that's why that's in there.

14       The other portion of ours is the logic OR of all the

15   conditions under which the hardware description is true.  That

16   came from the portions of the specification that we cited that,

17   you know, Dr. Thomas agreed with.

18       **THE COURT:**  Well, you know, when you say "agreed," I

19   don't know what you mean by "agreed."  It's not saying he lied

20   in the patent or something.  I'm not sure what -- you know, in

21   other words, this is true, yes, this is what this diagram

22   shows, that's correct, that's true; but I don't know that he's

23   making the argument you're making.

24       **MR. VANDENBERG:**  I certainly don't intend to overstate

25   that he agreed with our ultimate position on claim

 1   construction.

 2          THE COURT:  Right.

 3          MR. VANDENBERG:  But by saying it was a true

 4   statement, and here apparently he didn't say it wasn't

 5   contradicted elsewhere, but if he says it's a true statement

 6   and it talks about assignment condition being all conditions

 7   and that a person would have considered it, that certainly

 8   eliminates some possibilities that somehow this was an

 9   aberration or this only applied, you know, to some embodiment

10   someone wouldn't have considered.  So we think that's of great

11   moment.

12      And in their reply brief --

13          THE COURT:  He's doing an awful lot of admitting

14   according to you.  I'm not sure if he's really conceding quite

15   as much as you would ascribe to him, but maybe.

16          MR. VANDENBERG:  Well, if that were true, one would

17   expect that plaintiff in their reply brief would have mentioned

18   his testimony or would have cross-examined him, and neither

19   happened.  It was rather curious.

20          THE COURT:  Well, maybe they felt they might mess it

21   up if they did.  I don't know.

22          MR. VANDENBERG:  So that was "assignment condition."

23      And then on "predetermined," the portion of the

24   specification we pointed to doesn't expressly say "assignment

25   condition."  It's not entirely clear that they were saying an

 1    assignment condition could be in the user description.  Our

 2    main concern was that just saying "beforehand" was too vague.

 3        In terms of the discussion Your Honor had with plaintiff's

 4    counsel, plaintiff mentioned something about claims for the

 5    synthesizer generates a logic element, something along those

 6    lines.  We would object referring to a synthesizer.  These

 7    claims don't talk about a synthesizer.  But we wouldn't object

 8    to saying "before generating a logic element," something along

 9    those lines.

10        THE COURT:  In other words, the passive tense more.

11        MR. VANDENBERG:  Right, without saying who or what is

12    doing it, just "before generating a logic element."

13        THE COURT:  Or "before the logic element is

14    generated" --

15        MR. VANDENBERG:  Correct.  Right.

16        THE COURT:  -- is what you're trying to get at; right?

17        MR. VANDENBERG:  Yeah.  I mean, it's not clear that

18    there are any assignment conditions that aren't predetermined,

19    so we think it's a rather vague term, but we would not object

20    to construction along those lines.

21        THE COURT:  Okay.

22        MR. VANDENBERG:  If there's nothing else....

23        THE COURT:  Okay.  Hang on one second.

24                    (Pause in proceedings.)

25        THE COURT:  Okay.  All right.  Let me go back to

1    Mr. Woo for a moment.  He's got all of his materials.  He's

2    jumping up and pushing you away from the podium.

3              **MR. WOO:**  Not pushing.

4              **THE COURT:**  No, he really isn't.

5              **MR. WOO:**  I'm just being mindful of our time,

6    Your Honor.

7              **THE COURT:**  So, Mr. Woo, you heard some of the

8    arguments that were made here.  Which ones do you want to

9    address in particular?

10             **MR. WOO:**  I think maybe, if we could, we'll do

11   "assignment condition" first.

12             **THE COURT:**  Okay.

13             **MR. WOO:**  And then I would like to just point out that

14   I think, again -- actually if we can put up our slide, then I

15   can go to the difference between their construction and our

16   construction.

17        So for "assignment condition," again, they're adding the

18   additional limitations of the condition, so they're actually

19   trying to create where there's a singular assignment condition

20   itself in the nature of a signal.

21             **THE COURT:**  Now, you have to slow down a little bit.

22             **MR. WOO:**  Oh, I'm sorry, Your Honor.

23             **THE COURT:**  Because when you're reading, then you tend

24   to just zip through.  Okay.

25             **MR. WOO:**  Okay.  My apologies.

1      THE COURT:  Which is fine if you're just reading

2   boilerplate in a contract or something, but not here.  Okay.

3      MR. WOO:  So the "assignment condition" term itself is

4   singular as you see that.

5      THE COURT:  Yes.

6      MR. WOO:  But they're adding in -- actually the next

7   one; thank you -- what they're adding in "is determining logic

8   OR of all the conditions."  So they're making something plural

9   that otherwise is singular by itself.

10     And, again, our construction comes right out of the

11  specification.  It's the one condition.

12     THE COURT:  Okay.  So if you went back to, you know,

13  not wanting your children to not fall out of your car, he was

14  concerned about groceries but I understand you're concerned

15  about the kids --

16     MR. WOO:  I'm glad you liked my analogy, Your Honor.

17     THE COURT:  Okay.  All right.  So using that example

18  and knowing your car -- I don't know, you've got a sedan or

19  you've got a --

20     MR. WOO:  I have a sedan.

21     THE COURT:  Oh, okay.

22     MR. WOO:  A nice little Honda Civic.

23     THE COURT:  Yeah, okay, four doors.  Now, the

24  inference at least from Mentor Graphics' argument is that you

25  would say for all of the doors that are, I guess, open at the

**CLAIMS CONSTRUCTION**

 1  time the -- well, you had windows.

 2      So, I don't know, at the time the ignition is engaged and

 3  all of the windows then you would want to have locked.  All

 4  right.  And I seem to understand from the defendant that

 5  they're arguing that you just have one condition that says if

 6  all those four doors have to go or all those windows have to be

 7  locked at the same time.  Are you suggesting more that there's

 8  four different conditions, one for each window; or --

 9          MR. WOO:  Well, what I'm -- actually if you look at

10  the passage, Your Honor, that they cite, what Mentor is

11  actually doing is mixing between "assignment condition" and

12  "activation condition" and that Mentor's counsel actually used

13  the term "activation condition."  So that is the -- those are

14  the conditions for which the logic OR is being determined.

15  It's not the singular assignment condition.

16          MS. THAYER:  Can I ask Your Honor that we get that

17  slide up on the board that counsel was referring to?  Because I

18  don't think these remarks -- I think this will be very clear

19  if -- Mentor's juxtaposition.  There were two paragraphs, one

20  that used the claim term and one that had another one.

21          THE COURT:  Do you accept that suggestion, Mr. Woo --

22          MR. WOO:  I accept all of the input from my --

23          THE COURT:  -- the amendment to your presentation?

24  All right.

25          MR. VANDENBERG:  Slide 61 of our set.

1      **THE COURT:**  Okay.  Thank you.

2      **MR. WOO:**  So you see here actually, Your Honor,

3  there's two things.  This is apples and oranges.  So the top

4  you see is actually the express definition from the patent --

5      **THE COURT:**  Yes.

6      **MR. WOO:**  -- for "assignment condition."

7      What you see on the bottom passage then is a discussion

8  about the "assignment condition" is apples and oranges because

9  that is not an express definition of "assignment condition."

10  What that is saying is it's in reference to all conditions

11  where all conditions are the activation conditions.

12      So now we're talking apples, "assignment conditions," and

13  they're mixing in the concept of oranges, "activation

14  conditions," "all activation conditions."

15      **THE COURT:**  Where are you getting the "activation"

16  inserted into that?

17      **MR. WOO:**  Well, actually, if you look -- they're

18  citing, Your Honor, Column 18 of the patent, lines 23 through

19  26.

20      **THE COURT:**  Okay.

21      **MR. WOO:**  If you read further, immediately after the

22  sentence that they actually start with here but goes on to say

23  in the patent itself:  (reading)

24          "Notice that in contrast to the definition of

25      'assignment conditions,' the assignment condition AD is

**CLAIMS CONSTRUCTION**

1     not limited to just activation conditions."

2     And, so, now there's a distinction between "assignment

3  conditions" and "activation conditions."

4       **THE COURT:**  Okay.  I'm trying to find it.  What lines

5  are those?

6       **MR. WOO:**  I'm sorry.  Those are Column 18, line 23

7  through --

8       **THE COURT:**  Oh, okay.  This is above --

9       **MR. WOO:**  -- 25, I believe.

10     **THE COURT:**  All right.  It comes before.

11     **MR. WOO:**  And then it continues within that same

12  passage.  It explains a little bit more about what an

13  activation condition is, which is different from an assignment

14  condition.

15     **THE COURT:**  Okay.  All right.  What's the next one?

16     **MR. WOO:**  So the next point I'd like to take on is

17  with respect to the "load function" and the "data function" --

18     **THE COURT:**  Right.

19     **MR. WOO:**  -- term.

20     If we can switch back to -- actually, I would refer

21  Your Honor to the very table that they were reciting in

22  describing that.  It's Table 4 from the patent.

23     I think what they were using in Table 4 in the patent you

24  can find in Column 19 of the patent around line 30.  They gave

25  an example of a variable for data in discussion of the data

1 function.

2      They said that the variable P must be assigned a logic

3 one; and if you actually look at the table itself, Table 4, you

4 see that the variable P under the very table says that it can

5 have a value of COND 1 not one per se.  So COND 1 is actually

6 something else.  It's a little bit different.  So it's not the

7 variable one variable -- I'm sorry, not the value of logic one,

8 because otherwise it would say "P equals one."  In this case P

9 does not equal one.

10      **THE COURT:**  Okay.

11      **MR. WOO:**  And those are the two points I have unless

12 you have any other questions for me, Your Honor.

13      **THE COURT:**  Well, just to ask you, I know that -- I

14 don't know if you would do this thing or Ms. Thayer; but she

15 had originally said you would rely on your briefs for the

16 question of time devices, whether they have to be clock edges

17 or not.  Apparently there's at least something called a

18 "strobe."

19      All right.  Would that work with this method if you had a

20 strobe?

21      **MR. WOO:**  Yes, Your Honor, I believe it would work

22 with this patent.

23      **THE COURT:**  Okay.  So, all right, well, we may have

24 covered the lay of the land here.

25      **MR. WOO:**  I think we did, Your Honor.

**CLAIMS CONSTRUCTION**

1          **THE COURT:**  Okay.  Are you trying for another 60

2  seconds?  Because last time you were --

3          **MR. VANDENBERG:**  That didn't work too well.

4          **THE COURT:**  No, it didn't work well.

5          **MR. VANDENBERG:**  I was hoping to keep it open-ended

6  but really brief, just limited points here.

7          **THE COURT:**  Well, I don't want to go back and forth

8  six times, you know, so then we get the surreply, sur-surreply,

9  et cetera, et cetera.

10    Give me a heads-up here.  Which terms did you want to

11  address?  The last person to say something isn't necessarily

12  going to win the point.  I just want to make that clear, too.

13         **MR. VANDENBERG:**  Well, I just wanted to -- on

14  "assignment condition" then.  If I had to choose one, I would

15  just -- if I may just from the table here invite the Court's

16  attention to a particular portion of the patent that I won't

17  argue about.

18         **THE COURT:**  Okay.  Which portion is it?

19         **MR. VANDENBERG:**  It would be Tables 13 and 17 and the

20  multiple conditions.  Well, so Tables 13 and 17 speak to the

21  issue of whether or not an assignment condition needs to

22  account for multiple conditions.

23    And then in terms of Table 4 on "data function," I believe

24  counsel perhaps misunderstood my argument.  The data function

25  is the condition under which the variable is assigned the value

 1    one.  So, of course, the data function says condition one

 2    because that is the condition under which variable P was

 3    assigned the value one.  And I would submit that no expert in

 4    the land would read it differently, Your Honor.

 5          **THE COURT:**  Okay.  Well, all right.

 6          Now, again, my question would be the same in each of

 7    these, and it's pretty much the heart of the argument on many

 8    of these terms, whether at any given point the applicant is

 9    simply describing a particular embodiment or whether they are

10    endeavoring to make a general statement.  And with one

11    exception your arguments in that regard have been pretty much

12    constant, the one exception being in that first part of the

13    '420.

14          **MS. THAYER:**  Memory unit, Your Honor.

15          **THE COURT:**  Yes, that's the one place.

16          Okay.  So, well, there's a lot for me to deal with.

17          I think you can sit down.  That's okay, Mr. Woo.

18          **MR. WOO:**  Would you like to cover "flow-through latch"

19    today or shall we wait?

20          **THE COURT:**  Would I what?

21          **MR. WOO:**  Would you like to cover "flow-through latch"

22    and "level-sensitive latch" today or -- okay.

23          **THE COURT:**  I think we've covered about as much as we

24    can cover today.  Thank you very much.

25          **MR. WOO:**  Thank you, Your Honor.

**CLAIMS CONSTRUCTION**

1    **THE COURT:**  But, you know, for someone who does not

2    deal in this technology routinely or maybe ever, it's a lot to

3    absorb at one time; and also it's hard to tell -- I don't think

4    anybody here is making a preposterous argument.  There may be

5    times where somebody actually makes an argument that simply, if

6    you followed it, that nothing would work right; and I don't

7    think anybody is doing that here, because otherwise people

8    would point it out.

9        But in each instance the argument is in great part, "Yes,

10   maybe you could do it this way but they have made it clear

11   either through their specification or the prosecution history

12   that they weren't trying to do it that way; and that in order

13   to get this patent, they had to be very specific."

14       And I think that's what I really have to look at, to see

15   whether they did bind themselves, the applicants here, or

16   whether they left themselves enough breathing room to cover

17   other ways of doing something that might not be as useful but,

18   I don't know, maybe the defendant is using nonetheless.  And,

19   so, that's what I want to look into more carefully now that I

20   see where you're coming from here.

21       I can't promise you when I will get an order out; but in

22   an effort to get it out more quickly than otherwise, I may

23   indicate in the order if I'm accepting a particular

24   construction, that I'm doing it for the reasons that are

25   expressed by the party who sought that construction, whether

1    it's the Mentor Graphics or Synopsys.

2        And if I'm coming up with something that's modified, then

3    I will try and explain why I modified it.  And I'm cognizant of

4    the fact that if I try to strike out and modify something on my

5    own, that I may end up in uncharted waters that I don't foresee

6    the hazards lurking.  So I will endeavor not to do that unless

7    there was some guidance along the way here in the presentations

8    that suggested a particular type of modification if the Court

9    was bound and determined to go in a particular direction would

10   be okay.

11       I don't know if there's anything else I can do right now.

12   We certainly exceeded our estimates on time, but it is

13   important that we cover everything.  And you may have thought

14   that you could get through faster because somebody would

15   understand it faster, and I believe you've been disabused of

16   that preconception if you held it.

17       So thank you all for your assistance today.  The matter

18   stands under submission.

19           **MR. WOO:**  Your Honor --

20           **MR. VANDENBERG:**  Thank you, Your Honor.

21           **MR. WOO:**  Thank you.

22       Actually, we have one other thing.  I know that we covered

23   a lot of territory today, but we do have copies of the

24   presentation in electronic form if you would like it.

25           **THE COURT:**  Well, if you'd like to hand those to the

CLAIMS CONSTRUCTION

```
 1    clerk, that's fine.  Have you seen those?
 2           MR. WOO:  We're prepared to give a copy.  It's exactly
 3    the same presentations.
 4           THE COURT:  If you take a look at it and for any
 5    reason, say, it's got things that are new, let --
 6           MR. VANDENBERG:  We don't expect that.
 7           THE COURT:  Okay.  Because then you could let me know.
 8    All right.  Otherwise I'm going to take them at their word it's
 9    just another modality for presenting the material.
10       Okay.  Why don't you go ahead and hand that up, then, to
11    the clerk.
12           MS. THAYER:  We also will confer and provide you with
13    that glossary of the acronyms.
14           THE COURT:  Yes.  If you can see your way clear to
15    agree on standardized terms and what they mean, I think that
16    would be helpful because I think many times you dealing in
17    these fields take certain things for granted and just say,
18    "Okay, everybody knows."  Well, maybe everybody out there
19    knows, but I may not.  So, okay.
20       All right.  Then thanks again.  We're in recess.  Thank
21    you.
22           ALL:  Thank you, Your Honor.
23                   (Proceedings adjourned at 3:47 p.m.)
24                        -- oOo --
25
```

1
2                    **CERTIFICATE OF REPORTER**

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6     DATE:   Monday, November 4, 2013

7

8

9

10     _____

11            Jo Ann Bryce, CSR No. 3321, RMR, CRR
                   U.S. Court Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25